SUSAN WILSON,                   )
as Administrator of the     )
Estate of MATTHEW BRIAN WILSON,   )
                            )
          Plaintiff,     )
                            )
         v.            )        1:24cv219
                            )
DAVIDSON COUNTY           )
SHERIFF'S OFFICE, et al.,     )
                            )
         Defendants.    )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Plaintiff's Motion for Partial Summary Judgment" (Docket Entry 56) (the "Motion"). For the reasons that follow, the Court should grant in part and deny in part the Motion.

## BACKGROUND

Alleging various claims related to "the wrongful death of Matthew Wilson [('Wilson')] as a result of injuries sustained at the Davidson County Jail" (Docket Entry 9 at 1),[1] Susan Wilson (the "Plaintiff"), Wilson's mother and the administrator of his estate (see id.), sued (i) Davidson County, Sheriff Richie T. Simmons, Officer Logan Peters (collectively, the "Remaining Defendants"), and Officer Jonathan Lambeth; (ii) IMS Correctional Healthcare, LLC

_____

1 Docket Entry page citations utilize the CM/ECF footer's pagination.

("IMS"), Celia Entwistle, MD, and Michelle Madden, LPN (collectively, the "Medical Defendants"); and (iii) Correctional Behavioral Health, PLLC ("CBH"). (See id. at 1-30.) The parties thereafter stipulated to CBH's dismissal without prejudice from this lawsuit. (See Docket Entry 27 at 1.) The remaining parties engaged in discovery (see, e.g., Text Order dated Apr. 23, 2025 (granting request to extend discovery deadline to September 16, 2025)), after which Plaintiff filed the Motion (see Docket Entry 56 at 5).

The Motion asks the Court to "hold[] as a matter of law" (id. at 1):

> (1) that [Wilson] suffered a serious medical need, satisfying the objective prong of the deliberate indifference test established by *Farmer v. Brennan*, 511 U.S. 825 (1994); (2) that Defendant IMS maintained a policy or custom that was deliberately indifferent to [Wilson's] serious medical need; and (3) that Defendant Lambeth was deliberately indifferent to [Wilson's] serious medical need.

(Docket Entry 56 at 1 (parallel citation omitted).) Medical Defendants and Officer Lambeth responded in (partial) opposition to Plaintiff's Motion. (See Docket Entries 88, 89.) Remaining Defendants did not respond to the Motion. (See Docket Entries dated Sept. 18, 2025, to Nov. 3, 2025.)

As relevant to the Motion, the record reflects:

## I. Relevant Policies and Procedures

IMS provides health care services at the Davidson County Jail (the "Jail" or "Detention Center") pursuant to a contract dated

2

September 1, 2021, with Davidson County. (See Docket Entry 60-7 (the "Contract") at 1.) Per the Contract:

IMS bears "responsib[ility] for providing adequate medical staff to operate a sick call clinic at the Jail." (Id.) "The detention staff will have no medical duties." (Id.) "Non-emergency cases will be seen at the Jail." (Id.) "In the event [IMS] determines that emergency services are needed, problems may be handled by a visit to the Jail or referral to the Emergency Department of Wake Forest Baptist Health - Lexington Medical Center or any other local hospital network with emergency room services." (Id.) "[The] Jail will be responsible for transportation. [IMS] will review all non-emergency cases involving 'High Risk Transports' at the Jail prior to transporting." (Id.) "[IMS] will work with [CBH] for the exclusive provision of Mental and Behavioral Healthcare Services." (Id. at 7.) "CBH is an independent company from [IMS] and is qualified to provide mental and behavioral healthcare services in support of the overall inmate healthcare at Davidson County." (Id.)

Under the provided excerpts of the "Davidson County Sheriff's Department Detention Center Medical Plan" (Docket Entry 60-6 (the "Medical Plan") at 1 (all-cap font omitted)):

"When [a] potential[ly] suicidal inmate is identified, it will be documented on the detention center card and on the booking card so when [such] inmate is taken to court, etc., they will continue

3

to be under close observation." (<u>Id.</u> at 3.) "Notify Dr. Detention Center physician [sic] for assessment and if Mental Health should be contacted. Emergency room treatment will be used if Mental Health does not respond." (<u>Id.</u>) "Any member of the detention staff who receives a notification . . . that a certain individual is a risk for suicide should follow Procedure B above." (<u>Id.</u>)[2] "Any inmate who is under close observation due to suicide risk shall have the following items removed for safety reasons: a. Anything that could be used to harm themselves. b. Matches and any flammable materials. c. All sharp objects." (<u>Id.</u>) "If Detention Center medical personnel determines an inmate is at great risk of harm to self, the shift supervisor, under advisement of the facility physician, will judge whether adequate precautions can be taken within the Detention Center to protect the inmate." (<u>Id.</u>) "If inmate safety can not [sic] be managed, arrangements should be made to transfer inmate to 'safe keeping.'" (<u>Id.</u>)

The "Policy" regarding "Suicide Attempts" specified:

> An actual attempted suicide by an inmate constitutes a situation that the facility is not prepared to treat. An inmate who attempts suicide will be processed out of the facility as soon as possible following procedures outlined below, to []an institution that is better prepared to treat that inmate's mental or physical condition.

(<u>Id.</u> (all-cap font omitted).)

---

2 The referenced Procedure B does not appear in the provided excerpts. (<u>See</u> <u>id.</u> at 1-4.)

4

In turn, the "Procedure" for such attempts (id. (all-cap font omitted); see id. ("This procedure describes the actions to be taken by detention personnel when a prisoner/inmate makes a suicide attempt.")) specifies:

A. Medical Care

1. Upon discovering a prisoner who has made a suicide attempt, detention personnel shall immediately render whatever first-aid necessary [sic] and shall immediately summon EMS personnel to evaluate the inmate's need for further medical care and contact Facility [sic] physician. If it is determined that further medical care is necessary, arrangements shall be made for transport of [the] inmate to the emergency room.

2. As soon as an inmate's requirements for immediate life preserving medical care are satisfied and he is put under close observation, detention personnel shall take immediate steps to relate the inmate's evaluation to the facility physician.

B. Pre-Trial Detainee

1. If the inmate attempts suicide while awaiting trial, he should be evaluated by the facility physician to see if he should be transferred to Central Prison for "safe-keeping".

2. If the person is being held on a misdemeanor and under a low bond, an Involuntary Commitment to the hospital may be appropriate once bond [sic] has been satisfied and shall be carried out through the normal Involuntary Commitment process. In cases of persons charged with felonies or under high bonds, transfer under a safe-keeping order to Department of Corrections.

*****

D. Transportation

When [a] court order is obtained ordering transfer of a person who has attempted suicide to the hospital of [sic] the Department of Corrections facility, the Chief Detention Center officer or his designee shall call the

5

> Department of Corrections and make admission
> arrangements. The inmate shall be transported as soon as
> all arrangements are complete from the detention facility
> to the hospital or Department of Corrections.

(Id. at 3-4 (underscoring in original).)

In turn, IMS maintained, inter alia, a "Suicide Prevention Program," with the stated purpose of preventing suicides "when possible by implementing prevention efforts and intervention." (Docket Entry 60-9 (at times, the "IMS Policy") at 2 (bold font omitted).)[3] Under this program, IMS's "policy is that the medical staff will be trained to recognize inmate suicidal behavioral signs. Any inmate who has been identified as acutely (actively) suicidal, or considered high risk of suicide behavior, will be immediately placed on suicide watch." (Id.) "The medical staff will refer the inmate for appropriate mental health assessment on the next available session." (Id.) Relevant procedures include:

> Th[e suicide prevention] program will begin upon intake
> of an inmate if there is the recognition of suicidal
> behaviors. All correctional and medical staff are
> responsible for monitoring the mental status of inmates.
>
> Inmates who are identified as having suicidal tendencies
> will be evaluated and relayed to the medical provider in
> a timely manner by qualified medical personnel or

---

3 The submitted version of IMS's "Clinical Policies and Procedures" bears a revision date of March 2023. (Id. at 1 (bold font omitted).) However, the parties do not dispute that the provided excerpts remained in force during Wilson's incarceration. (See, e.g., Docket Entry 60 at 5 ("Pursuant to IMS's own written Clinical Policies and Procedures in place and applicable to the Jail during the relevant period . . . ." (citing Docket Entry 60-9)); Docket Entry 88 at 12 (discussing Suicide Prevention Program and citing Docket Entry 60-9).)

6

qualified mental health professional. . . . Actively suicidal inmates will be assigned to strict suicide watch which means they are closely observed at least four times an hour by correctional staff. These monitoring rounds must be documented along with inmate's behaviors. . . . Communication is important between correctional staff and medical staff. Training on recognizing signs and symptoms of mental health crisis and suicidal ideation will be conducted and reviewed as needed.

\*\*\*\*\*

All suicide attempts are treated as medical emergencies and medical staff is to respond immediately. The Responsible Health Authority will ensure a debriefing is done with all involved. . . .

(Id. (bullet point markings omitted).)

Under IMS's "Emergency Services" provisions, IMS's "policy is that all inmates have access to 24-hour emergency care including medical, dental, and mental health." (Id. at 3 (stray space and bold font omitted).) To that end, "[m]edical staff and correctional staff are trained to respond to medical emergencies" and "[a]n on-call provider is available 24/7 for emergency consultations." (Id.) "The decision for evaluation is made by the on-duty medical staff. If time permits[,] the Medical Director or on-call provider is to be consulted prior to hospital transfer of [the] inmate but is not necessary during acute emergencies. Care should never be delayed." (Id.) However, "[t]ransfers outside the facility must be made with the on-duty correctional supervisor to facilitate arrangement of security to accompany the inmate." (Id.)

Additionally, the Jail followed a longstanding policy of not transferring an inmate to the hospital for purely mental ailments

7

prior to the inmate's initial appearance. (See, e.g., Docket Entry 88-1 at 10-22 (testifying that, in officer's roughly twenty-two-year tenure at Jail, no inmate, including actively suicidal inmates, transferred to hospital prior to arraignment absent serious physical ailment); see also, e.g., Docket Entry 60-8 at 6 (testifying on behalf of IMS that inmates cannot transfer out of Jail prior to first appearance and explaining basis for that position as follows: "I guess, a North Carolina state rule. It's not an IMS rule.").) Moreover, although IMS personnel could decide whether "a medical situation is an emergency or non-emergency" (Docket Entry 97-1 at 2 (bold font omitted)) and whether an "emergent medical situation[]" necessitated "call[ing] for an ambulance" (id. at 7 (bold font omitted); see id. at 8), IMS lacked the ability to refer an inmate to the hospital solely for mental health reasons (Docket Entry 86-1 at 55); it could only recommend such referral "to whoever the administrator is at the detention center or the sheriff" (id.). IMS also "can[no]t transfer" or "transport inmates." (Docket Entry 60-8 at 6.)

### II. Wilson's Incarceration

On November 15, 2022, officers arrested Wilson and, at 10:12 p.m., booked him into the Davidson County Jail. (See Docket Entry 73-5 (the "Screening Report") at 1.) Shortly thereafter, Officer DeCarlo conducted a jail suicide and medical health screening for Wilson. (See id. at 1-3.) Per the Screening Report,

8

Wilson suffered from mental illness, for which he was hospitalized the week prior, and attempted suicide (by cutting) the previous year. (See id. at 2.) The Screening Report listed the following four items as "current medical problems that [Wilson] might need treatment for" (id. at 3): "Bipol[a]r[,] Depressed[,] ?? Sociopath[,] Su[ici]dal" (id. (all-cap font omitted) (question marks in original)). The Screening Report further indicated that Wilson "seem[ed] depressed" (id.), "seem[ed] anxious or afraid" (id.), and "seem[ed] to be talking in a strange manner" (id.). It also specified that Wilson "currently believe[d] that someone can control [his] mind by putting thoughts into [his] head or taking thoughts out of [his] head" (id. at 1), although he did not "currently feel that other people know [his] thoughts and can read [his] mind" (id.).

Based on Wilson's answers to its Suicide Screening component, the Screening Report noted that "[Wilson] should be referred for further mental health evaluation." (Id. (bold font omitted).) Officer DeCarlo accordingly called a nurse (see Docket Entry 73-6 at 5) and, either on her own initiative (see id.) or "collectively" with the nurse (Docket Entry 73-10 at 3), "deci[ded] to put [Wilson] in a suicide watch cell" (Docket Entry 73-6 at 5 (bold font omitted)). As part of his suicide watch designation, Wilson "automatically" received "[a] suicide gown," known as a "turtle suit." (Id. at 2-3.) Designed "to prevent someone from hanging

9

themselves" (Docket Entry 73-8 at 4), a suicide gown "is like a thick blanket material that has some Velcro located on the shoulders and the back to be able to be worn on a human" (id. at 3). Because of the gown's thickness and design, individuals cannot easily knot the gown to hang themselves. (See id. at 4; Docket Entry 73-9 at 2.)

Officers then escorted Wilson to P-33, a suicide watch cell (see Docket Entry 50-1 at 7; Docket Entry 73-6 at 6), which officers "can see . . . from the [control] tower" (Docket Entry 73-6 at 3). A surveillance camera also broadcast footage of P-33 to the control tower, where a monitor continuously displayed the footage. (See, e.g., Docket Entry 89-1 at 7.) Official policy also obliged officers to check on inmates on special watch, such as suicide watch, four times an hour, no more than 20 minutes apart. (See Docket Entry 73-8 at 6-7; Docket Entry 73-12 at 4; Docket Entry 110 at 14-15.) Located at the very end of a hallway of cells, adjacent to the top of the stairs down to a common area, P-33 contains a gate made of vertical metal bars with a horizontal crossbar at roughly waist height. (See, e.g., Docket Entry 68, Ex. H at 8:54:25; Docket Entry 68, Ex. K at 11:29:58; Docket Entry 100, Ex. A at 12:10:18-12:10:24.) Made of concrete walls, P-33 contains a combination metal toilet and water basin/faucet in its front

10

right corner (as viewed from outside the cell),[4] just inside the gate, with a mirror affixed to the wall above it; the cell contains no other permanent fixtures. (See, e.g., Docket Entry 68, Ex. H at 8:54:25; Docket Entry 68, Ex. K at 11:30:14.)[5] The hallway appears to contain cells on one side and a wall of metal screening (similar to chain-link fencing) along the other side of the walkway, through which one can view the lower tier, which contains, inter alia, tables. (See Docket Entry 68, Ex. K at 11:29:45-11:30:46.) Positioned on the opposite side of that metal wall, the surveillance camera captures the top of the stairs, the interior of P-33, and parts of an adjoining cell, which contained at least one inmate during Wilson's time in P-33. (See Docket Entry 100, Ex. A at 12:10:10.)[6]

At 8:05 a.m. on November 16, 2022, Wilson received a carton of milk for his breakfast. (See Docket Entry 73-11 (the "Timeline") at 1.)[7] Approximately twenty minutes later, Wilson attempts to

_____

4 Unless otherwise specified, this Opinion uses the video viewer's perspective for all video descriptions.

5 Rather than a permanent bed, the cell contains a moveable mat. (See, e.g., Docket Entry 68, Ex. K at 11:29:45-11:29:51.)

6 The adjoining cell appears on the right of the screen when viewing the video footage. (See id.) Wilson's cell, P-33, occupies the last spot on the hallway, with a concrete wall on the left side of the video. (See id.)

7 Using jail surveillance footage, Captain Tracy Rabon prepared the Timeline for the North Carolina Department of Health and Human Services. (See, e.g., Docket Entry 110 at 36-38.) The
(continued...)

hang himself with his suicide gown. (See id.; see also Docket Entry 87 (the "Initial Video") at 8:24:07-8:24:45.) Approximately thirty seconds after Wilson starts trying to tie the gown around the upper portion of the cell bars, Officer Smith runs up the hallway to the cell and Wilson quickly lifts the gown from around his neck as he backs away from the cell bars. (See Docket Entry 87 at 8:24:11-8:24:46.) When Wilson releases the gown, it falls to the crossbar and, using one hand, Officer Smith subsequently removes it from the cell entirely, tossing it up the hallway. (See id. at 8:24:44-8:25:16.) Another officer comes up the stairs, joining Officer Smith outside Wilson's cell. (See, e.g., id. at 8:25:08-8:25:29.) The officers observe Wilson, who moves around his cell while apparently talking to them, for another minute before they depart back the way they came. (See id. at 8:25:29-8:26:51.) Throughout this incident, inmates walk up and down the hallway and stairs carrying, inter alia, food trays and a trash can. (See id. at 8:21:34-8:27:59.) Ordinarily, such trustee inmates would remove the breakfast items within an hour of serving breakfast. (See Docket Entry 73-12 at 3-4.) Per policy, inmates "[w]ere [not] allowed to keep trash, milk cartons, food, [or] other

---

7(...continued)
parties all rely on the Timeline, the accuracy of which they do not dispute. (See, e.g., Docket Entry 50 at 3-4; Docket Entry 53 at 3-4; Docket Entry 54 at 8-9; Docket Entry 60 at 7-8; Docket Entry 89 at 2.)

items inside their cell." (Docket Entry 73-21 at 4 (bold font omitted).)

Thirty minutes later, Nurse Madden and then-Lieutenant Phillips (see Docket Entry 73-8 at 3; Docket Entry 73-11 at 1) approach P-33, where Wilson appears to be sleeping, curled up on his side in a fetal position on his mat at the rear of the cell, facing the cell entrance. (See Docket Entry 68, Ex. H (the "Discussion Video") at 8:54:18-8:54:37.) When Nurse Madden begins speaking with Wilson, he lifts his head off his mat and begins talking with her, gesturing freely with his right arm before he sits and then stands up from his mat and approaches the front of the cell. (See id. at 8:54:30-8:55:17.) Wilson squats and then sits down in front of Nurse Madden at the gate, showing her various body parts as he cries and talks with Lieutenant Phillips and Nurse Madden, who crouches in front of Wilson at his eye level. (See id. at 8:55:17-8:57:00.) Wilson stands up, prompting Nurse Madden to stand, and continues to talk with Nurse Madden, occasionally including Lieutenant Phillips in his communications. (See id. at 8:57:00-8:59:15.) Wilson then turns around in the cell while Nurse Madden observes him, after which he moves towards the front right corner of the cell (approaching Lieutenant Phillips). (See id. at 8:59:15-8:59:36.) Wilson appears upset as he continues to speak with Nurse Madden, who approaches and stands in front of Wilson, largely obscuring him from view, as she continues communicating

13

with him.  (See id. at 8:59:36-8:59:58.)  After they shift their positions slightly, with Nurse Madden moving slightly to the right and Wilson moving slightly to the left, they continue communicating, with Wilson again fully visible in the footage. (See id. at 8:59:58-9:00:06.)

As Nurse Madden gestures towards Wilson, he nods his head, after which Nurse Madden reaches out with her left hand to hold Wilson's wrist as though taking his pulse.  (See id. at 8:59:58-9:00:16.)  Nurse Madden turns to her right, facing up the hallway towards Lieutenant Phillips, again largely obstructing Wilson from view; although somewhat unclear from the video, it appears that she continues measuring his pulse.  (See id. at 9:00:16-9:00:41.) Nurse Madden then shifts to the right as she and Wilson continue communicating, with Wilson appearing more animated as he continues speaking to Nurse Madden, as well as to Lieutenant Phillips, who responds, turns, and walks away up the hallway.  (See id. at 9:00:41-9:01:02.)  Nurse Madden and Wilson continue talking, with Wilson appearing upset as he drops into a crouch, seeming to plead with Nurse Madden as she begins moving away from his cell, ultimately walking up the hallway out of the video frame. (See id. at 9:01:02-9:01:30.)  Wilson remains crouched at the front of the cell momentarily, before retreating back to his mat and lying back down in his original fetal position, facing his cell entrance, as

14

inmates come up the stairs in front of his cell.  (See id. at 9:01:30-9:01:40.)

At approximately 10:52, Wilson throws an unknown liquid, later identified as toilet water, on Officer Peters, who subsequently sprays Wilson with pepper spray.  (See Docket Entry 60-12 at 2-3; Docket Entry 73-11 at 1; Docket Entry 73-15 at 2-5.)  According to the relevant Use of Force Report, officers then took Wilson for decontamination and a medical check.  (See Docket Entry 73-14 at 2; see also Docket Entry 73-11 at 2.)  Nurse Madden observed the officers with Wilson at the decontamination sink and went to assist, wiping Wilson's face and eyes and taking pictures of the marks on his body.  (See Docket Entry 73-16 at 2-4; Docket Entry 68, Ex. J at 11:02:08-11:08:26.)  Nurse Madden described him as "under distress" and out of touch with reality during this encounter.  (Docket Entry 73-16 at 3.)  At 11:10, officers escorted Wilson back to P-33.  (See Docket Entry 73-11 at 2.)

Shortly thereafter, Nurse Madden sent the following text message to Dr. Entwistle:

> Hi dr e I have a pt Matthew Wilson dob [redacted]2000, and he is on SW for making statements he wanted to end his life.  He tried to hang himself w the turtle suit and is naked now.  And got pepper sprayed.  He is a/o x0, and under distress.  Unable to do a H&P because of mental state

(Docket Entry 60-13 at 1 (abbreviations, capitalization, and formatting in original).)  Dr. Entwistle responded:

15

Reading
Can we give a Haldol shot
And Ativan

(Id. (formatting and capitalization in original).) Nurse Madden responded: "Janet isn't here she had an apt n has the key for the narc box" (id. (abbreviations in original)), prompting the following exchange:

[Dr. Entwistle:] Dang
Will he take a pill
Vistaril 50

[Nurse Madden:] I'll do that now Ty

[Dr. Entwistle:] Seroquel 100 if he will take
Both

[Nurse Madden:] Ty

(Id. at 2 (abbreviations, capitalization, and formatting in original).)

By 11:29:45, Nurse Madden returns to Wilson's cell, where she gives him the medication that Dr. Entwistle prescribed and advises Wilson to give the medicine about 20 minutes to take effect. (See Docket Entry 68, Ex. K at 11:29:45-11:30:26; Docket Entry 68, Ex. L at 12:44:06-12:44:15; Docket Entry 73-16 at 4-5.) Visibly distressed, Wilson repeatedly expresses pain and asks for a shower or water, imploring Nurse Madden and the accompanying officer to turn back on the water in his cell. (See Docket Entry 68, Ex. K at 11:29:45-11:30:47.) The officer says he lacks the key necessary to turn on Wilson's water and tells Wilson to go lie down, a directive

16

with which Wilson appears to comply as the video ends.  (See id. at 11:30:40-11:30:47.)

In both the Initial Video and Discussion Video, a white tray rests on the floor on the left side of the cell and a milk carton lies under the toilet on the right side of the cell.  (See, e.g., Docket Entry 68, Ex. H at 8:54:18-8:54:24; Docket Entry 87 at 8:26:47-8:26:50.)  By 12:10:00, the white tray no longer appears in the video footage of Wilson's cell, but a white (apparently styrofoam) cup rests against the rear wall, near the cell's right corner, and the milk carton remains under the toilet at the front of the cell, while Wilson sits on his mat near the cell entrance. (See Docket Entry 100, Ex. A at 12:10:00.)[8]  The mat lies on a slight diagonal slanted towards the right side of the cell, adjacent to the toilet and cell bars.  (See id.)  In visible distress, Wilson spends the next few minutes in constant motion, variously, inter alia, crying, screaming, splashing in the toilet bowl, repeatedly attempting to climb through the cell bars,

_____

8  Plaintiff originally submitted an exhibit combining video footage from Wilson's cell and from the control tower during the period of Wilson's second suicide attempt.  (See Docket Entry 58 at 1.)  After Officer Lambeth argued that "[t]h[e e]xhibit should not be considered as it is inadmissible evidence" because it "was modified in at least two different ways by Plaintiff and is not anything that was produced in discovery by any party or entered into evidence by any party" (Docket Entry 89 at 14), Plaintiff submitted the original videos produced in discovery (see Docket Entry 100 at 1; see also Docket Entry 98 at 3-4 (discussing contemporaneously submitted underlying videos)).  The facts described herein derive from those underlying videos rather than the initially submitted combined video.

17

flopping around on his mat, picking up his mat, sitting and/or curling up on the ground, and pacing.  (See id. at 12:10:00-12:13:42.)  By the end of this interval, Wilson's mat lies roughly perpendicular to the cell bars, on a slight rightward diagonal, with one end adjacent to the center of the rear wall and the other end angled towards the toilet.  (See, e.g., id. at 12:13:42.)[9]

At 12:13:43, Wilson picks up the milk carton, which he begins breaking apart and stuffing in his mouth.  (See id. at 12:13:42-12:13:55.)  For roughly the next six minutes, Wilson intermittently puts pieces of the milk carton and/or his fingers in his mouth as he continues his frenetic movements around the cell, often while screaming or crying.  (See id. at 12:13:42-12:19:38.)[10] Approximately seven minutes after he first picked up the milk carton, Wilson staggers from the right side of the cell to the left and then back to the right front corner of the cell gate, at which point he falls backwards, landing on his left side, atop his left arm, which extends, along with his right arm, to the right of his body, with his left leg fully extended towards the cell bars and his right leg slightly bent.  (See id. at 12:20:48-12:20:58.) Lying on the floor between his mat and the left wall, Wilson turns

---

9  By the time Wilson collapses, his mat lies on a very slight angle, roughly centered in the middle of the cell, perpendicular to the rear wall, which one end of it abuts.  (See, e.g., id. at 12:24:00.)

10   Wilson also drinks from the toilet bowl during this interval.  (See id. at 12:17:24-12:17:32.)

18

more fully onto his stomach, raising his torso and moving his right leg and arm, before his head and body lower back to the floor, as his body turns more fully face-down, settling onto the floor with his left arm still lodged beneath his body, his legs fully extended, and his feet adjacent to the cell gate. (See id. at 12:20:58-12:22:35.) For three seconds at 12:22:49, Wilson's body twitches, and at 12:23:13 and again at 12:23:56, his shoulders rise and fall; otherwise, to the extent visible on the surveillance footage, Wilson lies motionless until officers enter his cell and rotate him to his back to begin administering CPR. (See id. at 12:21:40-12:29:33.)

In the interim, at 12:23:28, Officer Lambeth walks up the hallway into the video footage, briefly glancing into Wilson's cell as he strides towards the end of the hallway, where he holds his cellular telephone up to the wall before turning to face Wilson's cell. (See id. at 12:23:24-12:23:36.) Officer Lambeth faces Wilson's cell for a few second before focusing on the cellular telephone in his left hand, which he again holds up to the wall, apparently trying to scan it. (See id. at 12:23:36-12:23:52.) At 12:23:53, Officer Lambeth looks to his right, towards the inmate in the adjoining cell; a second later, Officer Lambeth looks towards Wilson's cell as he turns his head back to the left towards his cellular telephone. (See id. at 12:23:53-12:23:56.) According to Officer Lambeth, the inmate "asked if Mr. Wilson was all right

19

[sic] due to [the inmate] noticing that [Wilson] ceased to be yelling and screaming.  And when [Officer Lambeth] looked for a second time, [Officer Lambeth] could see Wilson breathing, no obvious signs of distress, so [Officer Lambeth] just relayed to [the inmate], 'Yes, he's all right [sic].'" (Docket Entry 60-15 at 3.)  Officer Lambeth then turns to his right and walks towards the wall between the cells, where he holds his cellular telephone up to three blue squares on the wall before walking to stand in front of the inmate in the adjoining cell.  (See Docket Entry 100, Ex. A at 12:23:56-12:24:11.)  They converse for a while before Officer Lambeth turns around and walks back past Wilson's cell and down the stairs, again largely focused on his cellular telephone aside from a brief glance towards Wilson's cell on his approach.  (See id. at 12:24:11-12:24:39.)[11]

At 12:27:30, Officer Smith walks up the hallway to Wilson's cell and shines a flashlight on Wilson for about ten seconds before pulling out his radio and calling for assistance as he continues to

---

11  The Timeline offers this description of events:

1223 Officer Lambeth approaches P33 and looks at Wilson then scans P2 outside of P33 and stands in front of P33 looking towards Wilson, then scans P33 Bed 1, 2 & 3 tags. At that point Officer Lambeth heads toward P34 and scans P34 Bed 2 then Bed 1 while Inmate [W., R. L.] talks to Officer Lambeth for several seconds.  Officer Lambeth then turns back around, looks into P33 towards Wilson, then proceeds down the stairs outside P33.

(Docket Entry 73-11 at 2.)

20

shine his flashlight on Wilson.  (See id. at 12:27:30-12:28:00; see also Docket Entry 73-11 at 2.)  After additional officers arrive on the scene, they enter Wilson's cell and subsequently attempt CPR on him.  (See Docket Entry 100, Ex. A at 12:28:00-12:31:57.)  By the time EMS arrive, Nurse Madden has joined those attempting to revive Wilson.  (See Docket Entry 68, Ex. L at 12:44:06-12:44:15; see also Docket Entry 73-11 at 3-4.)

Plaintiff also submitted surveillance footage of the control tower interior from 12:17:00 to 12:27:58 on November 16, 2022. (See Docket Entry 100, Ex. B.)  Taken from the vantage of a camera affixed on or near the ceiling above an entrance area, the forefront of the video consists of a hexagonal room, bisected into two by a hallway that leads to another door.  (See id. at 12:22:13-12:22:46, 12:26:24-12:26:29.)  A built-in desk follows the contours of each half of the room.  (See, e.g., id. at 12:17:00.)  On the left, the wall above the desk contains at least three vertical windows; Officer Smith sits at a computer in front of the most visible windows, near the hallway, while Officer Lambeth sits at the portion of the desk closest to the video camera.  (See id.)[12] Two raised, large monitors appear in the left corner of the footage, above and adjacent to where Officer Lambeth sits. (See id.)  Apparently overexposed, the screens on the left side of

_____

12  The letter "P" appears over the right-most of these windows.  (See, e.g., id.)

the room, where Officers Lambeth and Smith sit, appear entirely white. (See id.) However, windows on the right side of the room reflect the middle and left portions of the left-side desk, revealing a monitor with multiple images as well as Officers Smith and Lambeth (to the extent they remain in the middle to left portion of that desk area). (See, e.g., id. at 12:17:00.)[13] At various times during the first few minutes of the video footage, Officer Lambeth looks in the direction of the windows and monitor, but one cannot tell from the video itself what he sees. (See id. at 12:17:00-12:22:11.) At 12:22:11, Officer Lambeth stands up and walks down the hallway, exiting through the door at the end of the hallway. (See id. at 12:22:11-12:22:46.) Officer Smith remains working at the desk until Officer Lambeth returns approximately four minutes later, entering the room from the entrance under the camera. (See id. at 12:22:46-12:26:27.) As Officer Lambeth retakes his earlier seat, he turns his head towards Officer Smith, who then leans forward in his chair, stands up, and exits the control tower through the door at the end of the hallway, while Officer Lambeth remains at the desk, apparently looking at the images on the monitor. (See id. at 12:26:27-12:27:03.) Officer Lambeth remains at the desk, looking in the direction of the

_____

13  The letter "O" appears over these windows. (See, e.g., id.)

22

windows and monitor, until the video footage ends.  (See id. at 12:27:03-12:27:58.)

According to the Timeline, the control tower footage reveals:

1219 Officer W Smith and Officer Lambeth are sitting the Control Tower looking toward P33 for several seconds with discussions between each other

2020 Officer W Smith is looking JMS

12:21:00 Officer W Smith and Officer Lambeth are still sitting and looking towards P33 and having discussions till 12:21:21

1222 Officer Lambeth stands up and looks towards P33, then proceeds to start a scan

1224 Officer W Smith looks toward P33 several times thru out that minute between 1224 and 1225

12:24:24 [sic] Officer Lambeth returns to the Control Tower and sits down beside Officer W Smith as they look towards P33 and have a discussion

12:26:41 Officer W Smith stands up and heads towards P33 and Officer Lambeth continues to look towards P33 while the Officer W Smith is at the P33

1252 Lieutenant Phillips enters the Control Tower and it appears that Officer Lambeth and Lieutenant Phillips is [sic] having a discussion about the situation.

(Docket Entry 73-11 at 4.)

For his part, Officer Lambeth avers:

After "hav[ing no] contact with Matthew Wilson on November 15, 2022" (Docket Entry 73-18, ¶ 3), Officer Lambeth arrived at the "Davidson County Detention Center at approximately 10:00 a.m." on November 16, 2022 (id., ¶ 4).  "When [Officer Lambeth] arrived at the Detention Center, Mr. Wilson was in a suicide cell.  [Wilson]

23

was screaming and [Officer Lambeth] was made aware Mr. Wilson had attempted to kill himself, which is why [Wilson] was naked." (Id., ¶ 5.) "[Officer Lambeth] recall[s] hearing and seeing Mr. Wilson yelling and screaming for most of the morning on November 16, 2022." (Id., ¶ 6.) "Upon arrival, [Officer Lambeth] performed some housekeeping in the Detention Center and then went to the control tower." (Id., ¶ 7.) "The control tower had a direct view into the suicide cell Mr. Wilson was in. There was also a surveillance camera pointed at the suicide cell Mr. Wilson was in which relayed the feed to the control tower." (Id.)

"At 12:03 p.m.[] on November 16, 2022, [Officer Lambeth] conducted a scan of Mr. Wilson's cell where [Officer Lambeth] believe[s Wilson] made comments to [Officer Lambeth] about wanting to go to the hospital and that [Wilson] was going to harm himself." (Id., ¶ 8.) "After the scan at 12:03 p.m., [Officer Lambeth] returned to the control tower and told Officer Smith, who was the senior officer in charge in the control tower, about the statements Mr. Wilson made during [Officer Lambeth's] last scan." (Id., ¶ 9.) "[Officer Lambeth] was in the control tower with Officer Smith until [Officer Lambeth] got up for [his] next round of scans at 12:22 p.m. During that period, [Officer Lambeth] do[es] not recall if [Officer Lambeth] was actively watching Mr. Wilson or viewing [Wilson] on camera." (Id., ¶ 10.) "During that time, [Officer Lambeth] was not aware Mr. Wilson had put a milk carton in his

24

mouth or that he was making any effort to make himself throw up." (Id., ¶ 11.) "[Officer Lambeth] did not see Mr. Wilson ingest a milk carton nor did [Officer Lambeth] see him try to make himself throw up or struggle to breath [sic] in anyway [sic]." (Id.)

"At 12:23 p.m., [Officer Lambeth] approached Mr. Wilson's cell and saw him lying prone on the floor in his cell. [Officer Lambeth] checked if [Wilson] was breathing, saw [Wilson's] chest rise and fall, and saw no obvious signs of distress." (Id., ¶ 12.) "An inmate in the cell next to Mr. Wilson's asked if Mr. Wilson was okay and [Officer Lambeth] looked into Mr. Wilson's cell again, saw [Wilson's] chest rise and fall, and told the inmate Mr. Wilson appeared to be okay. [Officer Lambeth] then continued [his] rounds." (Id., ¶ 13; see also Docket Entry 60-15 at 3 ("On the second round of [Officer Lambeth's] scan, [the inmate in P-34] had asked if Mr. Wilson was all right [sic] due to [the inmate] noticing that [Wilson] ceased to be yelling and screaming. And when [Officer Lambeth] looked for a second time, [Officer Lambeth] could see Wilson breathing, no obvious signs of distress, so [Officer Lambeth] just relayed to [the inmate], 'Yes, he's all right [sic].'").) "It appeared to [Officer Lambeth that] Wilson was sleeping[,] and since [Wilson] had been yelling and cussing since at least 10:00 a.m., [Officer Lambeth] assumed [Wilson] had finally gotten tired and fell asleep." (Docket Entry 73-18, ¶ 14.)

25

"When [Officer Lambeth] returned to the control tower, [Officer Lambeth] informed Officer Smith that Mr. Wilson had stopped yelling, that [Officer Lambeth] confirmed [Wilson] was breathing, and that [Officer Lambeth] thought [Wilson] was sleeping. Officer Smith then went to check on Mr. Wilson himself." (Id., ¶ 15.) "Officer Smith found that Mr. Wilson was unresponsive when [Officer Smith] went to check on [Wilson] and medical staff as well as EMS were called." (Id., ¶ 16.) "At some point after EMS took Mr. Wilson from the facility, [Officer Lambeth] became aware that Mr. Wilson had ingested a milk carton that was in [Wilson's] cell, and [Wilson] asphyxiated on it." (Id., ¶ 17.) "That was the first time [Officer Lambeth] was made aware Mr. Wilson had a milk carton in his cell." (Id.)

During his deposition, Officer Lambeth further testified that he noticed Wilson naked and screaming in P-33 "[i]mmediately upon [Officer Lambeth's] arrival" on November 16, 2022. (Docket Entry 60-15 at 5; see id. at 4.) As Officer Lambeth explained:

To reach the control tower, when "you walk into booking, you come out the back door and kind of go down this little sidewalk, and there's . . . a drive for like the dumpster and delivery and stuff like that, and then you get to the new jail." (Id. at 5.) Then "[you] go up the steps, and that puts you on the top floor," and "immediately to your right is P-Pod, in the middle is the catwalk for the control tower, and then across the final door on

26

the right, [Officer Lambeth] believe[s], was O-Pod." (<u>Id.</u> at 5-6.) "[I]mmediately upon going up the steps to the second level when [Officer Lambeth] opened the door, [he] could hear screaming coming from P-Pod." (<u>Id.</u> at 6.) Although Officer Lambeth did not know the source of the screaming "until [he] got to the control tower" (<u>id.</u>), "it was indeed[] Mr. Wilson" screaming (<u>id.</u>). "[T]here w[ere] intermittent breaks" during the screaming, "but it was loud and distinct." (<u>Id.</u>) "[Officer Lambeth] could pick out a couple of words here and there, but" he "mainly just recall[s] the volume and intensity" of the screaming. (<u>Id.</u>)

"[A]fter [Officer Lambeth] got into the control tower and made it to the control desk where Officer Smith was sitting," Officer Lambeth "could see Mr. Wilson in the cell" (<u>id.</u>), as "[there wa]s [a] direct line of sight into [Wilson's] suicide cell" (<u>id.</u> at 5). At that time, "[Wilson] was standing by the bars completely unclothed and screaming." (<u>Id.</u> at 6.) "At some point [Officer Lambeth] asked why Wilson was not placed in the restraint chair and was told Lieutenant Childress did to [sic] not sign off on it." (<u>Id.</u> at 4 (bold font omitted).) Later that morning, Officer Lambeth again brought up the restraint chair, asking "'[w]hy are we putting him back in the cell?' 'Why isn't he in a restraint chair?'" (Docket Entry 89-1 at 10.) In response to Officer Lambeth's queries regarding the restraint chair, Officer Smith "said that [Officer Smith] would have to talk to Lieutenant

27

Childress; the supervisor had to sign off on it.  Whether [Officer Smith] did or not, [Officer Lambeth] do[es]n't recall."  (Id.) "[T]he restraint chair was located in the booking office," in imminent proximity to Jail staff.  (Id. at 9.)

As for Officer Lambeth's personal observations of Wilson, "[d]uring [Officer Lambeth's] initial round [Wilson] was up and verbal.  And then during [Officer Lambeth's] time in the tower, [Officer Lambeth] did observe [Wilson] still moving around." (Id. at 11.)  "[Officer Lambeth] cannot testify that [he] was looking into the cell or looking at the camera when [Wilson] went to the ground, but when [Officer Lambeth] returned for the second scan and observed [Wilson] breathing, it was [Officer Lambeth's] assumption that [Wilson] was sleeping."  (Id.)  As for what Officer Smith said when Officer Lambeth returned to the control tower, "[Officer Lambeth] can't remember verbatim, but it was something to the nature of [Officer Smith] just thought it was weird, [Wilson's] been, you know, screaming and carrying on for the past however long he had been there.  So [Officer Smith] wanted to go check on [Wilson]."  (Id.)  "[Officer Lambeth] do[es]n't know why, you would have to ask [Officer Smith]."  (Id.)

28

## DISCUSSION

### I. Relevant Standards

### A. Summary Judgment

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, and all internal conflicts in it resolved favorably to him." Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets and internal quotation marks omitted). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies

29

Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996). Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

Additionally, "[w]here affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie." Raynor v. Pugh, 817 F.3d 123, 130 (4th Cir. 2016) (internal quotation marks omitted). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007); see also, e.g., Love v. Beasley, 788 F. App'x 935, 937 (4th Cir. 2020) (concluding, on review of summary judgment decision, "that the district court did not err in finding that [a defendant] did not punch [the plaintiff] as alleged, because video of the incident confirms [the defendant's] denial"). Notably, though, in Scott,

> the [United States] Supreme Court was faced with a videotape of the incident in question that "utterly discredited" the plaintiff's account, rendering it a "visible fiction." 550 U.S. at 380–81. As between a videotape of undisputed authenticity, *id.* at 378, and the plaintiff's story, the Court held, the videotape should prevail. Where the nonmoving plaintiff's account is "blatantly contradicted by the record" so that "no reasonable jury could believe it," it should not be adopted by a court ruling on a motion for summary judgment. *Id.* at 380.

30

As [the United States Court of Appeals for the Fourth Circuit] ha[s] clarified, *Scott* is the exception, not the rule. It does not "abrogate the proper summary judgment analysis . . . ." *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott*, 550 U.S. at 378). That standard continues to apply in the face of "documentary evidence" that lends support to [the movant's] account of events, *id.*, or even makes it "unlikely" that the [opposing party's] account is true, *United States v. Hughes*, 606 F.3d 311, 319–20 (6th Cir. 2010) (holding that *Scott* does not apply to photographs rendering plaintiff's account "unlikely"). Summary judgment is proper under *Scott* only when there is evidence — like the videotape in *Scott* itself — of undisputed authenticity that shows some material element of the [opposing party's] account to be "blatantly and demonstrably false." *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007) (refusing to extend *Scott* to evidence in form of police photographs that fail to depict "all of the defendant's conduct and all of the necessary context"); *see also Witt*, 633 F.3d at 277 (holding *Scott* inapplicable to soundless video that does not capture key disputed facts).

Harris v. Pittman, 927 F.3d 266, 275–76 (4th Cir. 2019) (parallel citations omitted).

### B. Monell Liability

As relevant to the Motion, "Section 1983 provides a remedy . . . for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002) (quoting 42 U.S.C. § 1983); see also Lindiment v. Jones, No. 1:17cv501, 2017 WL 4119644, at *4 (M.D.N.C. Sept. 15, 2017) ("The statutory basis for federal claims involving constitutional violations by state actors appears in 42 U.S.C. § 1983."), recommendation adopted, No. 1:17cv501, 2017 WL 4417676 (M.D.N.C. Oct. 3, 2017). Section 1983

31

creates municipal liability for constitutional violations "for which the municipality is actually responsible." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 479 (1986). The "tortious conduct" that forms the basis of such liability "must be pursuant to a municipality's official policy," a requirement that "distinguish[es] acts of the m*unicipality* from acts of *employees* of the municipality." <u>Id.</u> (internal quotation marks omitted) (emphasis in original). "[I]n other words, a municipality cannot be held liable under [Section] 1983 on a *respondeat superior* theory." <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658, 691 (1978). In that regard:

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

<u>Lytle v. Doyle</u>, 326 F.3d 463, 471 (4th Cir. 2003) (brackets and internal quotation marks omitted).

Further, "a plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a *particular* constitutional or statutory right will follow the decision." <u>Carter v. Morris</u>, 164 F.3d 215, 218 (4th Cir. 1999) (internal quotation marks omitted) (emphasis in original). "Thus, municipal liability will attach only for those

32

policies or customs having a *specific* deficiency or deficiencies . . . such as to make the *specific* violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run." Id. (internal quotation marks omitted) (emphasis and ellipsis in original). Moreover, "[if] there are no underlying constitutional violations by any individual, there can be no municipal liability." Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999).

Notably, "these principles are equally applicable to a private corporation acting under color of state law when an employee exercises final policymaking authority concerning an action that allegedly causes a deprivation of federal rights." Austin v. Paramount Parks, Inc., 195 F.3d 715, 729 (4th Cir. 1999). An entity that provides medical care to a state prisoner acts under color of state law, see, e.g., Conner v. Donnelly, 42 F.3d 220, 224-25 (4th Cir. 1994) (explaining that Supreme Court has held "that a private physician under contract with the State of North Carolina to provide medical services to prison inmates, but not employed directly by the state, nonetheless acts under the color of state law when treating an inmate" and "that the Supreme Court's analysis applies also to private physicians who treat state prisoners without the benefit of a contract"), and thus can incur liability for deliberate indifference, see id. at 225 ("If a physician treating a prisoner — whether by contract or by referral

33

— misuses his power by demonstrating deliberate indifference to the prisoner's serious medical needs, the prisoner suffers a deprivation under color of state law.  The source of the deprivation does not change because the physician has no contractual relationship with the state: the physician acts under color of state law because the state has incarcerated the prisoner and denied him the possibility of obtaining adequate medical care on his own.").

### C. Deliberate Indifference Standard

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989).  In other words, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his . . . medical care . . .[,] it transgresses the substantive limits on state action set by the Eighth Amendment [in the case of convicted prisoners] and the Due Process Clause [of the Fourteenth Amendment in the case of pretrial detainees]."  Id. at 200; see also Mays v. Sprinkle, 992 F.3d 295, 300 (4th Cir. 2021) ("[S]ince [the plaintiff] was a pretrial detainee and not a convicted prisoner, the Fourteenth Amendment, and not the Eighth Amendment,

34

governs his claim." (internal quotation marks omitted)); <u>Parrish ex rel. Lee v. Cleveland</u>, 372 F.3d 294, 302 (4th Cir. 2004) ("In cases where the government is accused of failing to attend to a detainee's serious medical needs, . . . conduct that amounts to deliberate indifference . . . can support a Fourteenth Amendment claim." (internal quotation marks omitted)).

Accordingly, "pretrial detainees can state a claim under the Fourteenth Amendment, based on a purely objective standard, for prison officials' deliberate indifference to excessive risks of harm." <u>Short v. Hartman</u>, 87 F.4th 593, 604-05 (4th Cir. 2023). As the Fourth Circuit has explained, "[t]he Fourteenth Amendment Due Process Clause protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'" <u>Id.</u> at 608-09 (quoting <u>Kingsley v. Hendrickson</u>, 576 U.S. 389, 398 (2015)). "That test is 'solely an objective one.'" <u>Id.</u> (quoting <u>Kingsley</u>, 576 U.S. at 397). Under this standard, "it is sufficient that the plaintiff show that the defendant's action or inaction was, in <i>Kingsley</i>'s words, 'objectively unreasonable,' 576 U.S. at 397: that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly." <u>Short</u>, 87 F.4th at 611 (parallel citation omitted). "Or as the Supreme Court put it . . ., it is enough that the plaintiff show that the defendant acted or failed to act 'in

35

the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Id. (quoting Farmer, 511 U.S. at 836).

Thus, to succeed on a claim of deliberate indifference to a medical need, a pretrial detainee must show:

> (1) [he] had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

Id. "There is no subjective element." Williams v. Clayton, No. 9:23cv4663, 2025 WL 2581923, at *4 n.7 (D.S.C. Sept. 5, 2025). Importantly, though, "it is still not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee." Short, 87 F.4th at 611-12.

## II. Analysis

### A. Serious Medical Need

Plaintiff asserts "entitle[ment] to judgment as a matter of law with respect to the first prong of the Farmer test because [Wilson] suffered from a serious medical need in the form of a mental health crisis and/or a substantial risk of suicide while confined to the Jail." (Docket Entry 60 at 13; accord id. at 11 ("[Wilson] suffered from an objectively serious medical need sufficient to satisfy the first prong under Farmer as a matter of

36

law." (bold font omitted).)[14]  "IMS agrees that Mr. Wilson suffered an objectively serious mental illness."  (Docket Entry 88 at 2; <u>see also</u> <u>id.</u> at 18 ("[Medical] Defendants do not dispute that Mr. Wilson had a serious psychiatric illness but it was one for which he received reasonable and appropriate treatment.").)  For his part, Officer Lambeth "does not dispute that Wilson posed a substantial risk of suicide at the time [Officer] Lambeth arrived

---

14  In moving for summary judgment, Plaintiff consistently relies upon the eighth-amendment standards applicable to convicted prisoners.  (<u>See, e.g.</u>, <u>id.</u> at 11 ("The Eighth Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.' *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citations omitted).  The Supreme Court prescribes a two-part test for when conditions of confinement violate the Eighth Amendment. *Farmer*[, 511 U.S. at 834].  The objective prong requires the inmate to demonstrate a 'substantial risk of serious harm,' while the subjective prong requires that the inmate demonstrate that the prison official knew of and disregarded that risk of harm.  *Id.*").)  "[Alt]hough the Supreme Court instructed in *Kingsley* that an objective test is proper for pretrial detainees' claims under the Fourteenth Amendment, a pretrial detainee can still state a claim if they can meet the more demanding Eighth Amendment standard." <u>Short</u>, 87 F.4th at 612.  "In other words, satisfying the Eighth Amendment test remains sufficient, but is no longer necessary, for a pretrial detainee to state a claim for deliberate indifference to a serious medical need." <u>Id.</u>  "Th[at] deliberate indifference test includes objective and subjective elements."  <u>Id.</u> (internal quotation marks omitted).  "The objective element requires an objectively serious medical condition.  A condition is objectively serious if it is diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Id.</u> (internal quotation marks and citation omitted).  "The subjective element requires that the prison official acted with deliberate indifference to inmate health or safety, meaning that the official had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction."  <u>Id.</u> (internal quotation marks omitted).

37

at the Detention Center." (Docket Entry 89 at 8.)[15] As noted, Remaining Defendants failed to respond to the Motion, thus conceding Plaintiff's (generally applicable) contention. See, e.g., <u>Kinetic Concepts, Inc. v. ConvaTec Inc.</u>, No. 1:08cv918, 2010 WL 1667285, at *6-9 (M.D.N.C. Apr. 23, 2010) (explaining that party

---

15 However, Officer Lambeth disputes any assertion that Wilson evidenced any additional serious medical need when Officer Lambeth observed Wilson on Officer Lambeth's second scan of Wilson's cell. (<u>Compare</u> Docket Entry 60 at 20-21 ("Beyond this notice of a serious medical condition, based on the video evidence, [Officer] Lambeth was indisputably aware of an objectively serious medical need when he discovered [Wilson] silent, face-down, and collapsed on the floor of his cell during a time when [Wilson] was known to be suicidal, was on suicide watch, had attempted suicide while on suicide watch, had been pepper-sprayed, and had previously been screaming in the cell before falling silent."), <u>with</u> Docket Entry 89 at 8 ("But, Wilson was not suffering from a medical need that was 'both apparent and serious' at the time [Officer] Lambeth observed Wilson in his cell on the ground. [Officer] Lambeth saw Wilson lying on the ground breathing, was unaware he had put anything in his mouth, and thought he was sleeping after he spent the entire morning yelling and screaming. There is no evidence Wilson was bleeding or showed any physical signs of injury when [Officer] Lambeth observed him. He was simply lying on the floor. [Officer] Lambeth cannot be faulted for thinking a nonbleeding inmate on the floor in his cell was sleeping rather than suffering from a serious medical condition." (citations omitted)).) As Plaintiff seeks summary judgment only regarding the more general contention that Wilson's suicidality and/or mental illness constituted an objectively serious medical need (<u>see, e.g.</u>, Docket Entry 60 at 2-3 (asserting entitlement to summary judgment on grounds that "Wilson suffered from an objectively serious medical need when he attempted suicide by trying to hang himself"), 10 (describing question presented by Motion as "[w]hether [Wilson] suffered from an objectively serious medical need satisfying the objective prong under *Farmer* where he reported a history of mental illness, reported a history of attempting suicide, repeatedly communicated his suicidal intentions while in the Jail, and attempted suicide while confined in the Jail")), this dispute does not impact resolution of the Motion.

38

concedes opponent's argument by failing to address it and collecting cases).

In any event, Wilson's patent mental illness and suicidality qualify as objectively serious medical needs.  Under the more-stringent eighth-amendment deliberate indifference test, "[a] condition is objectively serious if it is diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Short, 87 F.4th at 612 (internal quotation marks omitted).  "A substantial risk of suicide is certainly the type of serious harm that is contemplated by the first prong of the deliberate indifference test."  Id. (internal quotation marks omitted); see also id. (explaining that allegations that pretrial detainee "very recently attempted suicide, was undergoing severe withdrawal, and was experiencing feelings of uselessness or sinfulness. . . . demonstrate a substantial risk of suicide, and, by extension, satisfy the objective prong of the deliberate indifference test" under the higher eighth-amendment standard).  Likewise, Wilson's manifest mental illness satisfies the first prong of the deliberate indifference test.  See, e.g., Lapp v. United States, 706 F. Supp. 3d 568, 577 (E.D. Va. 2023) (concluding that psychiatric illness, specifically "bipolar disorder with psychotic features," id. at 570, qualified as serious medical need).  The Court should thus grant the Motion insofar as it requests a finding that Wilson's

39

mental illness and apparent suicidality qualified as an objectively serious medical need under the first prong of the deliberate indifference test.

**B.  IMS's Liability**

Plaintiff next seeks a ruling that, as a matter of law, "IMS maintained an official policy or custom that was deliberately indifferent to [Wilson's] constitutional rights."  (Docket Entry 60 at 3.)  More specifically, Plaintiff contends that

> IMS maintained an official policy or custom that was deliberately indifferent to [Wilson's] constitutional rights where the unwritten policy or custom of IMS was to never refer an inmate to an emergency room solely due to a suicide attempt even though the written policies of IMS and the Jail required such a transfer and specified that the Jail facility was not equipped to treat a suicide attempt[.]

(Id. at 10.)  According to Plaintiff:

> IMS was aware of a substantial risk of harm posed by a suicide attempt in the Jail yet maintained policies or customs that were inappropriate considering that risk. Simply, IMS was deliberately indifferent because it knew suicide attempts could not be treated in the Jail, yet refused to refer certain inmates who attempted suicide to a facility equipped to treat them.  The express terms of the Medical Plan, the IMS Policy, and the Contract clearly and emphatically recognized the substantial risk of harm posed by an inmate who attempts suicide at the Jail.   Those terms also permitted referral of such inmates to the emergency department.   IMS ignored the risk, ignored the written policies, and created its own contrary policy or custom that required an inmate like [Wilson] to remain in a facility unequipped to treat him unless he was 'bleeding out'.

(Id. at 16 (citations omitted) (single quotation marks in original).)  Plaintiff further asserts:

40

Based on the written terms of the Medical Plan, the IMS Polic[y], and the Contract, IMS was on notice that a suicide attempt by itself presented a serious medical need and a substantial risk of serious harm that may require emergent hospitalization, specifically because the facility was not equipped to handle a suicide attempt. Despite having subjective knowledge of this particularized and objective risk, IMS adopted an official policy or custom that a suicide attempt alone could <u>never</u> justify referral to an emergency department. IMS knew that its no-emergency-referral policy created a serious risk of substantial harm for inmates like [Wilson] who attempted suicide in a facility that could not treat them. However, IMS maintained this policy or custom in the face of the known risk.

Therefore, IMS maintained a policy or custom that was deliberately indifferent to [Wilson's] constitutional rights and ultimately led to his death.

(<u>Id.</u> at 17 (citations omitted) (emphasis in original).)

Recognizing that "an affirmative link between the policy or custom and the violation must be established in terms of proximate cause," Plaintiff next contends that "IMS's policy or custom caused the constitutional violation." (<u>Id.</u> at 18 (underscoring omitted).) Per Plaintiff:

the same evidence that demonstrates deliberate indifference by IMS provides the affirmative causal link between the unconstitutional policy and the constitutional violation. The Medical Plan clearly stated that the Jail was not a proper facility to treat an inmate who attempted suicide. The Medical Plan, the IMS Contract, and IMS Policy all demonstrate the foreseeability of an inmate being injured or killed if he or she is left at the facility despite an attempted suicide (due to the Jail not being equipped to manage such a situation). That the Jail was in fact not equipped to treat a suicide attempt is demonstrated not just by the Medical Plan, but also by the inability of IMS staff to obtain recommended drugs at the Jail, by the use of pepper spray on [Wilson] while he was locked in his cell and undergoing an obvious psychiatric crisis, by

41

the failure to conduct required surveillance, by leaving objects in [Wilson's] cell that he could use to hurt himself for hours after his first attempt despite taking away his antisuicide gown, and by [O]fficer Lambeth's decision to walk away after he observed [Wilson] collapsed face-down on the floor of his cell. [Wilson] suffered and died needlessly in a facility that could not treat him because IMS maintained a policy whereby it refused to allow referral to an emergency room, despite knowing that a suicide attempt was a medical emergency that the Jail was not prepared to treat.

(Id. at 18-19 (citations omitted).)

Thus, Plaintiff maintains, "there is no dispute of fact that IMS proximately caused the deprivation of [Wilson's] constitutional rights," such that "Plaintiff is entitled to summary judgment as to the *Monell* claim against IMS, and there should only be a jury trial as to the damages that resulted from said deprivation." (Id. at 19.)

Medical Defendants dispute these contentions, maintaining, inter alia, that "the policy upon which Plaintiff bases her argument is the Sheriff's policy, not IMS's policy." (Docket Entry 88 at 4 (all-cap and bold font omitted).)[16] Arguing that they complied with all applicable policies, Medical Defendants further assert that Wilson received appropriate medical care, including following his initial suicide attempt, while in the Jail. (See,

---

16 The parties dispute IMS's responsibility for the relevant policy. (Compare, e.g., id., with Docket Entry 101 at 1-4 (arguing that relevant policy "is attributable to IMS as a matter of law," id. at 2).) The Court need not resolve this issue, as Plaintiff lacks entitlement to summary judgment regardless of the policy's attribution.

42

e.g., id. at 13 ("It is clear that IMS did not violate its own policy. This is nothing more than an argument about the necessary care for Mr. Wilson's mental illness."), 16 ("The Jail was equipped to treat mental illness, and Mr. Wilson received medications for his mental illness."), 18 ("[Medical] Defendants do not dispute that Mr. Wilson had a serious psychiatric illness but it was one for which he received reasonable and appropriate treatment.").)[17] According to Medical Defendants:

> Plaintiff takes the position that anything other than sending Mr. Wilson to the hospital amounts to deliberate indifference. That is simply not the standard. Plaintiff's theory ignores the medical judgment exercised by, and care provided by, Dr. Entwistle and Ms. Madden. Mr. Wilson's constitutional rights were not violated because he was not immediately transferred to a hospital after he attempted to tie a turtle suit around his neck and cell bars. IMS cannot be held liable under *Monell* for a policy it did not create.

(Id. at 17.) This position should prevail.

To begin, "a failure to carry out established procedures, without more, does not constitute 'deliberate disregard for the possibility' that [Wilson] 'would take his own life.'" Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir. 1990); see also Lewis v. North Carolina Dep't of Pub. Safety, No. 1:15cv284, 2019 WL 177480, at *5

---

17 Notably, Plaintiff did not respond to this argument (see Docket Entry 101 at 1-6), thereby conceding it, see Kinetic Concepts, 2010 WL 1667285, at *6-9. This failure independently justifies denial of Plaintiff's request for summary judgment against IMS. See, e.g., Grayson, 195 F.3d at 697 (explaining that Monell liability cannot exist without underlying constitutional violation).

43

(W.D.N.C. Jan. 11, 2019) ("[The p]laintiff cites no authority that any of the publications/guidelines create a standard of care applicable to the Department, which was only required to provide adequate medical care and even if one or more of the publications/guidelines did create an applicable standard of care, deviation from that standard was by definition merely negligent that fails to support a deliberate indifference claim."); Chennault v. Mitchell, 923 F. Supp. 2d 765, 781 (E.D. Va. 2013) ("[A] violation of jail policies alone fails to provide a cause of action under 42 U.S.C. § 1983."). Therefore, any failure to adhere to either IMS's or the Jail's written policies would not itself establish Section 1983 liability for IMS. See, e.g., Chennault, 923 F. Supp. 2d at 781 ("[The p]laintiff initially alleges that [the defendants] acted with deliberate indifference by failing to follow the Jail Annex policies regarding inmate intake. . . . [The p]laintiff's general allegation that [the defendants] fail[ed] to abide by jail policy cannot on its own support a cause of action under § 1983.").

Moreover, Plaintiff's Monell claim rests upon the proposition that the Jail could not adequately treat mentally ill inmates who attempted suicide, thus necessitating such inmates' transfer to the hospital regardless of whether the inmates incurred any physical injuries in the suicide attempt. (See, e.g., Docket Entry 60 at 10, 16; see also Docket Entry 101 at 2 (describing policy as "no

44

inmate could ever be emergently referred solely for mental health reasons, including attempted suicide, despite the fact that the Jail was not prepared to treat attempted suicides").)[18]  The record

_____

18  According to IMS:

> Plaintiff's Amended Complaint does not allege a *Monell* claim against IMS; therefore, an argument predicated upon *Monell* is not properly before this Court.  The word "Monell" appears nowhere in Plaintiff's Amended Complaint, and the Amended Complaint fails to allege that IMS had a policy or custom to not transfer inmates to a hospital emergency department before first appearance and arraignment for psychiatric illness alone without a concurrent physical injury that could not be treated at the Jail.

(Docket Entry 88 at 8-9.)  This contention warrants no relief.

The Amended Complaint asserts that IMS followed an "official policy, and/or widespread custom" that prevented "refer[ral of] detainees to local hospitals despite the availability of medically necessary medication at an outside hospital and the lack of availability of medically necessary medication within the Jail." (Docket Entry 9, ¶ 111.)  Although the details of that custom as alleged in the Amended Complaint differ from details developed through discovery (see id. (describing custom as authorizing nurses to decide against such referrals)), fairly read, the Amended Complaint encompasses Plaintiff's refined hospital-related Monell claim.  See, e.g., Rose v. Baltimore Cnty., No. 1:23cv2078, 2024 WL 3924595, at *12 (D. Md. Aug. 23, 2024) (observing that plaintiffs often "lack[] specific details regarding the municipal actor's internal policies and training procedures before discovery" (internal quotation marks omitted)).  Even if the Amended Complaint did not encompass Plaintiff's refined Monell claim, the record would support Plaintiff's alternative request to amend her pleadings to assert such claim (see Docket Entry 101 at 4-5 (arguing that "Plaintiff sufficiently pled and pursued her *Monell* claim against IMS," but "alternatively and respectfully request[ing] that the pleadings be amended to conform to the evidence that was obtained after the passage of the amendment deadline")).  See Fed. R. Civ. P. 15(a)(2) ("The [C]ourt should freely give leave when justice so requires."); see also Fed. R. Civ. P. 15(b)("If, at trial, a party objects that evidence is not
(continued...)

45

does not support this contention. As Medical Defendants emphasize, "[t]he Jail had resources to treat mental illness, including sedatives and anti-psychotics" (Docket Entry 88 at 16). (See, e.g., Docket Entry 60-13 at 2; Docket Entry 68, Ex. K at 11:29:45-11:30:26; Docket Entry 73-16 at 5; see also Docket Entry 88-1 at 67 (identifying prescribed medications as treatments for psychosis)). In addition to available antipsychotic medication, which Wilson obtained at the Jail (see, e.g., Docket Entry 60-13 at 2; Docket Entry 68, Ex. K at 11:29:45-11:30:26; Docket Entry 73-16 at 4-5), the Jail possessed multiple avenues for safeguarding physically uninjured suicidal inmates, including placement in either the suicide watch cell (with its increased monitoring rounds and constant video surveillance) or restraint chair. The record thus does not support Plaintiff's blanket assertion that "a suicide attempt was a medical emergency that the Jail was not prepared to treat." (Docket Entry 60 at 19.)

Even if attributable to IMS, the policy of not referring physically uninjured inmates to the hospital following a suicide attempt also did not proximately cause Wilson's death. As the Supreme Court has explained:

18(...continued)
within the issues raised in the pleadings, the [C]ourt may permit the pleadings to be amended. The [C]ourt should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits.").

46

As a general matter, to say one event proximately caused another is a way of making two separate but related assertions. First, it means the former event caused the latter. This is known as actual cause or cause in fact. The concept of actual cause "is not a metaphysical one but an ordinary, matter-of-fact inquiry into the existence . . . of a causal relation as laypeople would view it."

Every event has many causes, however, and only some of them are proximate, as the law uses that term. So to say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result. The idea of proximate cause, as distinct from actual cause or cause in fact, defies easy summary. It is "a flexible concept" that generally "refers to the basic requirement that . . . there must be 'some direct relation between the injury asserted and the injurious conduct alleged.'" The concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel in many instances. Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct. A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.

Paroline v. United States, 572 U.S. 434, 444-45 (2014) (citations omitted) (ellipses in original); see also National Org. for Marriage, Inc. v. United States, 24 F. Supp. 3d 518, 530 (E.D. Va. 2014) ("Boiled down, the plaintiff must prove that the harm was a reasonable and probable [foreseeable] consequence of the wrongful act; that is, the plaintiff must prove that, considering other potential causes, it is sensible to impose liability upon the defendant." (internal quotation marks omitted) (brackets in original)).

47

Here, Wilson sustained no physical injuries in his initial suicide attempt. Nevertheless, relying almost exclusively on alleged actions by Jail personnel following that attempt, Plaintiff maintains that the policy of not referring physically uninjured inmates to the hospital after a suicide attempt proximately caused Wilson's subsequent death. (See Docket Entry 60 at 18-19.) As Plaintiff's own litany of wrongs demonstrates (see id.), the causal link between any-policy-related failure to refer the physically uninjured Wilson to the hospital after his initial suicide and Wilson's subsequent suicide "is so attenuated that the consequence is more aptly described as mere fortuity," Paroline, 572 U.S. at 445. Quite simply, even setting aside IMS's inability to itself refer or transport an inmate to the hospital for mental health reasons (see Docket Entry 60-8 at 6; Docket Entry 86-1 at 55), Plaintiff has not "prove[n] that, considering other potential causes, it is sensible to impose liability upon [IMS for Wilson's suicide]," National Org., 24 F. Supp. 3d at 530 (internal quotation marks omitted); see also Monell, 436 U.S. at 691 (explaining that entities "cannot be held liable under [Section] 1983 on a *respondeat superior* theory"). The Court should therefore deny Plaintiff's request for summary judgment against IMS.

### C. Officer Lambeth's Liability

Finally, Plaintiff seeks summary judgment against Officer Lambeth, contending that "[Officer] Lambeth was deliberately

48

indifferent to [Wilson's] serious medical need." (Docket Entry 60 at 23.) In so arguing, rather than relying on the "objective test [applicable to] pretrial detainees' claims under the Fourteenth Amendment," Short, 87 F.4th at 612, Plaintiff relies entirely on the eighth-amendment deliberate indifference test, which "includes objective and subjective elements," id. (internal quotation marks omitted). (See Docket Entry 60 at 11-13, 19-22.) Even after Officer Lambeth explicitly argued that Plaintiff cannot satisfy the "elements set forth by the Court in *Short*" (Docket Entry 89 at 8; see id. at 8-9 ("Under the standard set forth in *Short*, Plaintiff must show that [Officer] Lambeth's action or inaction in response to a serious medical condition was 'objectively unreasonable.' . . . Here, [Officer] Lambeth did not fail to act nor were his actions unreasonable in light of the information he had and the condition of Wilson.")), Plaintiff failed to address Short (and Officer Lambeth's Short-based arguments). (See Docket Entry 98 at 1-5.) These failures alone warrant denial of the Motion as to Officer Lambeth. See, e.g., Shaughnessy v. Duke Univ., No. 1:18cv461, 2020 WL 4227545, at *6 (M.D.N.C. July 23, 2020) (denying summary judgment on claims where movant "d[id] not explain why the evidence is insufficient to support a jury verdict on any particular element or elements" of such claims and thus "ha[d] not met its initial burden to show that it is entitled to summary judgment on these claims"); see also Hill v. Carvana, LLC, No.

49

1:22cv37, 2022 WL 1625020, at *5 (M.D.N.C. May 23, 2022) ("It is not the Court's job to undertake the analysis and legal research needed to support a perfunctory argument, nor should a party expect [the C]ourt to do the work that [the party] elected not to do." (citation and internal quotation marks omitted)); Kinetic Concepts, 2010 WL 1667285, at *6-9 (explaining that party concedes opponent's argument by failing to address it and collecting cases).

Nevertheless, because "satisfying the Eighth Amendment test remains sufficient . . . for a pretrial detainee to state a claim for deliberate indifference to a serious medical need," Short, 87 F.4th at 612, this Opinion analyzes Plaintiff's entitlement to summary judgment under the eighth-amendment deliberate indifference standard.[19]  Under that standard, Plaintiff must "demonstrate that [Officer Lambeth] acted with 'deliberate indifference' (subjective) to [Wilson's] 'serious medical needs' (objective)," Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).  Notably, "[d]eliberate indifference is a very high standard — a showing of mere negligence will not meet it." Grayson, 195 F.3d at 695.  "In order to be liable under this standard, the official must both be aware of facts from which the inference could be drawn that a substantial

_____

[19]  Under either standard, however, Plaintiff's failure to respond to Officer Lambeth's argument that qualified immunity shields him from liability (compare Docket Entry 89 at 12-13, with Docket Entry 98 at 1-5) independently warrants denial of the Motion as to Officer Lambeth.  See Kinetic Concepts, 2010 WL 1667285, at *6-9.

50

risk of serious harm exists, and he must also draw the inference."
Parrish, 372 F.3d at 302 (internal quotation marks omitted).
"Stated somewhat differently, [d]eliberate indifference requires a
showing that the defendant[] . . . *actually knew of* and *ignored* a
detainee's serious need for medical care." Id. (internal quotation
marks omitted) (emphasis and initial set of brackets in original).

"Liability under this standard thus requires [these] two
showings," id. at 303:

> First, the evidence must show that the official in
> question subjectively recognized a substantial risk of
> harm. It is not enough that the officer[] *should have*
> recognized it; [he] actually must have perceived the
> risk. Second, the evidence must show that the official
> in question subjectively recognized that his actions were
> inappropriate in light of that risk. As with the
> subjective awareness element, it is not enough that the
> official *should have* recognized that his actions were
> inappropriate; the official actually *must have* recognized
> that his actions were insufficient.

Id. (citations and internal quotation marks omitted) (emphasis in
original). "The subjective component therefore sets a particularly
high bar to recovery." Iko, 535 F.3d at 241.

"Although the deliberate indifference standard requires a
showing of actual knowledge as to both elements, it 'is a question
of fact subject to demonstration in the usual ways, including
inference from circumstantial evidence.'" Parrish, 372 F.3d at
303. "Thus, a factfinder may conclude that an officer knew of a
substantial risk from the very fact that the risk was obvious."
Id. (brackets and internal quotation marks omitted). "But, it is

51

not enough that a reasonable officer *would have* found the risk to be obvious.  Rather, the risk of injury must be so obvious that the fact-finder could conclude that the officer *did* know of it because he could not have failed to know of it."  Id. (brackets, citation, and internal quotation marks omitted) (emphasis in original).  In that regard,

> a plaintiff can make a prima facie case under this standard by showing that a substantial risk of serious harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it.

Id. (brackets, ellipsis, and internal quotation marks omitted).  "Similarly, a factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances."  Id.

Here, Officer Lambeth does not recall if he "was actively watching Mr. Wilson or viewing [Wilson] on camera [during the period when Wilson ingested the milk carton and collapsed]."  (Docket Entry 73-18, ¶ 10.)  On the current record, one cannot tell from the control tower video whether Officer Lambeth's line of sight encompassed either P-33 or the surveillance footage of P-33 during the relevant period.  (See generally Docket Entry 100, Ex.

52

B.)[20]  Officer Lambeth, however, avers that he "was not aware" and "did not see" Wilson ingest a milk carton, attempt to "make himself throw up[,] or struggle to breath [sic] in anyway [sic]."  (Docket Entry 73-18, ¶ 11.)  Officer Lambeth further avers that, when he observed Wilson "lying prone on the floor in his cell" during Officer Lambeth's second scan, "[Officer Lambeth] checked if [Wilson] was breathing, saw [Wilson's] chest rise and fall, and saw no obvious signs of distress."  (Id., ¶ 12.)  The video reflects that, in the few seconds that Officer Lambeth looked into Wilson's cell, Wilson's shoulders rose and fell in Officer Lambeth's line of sight.  (See Docket Entry 100, Ex. A at 12:23:24-12:24:39.)  Officer Lambeth further avers that he thought that Wilson "was sleeping" (Docket Entry 73-18, ¶ 14), "ha[ving] finally gotten tired" after yelling for multiple hours (id.), a perception that Officer Lambeth relayed to Officer Smith upon returning to the control tower (see id., ¶ 15).

Nevertheless, Plaintiff maintains that "[Officer] Lambeth 'must have known' the risk" when "[Officer] Lambeth observ[ed] the collapsed, face-down, and silent [Wilson] on the floor of his cell," thereby satisfying the subjective component of the deliberate indifference test.  (Docket Entry 60 at 21; see also id.

_____

20  Plaintiff offers no evidence regarding what lay in Officer Lambeth's line of sight during his time in the control tower.  (See Docket Entry 60 at 9, 20-22 (discussing only cell surveillance footage).)

53

("The video footage negates any factual dispute with respect to the subjective appreciation of the risk of harm because it unambiguously depicts [Officer] Lambeth standing in front of and observing [Wilson] collapsed on the floor of his cell.").) However, particularly construed in Officer Lambeth's favor, as required at this stage of the proceedings, Wilson's posture in the video footage during Officer Lambeth's scan of his cell does not unambiguously reveal that Wilson had "collapsed" rather than fallen asleep. (See Docket Entry 100, Ex. A at 12:23:24-12:24:39.) Accordingly, the video footage neither "blatantly contradict[s]" (Docket Entry 60 at 19 (internal quotation marks omitted)) Officer Lambeth's version of events nor suggests that, in his brief glimpses of Wilson, Officer Lambeth "could not have failed to know [that Wilson had collapsed and needed aid]," Parrish, 372 F.3d at 303 (internal quotation marks omitted). Plaintiff has thus failed to establish that "[Officer Lambeth] *actually knew of* and *ignored* [Wilson's] serious need for medical care," id. (internal quotation marks omitted) (emphasis in original), as required to prevail on summary judgment. The Court should therefore deny Plaintiff's request for summary judgment against Officer Lambeth.

## CONCLUSION

The record establishes that Wilson's suicidality and mental illness qualified as a serious medical need. However, Plaintiff

54

has not shown that, as a matter of law, IMS and Officer Lambeth violated Wilson's constitutional rights.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 56) be granted insofar as it requests a determination that Wilson's suicidality and mental illness constituted a serious medical need, but denied insofar as it seeks summary judgment against IMS and Officer Lambeth.

This 10th day of July, 2026.

/s/ L. Patrick Auld

**L. Patrick Auld**
**United States Magistrate Judge**
