## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SUSAN WILSON,                        )
as Administrator of the             )
Estate of MATTHEW BRIAN WILSON,     )
                                    )
            Plaintiff,              )
                                    )
      v.                            )            1:24cv219
                                    )
DAVIDSON COUNTY                     )
SHERIFF'S OFFICE, et al.,           )
                                    )
            Defendants.             )

### MEMORANDUM OPINION AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for recommendations on the motion in limine (Docket Entry 70) (the "Expert Motion") and the motion for summary judgment (Docket Entry 66) (the "Judgment Motion") filed by IMS Correctional Healthcare, LLC ("IMS"), Celia Entwistle, MD, and Michelle Madden, LPN (collectively, the "Medical Defendants").[1] For the reasons that follow, the Court should grant the Expert Motion and the Judgment Motion (collectively, the "Motions").

---

1 Although a motion to exclude expert witnesses qualifies as a nondispositive matter subject to resolution by a magistrate judge, see, e.g., Mr. Dee's Inc. v. Inmar, Inc., No. 1:19cv141, 2021 WL 4224720, at *1 n.1 (M.D.N.C. Sept. 16, 2021), the undersigned United States Magistrate Judge elects to enter a recommendation rather than an order on the Expert Motion given the intertwined nature of the Expert Motion and Judgment Motion.

Alleging various claims related to "the wrongful death of Matthew Wilson [('Wilson')] as a result of injuries sustained at the Davidson County Jail" (Docket Entry 9 (the "Amended Complaint") at 1),[2] Susan Wilson (the "Plaintiff"), Wilson's mother and the administrator of his estate (see id.), sued (i) Medical Defendants; (ii) Davidson County, Sheriff Richie T. Simmons, Officer Logan Peters, and Officer Jonathan Lambeth; and (iii) Correctional Behavioral Health, PLLC ("CBH"). (See id. at 1-30.) The parties thereafter stipulated to CBH's dismissal without prejudice from this lawsuit (see Docket Entry 27 at 1), as well as to the dismissal of "Count VII of Plaintiff's Amended Complaint (Violation of Article I, Section 27 of the North Carolina Constitution against all Defendants)" (Docket Entry 61 at 1-2). Accordingly, as relevant to the Motions, the Amended Complaint purportedly asserts the following claims against Medical Defendants: (i) "42 U.S.C. § 1983 Claim against [IMS]" (Count II) (Docket Entry 9 at 16 (bold font omitted)); (ii) "42 U.S.C.§ 1983 Claim against all Defendants – Conditions of Confinement and Excessive Force" (Count III) (id. at 19 (bold font omitted));[3] (iii) "42 U.S.C.§ 1983 Claim Against

---

2 Docket Entry page citations utilize the CM/ECF footer's pagination.

3 Although ostensibly directed against "all Defendants" (id. (bold font omitted)), this claim focuses on "Defendants Davidson County and Sheriff Simmons" (id.) and their "agents" (id. at 20)
(continued...)

2

[Dr.] Entwistle [and Nurse] Madden . . . in their Individual Capacities" (Count IV) (<u>id.</u> at 20 (bold font omitted)); (iv) "Negligence against all Defendants" (Count V) (<u>id.</u> at 22 (bold font omitted));[4] and (v) "Punitive Damages against all Defendants" (Count VIII) (<u>id.</u> at 28 (bold font omitted)).

After close of discovery (<u>see, e.g.,</u> Text Order dated Apr. 23, 2025 (granting request to extend discovery deadline to September 16, 2025)), Medical Defendants moved for summary judgment on all claims against them (<u>see</u> Docket Entry 66 at 1-2). Medical Defendants further moved, "pursuant to Rules 702 of the North Carolina and Federal Rules of Civil Procedure, for entry of an order excluding the testimony of Plaintiff's Experts George P. Corvin, Edna S. Wong McKinstry, and Maureen L. Reardon." (Docket Entry 70 at 1). Plaintiff responded in (partial) opposition to both Motions. (<u>See</u> Docket Entry 92 (the "Opposition"); Docket Entry 97.)

As relevant to the Motions, the record reflects:

_____

3(...continued)
and does not explicitly mention any Medical Defendants (<u>see</u> <u>id.</u> at 19-20).

4  Plaintiff relies on vicarious liability in asserting this claim against IMS. (<u>See</u> <u>id.</u> ("At all times relevant hereto, Defendant [sic] IMS and CBH were vicariously liable for the acts of its [sic] employees and agents, specifically Defendants Entwistle and Madden.").)

## I. Relevant Policies and Procedures

IMS provides health care services at the Davidson County Jail (the "Jail" or "Detention Center") pursuant to a contract dated September 1, 2021, with Davidson County. (See Docket Entry 60-7 (the "Contract") at 1.) Per the Contract:

IMS bears "responsib[ility] for providing adequate medical staff to operate a sick call clinic at the Jail." (Id.) "The detention staff will have no medical duties." (Id.) "Non-emergency cases will be seen at the Jail." (Id.)[5] "In the event [IMS] determines that emergency services are needed, problems may be handled by a visit to the Jail or referral to the Emergency Department of Wake Forest Baptist Health - Lexington Medical Center or any other local hospital network with emergency room services." (Id.) "[The] Jail will be responsible for transportation. [IMS] will review all non-emergency cases involving 'High Risk Transports' at the Jail prior to transporting." (Id.) "[IMS] will work with [CBH] for the exclusive provision of Mental and Behavioral Healthcare Services." (Id. at 7.) "CBH is an

---

5 Testifying on behalf of IMS, Rachel Ruppe defined "non-emergency cases" as: "[i]f you're breathing and you're not ready to bleed out, it's not an emergency, if it's not life or death — in a medical emergency, heart attack." (Docket Entry 57-1 at 28 (bold font omitted).) She further clarified that whether an attempted suicide constitutes a medical emergency "[d]epends on the injuries. Do they have injuries? Do they have physical medical injuries?" (Id.; see also id. at 28-29 (confirming that, after a suicide attempt, "if [an inmate] do[es]n't have physical injuries, if they're not bleeding out, that's not considered an emergency" (bold font omitted)).)

4

independent company from [IMS] and is qualified to provide mental and behavioral healthcare services in support of the overall inmate healthcare at Davidson County."  (Id.)

Under the provided excerpts of the "Davidson County Sheriff's Department Detention Center Medical Plan" (Docket Entry 60-6 (the "Medical Plan") at 1 (all-cap font omitted)):

"When [a] potential[ly] suicidal inmate is identified, it will be documented on the detention center card and on the booking card so when [such] inmate is taken to court, etc., they will continue to be under close observation." (Id. at 3.)  "Notify Dr. Detention Center physician [sic] for assessment and if Mental Health should be contacted.  Emergency room treatment will be used if Mental Health does not respond."  (Id.)  "Any member of the detention staff who receives a notification . . . that a certain individual is a risk for suicide should follow Procedure B above."  (Id.)[6] "Any inmate who is under close observation due to suicide risk shall have the following items removed for safety reasons: a. Anything that could be used to harm themselves.  b. Matches and any flammable materials.  c. All sharp objects."  (Id.)  "If Detention Center medical personnel determines an inmate is at great risk of harm to self, the shift supervisor, under advisement of the facility physician, will judge whether adequate precautions can be

_____

6  The referenced Procedure B does not appear in the provided excerpts.  (See id. at 1-4.)

5

taken within the Detention Center to protect the inmate." (Id.) "If inmate safety can not [sic] be managed, arrangements should be made to transfer inmate to 'safe keeping.'" (Id.)

The "Policy" regarding "Suicide Attempts" specified:

An actual attempted suicide by an inmate constitutes a situation that the facility is not prepared to treat. An inmate who attempts suicide will be processed out of the facility as soon as possible following procedures outlined below, to []an institution that is better prepared to treat that inmate's mental or physical condition.

(Id. (all-cap font omitted).)

In turn, the "Procedure" (id. (all-cap font omitted)) for such attempts (see id. ("This procedure describes the actions to be taken by detention personnel when a prisoner/inmate makes a suicide attempt.")) specifies:

A. Medical Care

1. Upon discovering a prisoner who has made a suicide attempt, detention personnel shall immediately render whatever first-aid necessary [sic] and shall immediately summon EMS personnel to evaluate the inmate's need for further medical care and contact Facility [sic] physician. If it is determined that further medical care is necessary, arrangements shall be made for transport of [the] inmate to the emergency room.

2. As soon as an inmate's requirements for immediate life preserving medical care are satisfied and he is put under close observation, detention personnel shall take immediate steps to relate the inmate's evaluation to the facility physician.

B. Pre-Trial Detainee

1. If the inmate attempts suicide while awaiting trial, he should be evaluated by the facility physician to see

6

if he should be transferred to Central Prison for "safe-keeping".

2. If the person is being held on a misdemeanor and under a low bond, an Involuntary Commitment to the hospital may be appropriate once bond [sic] has been satisfied and shall be carried out through the normal Involuntary Commitment process. In cases of persons charged with felonies or under high bonds, transfer under a safe-keeping order to Department of Corrections.

*****

D. Transportation

When [a] court order is obtained ordering transfer of a person who has attempted suicide to the hospital of [sic] the Department of Corrections facility, the Chief Detention Center officer or his designee shall call the Department of Corrections and make admission arrangements. The inmate shall be transported as soon as all arrangements are complete from the detention facility to the hospital or Department of Corrections.

(Id. at 3-4 (underscoring in original).)

For its part, IMS maintained, inter alia, a "Suicide Prevention Program," with the stated purpose of preventing suicides "when possible by implementing prevention efforts and intervention." (Docket Entry 60-9 (at times, the "IMS Policy") at 2 (bold font omitted).)[7] Under this program, IMS's "policy is that the medical staff will be trained to recognize inmate suicidal

---

7 The submitted version of IMS's "Clinical Policies and Procedures" bears a revision date of March 2023. (Id. at 1 (bold font omitted).) However, the parties do not dispute that the provided excerpts remained in force during Wilson's incarceration. (See, e.g., Docket Entry 60 at 5 ("Pursuant to IMS's own written Clinical Policies and Procedures in place and applicable to the Jail during the relevant period . . . ." (citing Docket Entry 60-9)); Docket Entry 88 at 12 (discussing Suicide Prevention Program and citing Docket Entry 60-9).)

behavioral signs.  Any inmate who has been identified as acutely (actively) suicidal, or considered high risk of suicide behavior, will be immediately placed on suicide watch." (Id.)  "The medical staff will refer the inmate for appropriate mental health assessment on the next available session."  (Id.)  Relevant procedures include:

> Th[e suicide prevention] program will begin upon intake of an inmate if there is the recognition of suicidal behaviors.  All correctional and medical staff are responsible for monitoring the mental status of inmates.
>
> Inmates who are identified as having suicidal tendencies will be evaluated and relayed to the medical provider in a timely manner by qualified medical personnel or qualified mental health professional.  . . . Actively suicidal inmates will be assigned to strict suicide watch which means they are closely observed at least four times an hour by correctional staff.  These monitoring rounds must be documented along with inmate's behaviors.  . . . Communication is important between correctional staff and medical staff.  Training on recognizing signs and symptoms of mental health crisis and suicidal ideation will be conducted and reviewed as needed.
>
> *****
>
> All suicide attempts are treated as medical emergencies and medical staff is to respond immediately.  The Responsible Health Authority will ensure a debriefing is done with all involved.  . . .

(Id. (bullet point markings omitted).)[8]

_____

8  Per Ruppe, this policy meant that "our nurses are to treat suicide attempts as emergencies and respond [as if] it is a true emergency.  They are not to[ say,] I don't have to go, he didn't do anything, he's not hurt, they are required to respond." (Docket Entry 67-1 at 23; see also id. at 25 (explaining that IMS policy "sa[ys] the nurses should treat [an attempted suicide] as a medical emergency").)

Under IMS's "Emergency Services" provisions, IMS's "policy is that all inmates have access to 24-hour emergency care including medical, dental, and mental health." (Id. at 3 (stray space and bold font omitted).) To that end, "[m]edical staff and correctional staff are trained to respond to medical emergencies" and "[a]n on-call provider is available 24/7 for emergency consultations." (Id.)[9] "The decision for evaluation is made by the on-duty medical staff. If time permits[,] the Medical Director or on-call provider is to be consulted prior to hospital transfer of [the] inmate but [such consultation] is not necessary during acute emergencies. Care should never be delayed." (Id.) However, "[t]ransfers outside the facility must be made with the on-duty correctional supervisor to facilitate arrangement of security to accompany the inmate." (Id.)

Additionally, the Jail followed a longstanding policy of not transferring an inmate to the hospital for purely mental ailments prior to the inmate's initial appearance. (See, e.g., Docket Entry 88-1 at 10-22 (testifying that, in officer's roughly twenty-two-year tenure at Jail, no inmate, including actively suicidal

_____

9 According to Ruppe, under IMS's policy, "an inmate's mental illness," by itself, would never "rise to the level of what IMS personnel would consider to be a medical emergency." (Docket Entry 57-1 at 37 (bold font omitted).) Instead, a situation would constitute a medical emergency only if the inmate suffers physical injury (see, e.g., id. (explaining that "[t]he[ inmate] would have to be, again, actively bleeding if they cut their arm, then, yes, it would become a medical emergency")), as "prior to that [development] it's mental health" (id.).

inmates, transferred to hospital prior to arraignment absent serious physical ailment); see also, e.g., Docket Entry 60-8 at 6 (testifying on behalf of IMS that inmates cannot transfer out of Jail prior to first appearance and explaining basis for that position as follows: "I guess, a North Carolina state rule. It's not an IMS rule.").)  Under the Contract, inmates remained in the custody of the Sheriff (see Docket Entry 57-1 at 39), whose "policies trump everything in [IMS's] policies" (Docket Entry 67-1 at 23).  Moreover, CBH, which generally[10] provided virtual mental health services on Thursdays (see Docket Entry 57-1 at 39; Docket Entry 67-1 at 6, 19),[11] bore responsibility for ascertaining "whether or not an inmate has experienced a psychiatric crisis" (Docket Entry 57-1 at 36).

Thus, although IMS personnel could decide whether "a medical situation is an emergency or non-emergency" (Docket Entry 97-1 at 2 (bold font omitted)) and whether an "emergent medical

_____

10  If acute mental health needs arose sufficiently in advance of the scheduled Thursday service, an "emergency mental health clinic[]" could be arranged with CBH.  (Docket Entry 67-1 at 6; see id. (explaining that an "acutely suicidal inmate[ would] have to wait until Thursday for the mental health evaluation . . . . [i]f it's on  Wednesday," but "[i]f it was on a Friday and mental health would not be there until Thursday, then of course they would call and say, hey, is there someone that you can send to see this person," as "[t]hey will do, we have set aside times for emergency mental health clinics" (bold font omitted)).)

11  As such, had Wilson not "had the cardiac arrest [on Wednesday, November 16, 2022,] he would have been seen the next day, Thursday, by [CBH]."  (Docket Entry 67-1 at 19 (bold font omitted).)

10

situation[]" necessitated "call[ing] for an ambulance" (id. at 7 (bold font omitted); see id. at 8),[12] IMS lacked the ability to refer an inmate to the hospital solely for mental health reasons (Docket Entry 86-1 at 55; see also, e.g., Docket Entry 57-1 at 39-40 (explaining that (i) "the [S]heriff [did not] delegate to IMS the authority to transfer [Wilson] out for mental health reasons" (id. at 39 (bold font omitted)), (ii) "[t]he [S]heriff has not delegated the authority to IMS to transfer patients for purely mental health reasons" (id. at 40 (bold font omitted)), and (iii), "in the case of a suicide, where there isn't a concurrent medical injury that rises to the level of emergency [sic], [IMS lacked] authority [from] the [S]heriff to transfer a patient out of the jail" (id. (bold font omitted)))). Rather, IMS, which "can[no]t transfer" or "transport inmates" (Docket Entry 60-8 at 6), could only recommend such referral "to whoever the administrator is at the detention center or the [S]heriff" (Docket Entry 86-1 at 55).

### II. Jail Medical Facilities & Personnel

"[B]oard-certified in emergency medicine" (Docket Entry 67-1 at 119; see Docket Entry 92-1 at 28, 33), Dr. Entwistle became "the contracted physician for IMS" (Docket Entry 67-1 at 5) following her retirement (see Docket Entry 92-1 at 2) from the Womack Army

_____

12  Per Dr. Entwistle, even after an attempted suicide, "to go to the hospital there needs to be some intervention that will happen there that is not going to happen at the [J]ail" (Docket Entry 67-1 at 46).

11

Medical Center in September 2021 (see id. at 2, 28, 34).  In her role as "the [J]ail physician" (Docket Entry 67-1 at 4 (bold font omitted)), Dr. Entwistle visited the Jail once a week (see id. at 3) for at least two hours at a time (see id. at 37; see also id. (explaining that "it's occasionally five or six [hours]")) to assess patients (see id. at 3; see also id. at 37).  According to Dr. Entwistle,

> [her] role was to advise the nurses when there were medical issues that deviated from anything in the [IMS] protocols, to see any inmate that the nurses felt [she] needed to see in person, and . . . generally just provide medical guidance in their evaluation of patients, generally if they're outside anything on the protocols . . . .

(Docket Entry 92-1 at 5-6.)  The nurses would call or text Dr. Entwistle if they needed guidance in her absence from the Jail. (See, e.g., id. at 17, 27.)

Dr. Entwistle "[g]enerally only [sees patients] in the medical office."  (Id. at 25; see also id. ("It's kind of remarkable for [her] to go see them in the jail . . . inside their cell or something.").)  Per Dr. Entwistle, the Jail's

> medical office is slightly larger than th[e] table[ at her deposition], and then there's a doorway at the end and there's a room at the back that has a toilet, a sink, and an incredible number of files and medical stuff in it.
>
> The actual medical clinic is about the size of this table, slightly wider.  On this side there's a counter, there's a little, tiny walkway, and then there's an exam table.  Then there's a — one of those rolly carts that has a bunch of supplies in it, then there's a

12

refrigerator for medications, file cabinets and some other stuff down at the end. . . .

Over here [they] have unknown equipment. Small area to write on. That's about [her] entire space. Right above [her] is the ginormous [sic] TV that the telehealth, telepsych does, that they provided. And then there's big [sic] something here, charts, suicide watch, wound care, blood pressure checks, diabetics. They keep all those up because they all have to be looked at every day. And there's some giant piece of equipment, and then there's another — then there's a computer, and then there's the back area still on this side, all that's on this side, where the meds are and the med tech sits.

When [she] sit[s] here and the screen is above [her], and [she is] sitting here, the knees of the inmate on the exam table are almost against [her] chair. So if you go [to the office] while they're doing mental health, you're sitting with your back to an interesting population of patients, so [she] do[es]n't usually go during mental health. There's really no extra room for anyone else to be in that department.

(Id. at 9-10.)

Dr. Entwistle further explained that the Jail's "mental health service provider that sees patients" (id. at 25 (bold font omitted))

[i]s a telepsych company, and they provide psychologists. It's — [she] won't say it's never a psychiatrist. There may be a psychiatrist, but usually it's a social worker or clinical social worker or a licensed psychologist, and they provide their own enormous television screen, and in that way it is more — and they basically Zoom, and in that way it's more of a real-time experience . . . .

(Id.)

For her part, Nurse Madden thought that the Jail lacked a "full medical staff to meet [its] needs." (Id. at 45.) Specifically, she "felt that [they] were short staffed because

13

[they] would usually only have two people on duty" from IMS "for a twelve[-]hour shift."  (Id.; see also id. (explaining that they had "two or three" IMS people on duty).)  As for "how many inmates there were roughly" at the Jail, Nurse Madden thought "[m]aybe 300, 350.  [She was] not exactly sure."  (Id.)

### III. Wilson's Incarceration

On Tuesday, November 15, 2022, officers arrested Wilson and, at 10:12 p.m., booked him into the Davidson County Jail.  (See Docket Entry 73-5 (the "Screening Report") at 1.)  Shortly thereafter, Officer DeCarlo conducted a jail suicide and medical health screening for Wilson.  (See id. at 1-3.)  Per the Screening Report, Wilson suffered from mental illness, for which he was hospitalized the week prior, and attempted suicide (by cutting) the previous year.  (See id. at 2.)  The Screening Report listed the following four items as "current medical problems that [Wilson] might need treatment for" (id. at 3):  "Bipol[a]r[,] Depressed[,] ?? Sociopath[,] Su[ici]dal" (id. (all-cap font omitted) (question marks in original)).  The Screening Report further indicated that Wilson "seem[ed] depressed" (id.), "seem[ed] anxious or afraid" (id.), and "seem[ed] to be talking in a strange manner" (id.).  It also specified that Wilson "currently believe[d] that someone can control [his] mind by putting thoughts into [his] head or taking thoughts out of [his] head" (id. at 1), although he did not

14

"currently feel that other people know [his] thoughts and can read [his] mind" (id.).

Based on Wilson's answers to its Suicide Screening component, the Screening Report noted that "[Wilson] should be referred for further mental health evaluation." (Id. (bold font omitted).) Officer DeCarlo accordingly called a nurse (see Docket Entry 73-6 at 5) and, either on her own initiative (see id.) or "collectively" with the nurse (Docket Entry 73-10 at 3), "deci[ded] to put [Wilson] in a suicide watch cell" (Docket Entry 73-6 at 5 (bold font omitted)). As part of his suicide watch designation, Wilson "automatically" received "[a] suicide gown," known as a "turtle suit." (Id. at 2-3.) Designed "to prevent someone from hanging themselves" (Docket Entry 73-8 at 4), a suicide gown "is like a thick blanket material that has some Velcro located on the shoulders and the back to be able to be worn on a human" (id. at 3). Because of the gown's thickness and design, individuals cannot easily knot the gown to hang themselves. (See id. at 4; Docket Entry 73-9 at 2.)

Officers then escorted Wilson to P-33, a suicide watch cell (see Docket Entry 50-1 at 7; Docket Entry 73-6 at 6), which officers "can see . . . from the [control] tower" (Docket Entry 73-6 at 3). A surveillance camera also broadcast footage of P-33 to the control tower, where a monitor continuously displayed the footage. (See, e.g., Docket Entry 89-1 at 7.) Official policy

15

also obliged officers to check on inmates on special watch, such as suicide watch, four times an hour, no more than 20 minutes apart. (See Docket Entry 73-8 at 6-7; Docket Entry 73-12 at 4; Docket Entry 110 at 14-15.) Located at the very end of a hallway of cells, adjacent to the top of the stairs down to a common area, P-33 contains a gate made of vertical metal bars with a horizontal crossbar at roughly waist height. (See, e.g., Docket Entry 68, Ex. H at 8:54:25; Docket Entry 68, Ex. K at 11:29:58; Docket Entry 100, Ex. A at 12:10:18-12:10:24.) Made of concrete walls, P-33 contains a combination metal toilet and water basin/faucet in its front right corner (as viewed from outside the cell),[13] just inside the gate, with a mirror affixed to the wall above it; the cell contains no other permanent fixtures. (See, e.g., Docket Entry 68, Ex. H at 8:54:25; Docket Entry 68, Ex. K at 11:30:14.)[14] The hallway appears to contain cells on one side and a wall of metal screening (similar to chain-link fencing) along the other side of the walkway, through which one can view the lower tier, which contains, inter alia, tables. (See Docket Entry 68, Ex. K at 11:29:45-11:30:46.) Positioned on the opposite side of that metal wall, the surveillance camera captures the top of the stairs, the interior of P-33, and parts of an adjoining cell, which contained at least one

---

13  Unless otherwise specified, this Opinion uses the video viewer's perspective for all video descriptions.

14  Rather than a permanent bed, the cell contains a moveable mat. (See, e.g., Docket Entry 68, Ex. K at 11:29:45-11:29:51.)

inmate during Wilson's time in P-33.  (See Docket Entry 100, Ex. A at 12:10:10.)[15]

At 8:05 a.m. on November 16, 2022, Wilson received a carton of milk for his breakfast.  (See Docket Entry 73-11 (the "Timeline") at 1.)[16]  Approximately twenty minutes later, Wilson attempts to hang himself with his suicide gown.  (See id.; see also Docket Entry 87 (the "Initial Video") at 8:24:07-8:24:45.)  Approximately thirty seconds after Wilson starts trying to tie the gown around the upper portion of the cell bars, Officer Smith runs up the hallway to the cell and Wilson quickly lifts the gown from around his neck as he backs away from the cell bars.  (See Docket Entry 87 at 8:24:11-8:24:46.)  When Wilson releases the gown, it falls to the crossbar and, using one hand, Officer Smith subsequently removes it from the cell entirely, tossing it up the hallway.  (See id. at 8:24:44-8:25:16.)  Another officer comes up the stairs, joining Officer Smith outside Wilson's cell.  (See, e.g., id. at 8:25:08-8:25:29.)  The officers observe Wilson, who moves around

---

15  The adjoining cell appears on the right of the screen when viewing the video footage.  (See id.)  Wilson's cell, P-33, occupies the last spot on the hallway, with a concrete wall on the left side of the video.  (See id.)

16  Using jail surveillance footage, Captain Tracy Rabon prepared the Timeline for the North Carolina Department of Health and Human Services.  (See, e.g., Docket Entry 110 at 36-38.)  The parties all rely on the Timeline, the accuracy of which they do not dispute.  (See, e.g., Docket Entry 50 at 3-4; Docket Entry 53 at 3-4; Docket Entry 54 at 8-9; Docket Entry 60 at 7-8; Docket Entry 89 at 2.)

17

his cell while apparently talking to them, for another minute before they depart back the way they came. (See id. at 8:25:29-8:26:51.) Throughout this incident, inmates walk up and down the hallway and stairs carrying, inter alia, food trays and a trash can. (See id. at 8:21:34-8:27:59.) Ordinarily, such trustee inmates would remove the breakfast items within an hour of serving breakfast. (See Docket Entry 73-12 at 3-4.) Per policy, inmates "[w]ere [not] allowed to keep trash, milk cartons, food, [or] other items inside their cell." (Docket Entry 73-21 at 4 (bold font omitted).)

Thirty minutes later, Nurse Madden and then-Lieutenant Phillips (see Docket Entry 73-8 at 3; Docket Entry 73-11 at 1) approach P-33, where Wilson appears to be sleeping, curled up on his side in a fetal position on his mat at the rear of the cell, facing the cell entrance. (See Docket Entry 68, Ex. H (the "Discussion Video") at 8:54:18-8:54:37.) When Nurse Madden begins speaking with Wilson, he lifts his head off his mat and begins talking with her, gesturing freely with his right arm before he sits and then stands up from his mat and approaches the front of the cell. (See id. at 8:54:30-8:55:17.) Wilson squats and then sits down in front of Nurse Madden at the gate, showing her various body parts as he cries and talks with Lieutenant Phillips and Nurse Madden, who crouches in front of Wilson at his eye level. (See id. at 8:55:17-8:57:00.) At that point, Wilson stands up, prompting

18

Nurse Madden to stand, and continues to talk with Nurse Madden, occasionally including Lieutenant Phillips in his communications. (See id. at 8:57:00-8:59:15.)  Wilson then turns around in the cell while Nurse Madden observes him, after which he moves towards the front right corner of the cell (approaching Lieutenant Phillips). (See id. at 8:59:15-8:59:36.)  Wilson appears upset as he continues to speak with Nurse Madden, who approaches and stands in front of Wilson, largely obscuring him from view, as she continues communicating with him.  (See id. at 8:59:36-8:59:58.)  After they shift their positions slightly, with Nurse Madden moving slightly to the right and Wilson moving slightly to the left, they continue communicating, with Wilson again fully visible in the footage. (See id. at 8:59:58-9:00:06.)

As Nurse Madden gestures towards Wilson, he nods his head, after which Nurse Madden reaches out with her left hand to hold Wilson's wrist as though taking his pulse.  (See id. at 8:59:58-9:00:16.)  Nurse Madden turns to her right, facing up the hallway towards Lieutenant Phillips, again largely obstructing Wilson from view; although somewhat unclear from the video, it appears that she continues measuring his pulse.  (See id. at 9:00:16-9:00:41.) Nurse Madden next shifts to the right as she and Wilson continue communicating, with Wilson appearing more animated as he continues speaking to Nurse Madden, as well as to Lieutenant Phillips, who responds, turns, and walks away up the hallway.  (See id. at

19

9:00:41-9:01:02.) Nurse Madden and Wilson continue talking, with Wilson appearing upset as he drops into a crouch, seeming to plead with Nurse Madden as she begins moving away from his cell, ultimately walking up the hallway out of the video frame. (See id. at 9:01:02-9:01:30.) Wilson remains crouched at the front of the cell momentarily, before retreating back to his mat and lying back down in his original fetal position, facing his cell entrance, as inmates come up the stairs in front of his cell. (See id. at 9:01:30-9:01:40.)

According to Nurse Madden, a Licensed Practical Nurse (Docket Entry 67-1 at 56), "what [her] education and training t[o]l[d her] to do" when encountering "a patient like [Wilson]" (id. at 59) was to "[f]irst . . . encourage [the] patient to lay on the mat and do some breathing exercises" (id.). "[She] was hoping that that would calm him down." (Id.; see also id. (explaining that she had learned she should "[t]ry to calm them down" when encountering "someone [who] is screaming I'm going to die, they're not in touch with reality, [and she is] going to see them for self harming").) Nurse Madden, whose "shift started at seven" that morning (id. at 65) first saw Wilson at 8:54 that morning (id.). She saw Wilson twice more over the next two and a half hours, as discussed below.

At approximately 10:52, Wilson throws an unknown liquid, later identified as toilet water, on Officer Peters, who subsequently sprays Wilson with pepper spray. (See Docket Entry 60-12 at 2-3;

20

Docket Entry 73-11 at 1; Docket Entry 73-15 at 2-5.)  According to the relevant Use of Force Report, officers then took Wilson for decontamination and a medical check.  (See Docket Entry 73-14 at 2; see also Docket Entry 73-11 at 2.)  Nurse Madden observed the officers with Wilson at the decontamination sink and went to assist, wiping Wilson's face and eyes and taking pictures of the marks on his body.  (See Docket Entry 73-16 at 2-4; Docket Entry 68, Ex. J at 11:02:08-11:08:26.)  Nurse Madden described Wilson as "under distress" and out of touch with reality during this encounter.  (Docket Entry 73-16 at 3.)  At 11:10, officers escorted Wilson back to P-33.  (See Docket Entry 73-11 at 2.)

Shortly thereafter, Nurse Madden sent the following text message to Dr. Entwistle:

> Hi dr e I have a pt Matthew Wilson dob [redacted]2000, and he is on SW for making statements he wanted to end his life.  He tried to hang himself w the turtle suit and is naked now.  And got pepper sprayed.  He is a/o x0, and under distress.  Unable to do a H&P because of mental state

(Docket Entry 60-13 at 1 (abbreviations, capitalization, and formatting in original).)[17]  Dr. Entwistle responded:

---

[17]  "Dr. Entwistle learned Mr. Wilson had been booked at the Davidson County Detention Center via [this] text [message that Nurse] Madden sent at approximately 11:16 [a.m.] on November 16, 2022."  (Docket Entry 67-1 at 53; see also id. at 54 (verifying response).)  "Dr. Entwistle was not present at the Davidson County Detention Center [during Wilson's incarceration] and did not personally perform any physical and/or mental examinations of Mr. Wilson [during his incarceration]."  (Id. at 53.)

21

> Reading
> Can we give a Haldol shot
> And Ativan

(Id. (formatting and capitalization in original).) Nurse Madden responded: "Janet isn't here she had an apt n has the key for the narc box" (id. (abbreviations in original)),[18] prompting the following exchange:

> [Dr. Entwistle:] Dang
> Will he take a pill
> Vistaril 50
>
> [Nurse Madden:] I'll do that now Ty
>
> [Dr. Entwistle:] Seroquel 100 if he will take
> Both
>
> [Nurse Madden:] Ty

(Id. at 2 (abbreviations, capitalization, and formatting in original).)[19]

By 11:29:45, Nurse Madden returns to Wilson's cell, where she gives him the medication that Dr. Entwistle prescribed and advises

---

18  In actuality, medical staff possessed two keys to the "narc box," which contains medications labeled as narcotics (Docket Entry 67-1 at 18), with one key located on the medical cart and the other in the supply cabinet. (See id. at 10-11.) Regardless, the narc box did not contain Haldol on the day in question. (See id. at 15, 20-21.)

19  Seroquel, a "pretty first-line antipsychotic" (Docket Entry 67-1 at 16), was "on the formulary list" (id. at 17) of medications always present at the jail (id.; see also id. at 21 (explaining that "Seroquel is physically present in tablet form because it's part of the formulary and has a standing order" (bold font omitted))). For its part, although "[t]echnically not psychotropic," Vistaril "[c]auses sedation" and thus "has an effect." (Id. at 49.)

Wilson to give the medicine about 20 minutes to take effect. (See Docket Entry 68, Ex. K at 11:29:45-11:30:26; Docket Entry 68, Ex. L at 12:44:06-12:44:15; Docket Entry 73-16 at 4-5.)[20] Visibly distressed, Wilson repeatedly expresses pain and asks for a shower or water, imploring Nurse Madden and the accompanying officer to turn back on the water in his cell. (See Docket Entry 68, Ex. K at 11:29:45-11:30:47.) The officer says he lacks the key necessary to turn on Wilson's water and tells Wilson to go lie down, a directive with which Wilson appears to comply as the video ends. (See id. at 11:30:40-11:30:47.)

In both the Initial Video and Discussion Video, a white tray rests on the floor on the left side of the cell and a milk carton lies under the toilet on the right side of the cell. (See, e.g., Docket Entry 68, Ex. H at 8:54:18-8:54:24; Docket Entry 87 at 8:26:47-8:26:50.) By 12:10:00, the white tray no longer appears in the video footage of Wilson's cell, but a white (apparently styrofoam) cup rests against the rear wall, near the cell's right corner, and the milk carton remains under the toilet at the front of the cell, while Wilson sits on his mat near the cell entrance. (See Docket Entry 100, Ex. A at 12:10:00.) In visible distress, Wilson spends the next few minutes in constant motion, variously,

_____

20 According to Ruppe, the medication would require at least an hour to take effect. (See Docket Entry 67-1 at 22.) Nevertheless, "Seroquel [wa]s quicker" than giving Haldol, which "would have had to have been [obtained] from the pharmacy." (Id. at 21 (bold font omitted).)

23

inter alia, crying, screaming, splashing in the toilet bowl, repeatedly attempting to climb through the cell bars, flopping around on his mat, picking up his mat, sitting and/or curling up on the ground, and pacing. (See id. at 12:10:00-12:13:42.) At 12:13:43, Wilson picks up the milk carton, which he begins breaking apart and stuffing in his mouth. (See id. at 12:13:42-12:13:55.) For roughly the next six minutes, Wilson intermittently puts pieces of the milk carton and/or his fingers in his mouth as he continues his frenetic movements around the cell, often while screaming or crying. (See id. at 12:13:42-12:19:38.)[21] Approximately seven minutes after he first picked up the milk carton, Wilson collapses face-down on the floor of his cell. (See id. at 12:20:48-12:22:35.) For three seconds at 12:22:49, Wilson's body twitches, and at 12:23:13 and again at 12:23:56, his shoulders rise and fall; otherwise, to the extent visible on the surveillance footage, Wilson lies motionless until officers enter his cell and rotate him to his back to begin administering CPR. (See id. at 12:21:40-12:29:33.)

In the interim, at 12:23:28, Officer Lambeth walks up the hallway into the video footage, briefly glancing into Wilson's cell as he strides towards the end of the hallway, where he holds his cellular telephone up to the wall before turning to face Wilson's

---

21 Wilson also drinks from the toilet bowl during this interval. (See id. at 12:17:24-12:17:32.)

24

cell.  (See id. at 12:23:24-12:23:36.)  Officer Lambeth faces Wilson's cell for a few second before focusing on the cellular telephone in his left hand, which he again holds up to the wall, apparently trying to scan it.  (See id. at 12:23:36-12:23:52.)  At 12:23:53, Officer Lambeth looks to his right, towards the inmate in the adjoining cell; a second later, Officer Lambeth looks towards Wilson's cell as he turns his head back to the left towards his cellular telephone.  (See id. at 12:23:53-12:23:56.)  According to Officer Lambeth, the inmate "asked if Mr. Wilson was all right [sic] due to [the inmate] noticing that [Wilson] ceased to be yelling and screaming.  And when [Officer Lambeth] looked for a second time, [Officer Lambeth] could see Wilson breathing, no obvious signs of distress, so [Officer Lambeth] just relayed to [the inmate], 'Yes, he's all right [sic].'"  (Docket Entry 60-15 at 3.)  Officer Lambeth then turns to his right and walks towards the wall between the cells, where he holds his cellular telephone up to three blue squares on the wall before walking to stand in front of the inmate in the adjoining cell.  (See Docket Entry 100, Ex. A at 12:23:56-12:24:11.)  They converse for a while before Officer Lambeth turns around and walks back past Wilson's cell and down the stairs, again largely focused on his cellular telephone aside from

25

a brief glance towards Wilson's cell on his approach.  (See id. at 12:24:11-12:24:39.)[22]

At 12:27:30, Officer Smith walks up the hallway to Wilson's cell and shines a flashlight on Wilson for about ten seconds before pulling out his radio and calling for assistance as he continues to shine his flashlight on Wilson.  (See id. at 12:27:30-12:28:00; see also Docket Entry 73-11 at 2.)  After additional officers arrive on the scene, they enter Wilson's cell and subsequently attempt CPR on him.  (See Docket Entry 100, Ex. A at 12:28:00-12:31:57.)  By the time EMS arrive, Nurse Madden has joined those attempting to revive Wilson.  (See Docket Entry 68, Ex. L at 12:44:06-12:44:15; see also Docket Entry 73-11 at 3-4.)

### IV. Plaintiff's Proposed Expert Witnesses

Plaintiff proffers three individuals — Dr. Corvin, Dr. McKinstry, and Dr. Reardon — as expert witnesses in support of her contention that Medical Defendants engaged in medical malpractice and displayed deliberate indifference to Wilson's serious medical

---

22  The Timeline offers this description of events:

1223 Officer Lambeth approaches P33 and looks at Wilson then scans P2 outside of P33 and stands in front of P33 looking towards Wilson, then scans P33 Bed 1, 2 & 3 tags. At that point Officer Lambeth heads toward P34 and scans P34 Bed 2 then Bed 1 while Inmate [W., R. L.] talks to Officer Lambeth for several seconds.  Officer Lambeth then turns back around, looks into P33 towards Wilson, then proceeds down the stairs outside P33.

(Docket Entry 73-11 at 2.)

26

needs. (See Docket Entry 71-1 at 1, 17-18, 49-52, 81-82, 85.) Board-certified in forensic and general psychiatry (id. at 7), Dr. Corvin has never served as the "medical director of a county detention center" (id. at 10) or "supervised nurses in their practice of nursing in a county detention center" (id.). See also id. (confirming that, for year preceding November 16, 2022, Dr. Corvin "w[as] not a medical director and providing medical care to either prisoners or pretrial detainees in any detention center in North Carolina").)

"[B]oard-certified in internal medicine" (id. at 39), Dr. McKinstry has similarly neither "practiced medicine in a jail or county detention center" (id. at 47) nor "supervised any nurse [or other medical assistants] in a county jail or detention center" (id.). However, in the year preceding November 16, 2022, Dr. McKinstry "was at the [W]omen's [P]rison working full-time, Mondays through Fridays, in the capacity as a prison doctor, basically." (Docket Entry 92-1 at 48.) More specifically, during the relevant period, Dr. McKinstry worked at the "Department of Adult Corrections Institute for Women, which is in Raleigh, North Carolina" (Docket Entry 71-1 at 49), "roughly 100 miles from [the] Davidson County Detention Center" (id.). Nevertheless, "in [her] role as a medical doctor at the [W]omen's [P]rison, [Dr. McKinstry has] actually treated inmates that have been transferred from Davidson County Detention Center." (Docket Entry 92-1 at 62.)

27

According to Dr. McKinstry, during that period, in addition to multiple doctors, the prison had "at least three to four nurse practitioners" (id. at 52) and "a lot of nurses" (Docket Entry 71-1 at 41). As for how many nurses, Dr. McKinstry stated:

> [I]t's a guess, but [they] have about six pods. Each pod may have a nurse or a medical technician. And then . . . in the medical unit of the prison itself, there would be anywhere from three nurses and maybe four or five medical assistants or medical technicians. So at any one time during the day, [they] would have probably around, maybe, six nurses and then at night perhaps less than that. Maybe three or four nurses at night in the prison itself in the medical unit.

(Id.)

As for whether a "pod" differed from "the medical unit" (id.), Dr. McKinstry explained:

> Physically, they're different. So [she guesses] it would be equivalent to a housing unit. So the pods were housing units, and then on the prison grounds itself, [they] have a medical unit where [they] have clinics. [They] have physical therapy. [They] have imaging there in the medical unit. [They] also have, actually, inmates that are — quote/unquote — in the inpatient side. So the[se inmates] are not in a housing unit; but because of the[se inmates'] severe medical issues, they live in the medical unit.

(Id.) Dr. McKinstry estimates that, "in the medical unit[,] there were one to three nurses and four to five medical assistants or medical technicians." (Docket Entry 92-1 at 53; see also id. at 52 (confirming presence of "at least three to four nurse practitioners").) The Women's Prison also typically had three doctors present, one internal medicine doctor, one family medicine doctor, and one OB/GYN. (See id. at 55; see also id. at 52

28

(explaining why "there was an internal medicine and a family medicine doctor" at the prison).)  A director of nursing supervised nurses at the prison.  (See Docket Entry 71-1 at 46.)  As for Dr. McKinstry, "[i]f the[ nurses] were helping [her] take care of a patient acutely, then, yes [she directly supervised nurses], in that specific — in just that specific area."  (Id.)  She did not supervise certified medical assistants.  (Id.)[23]

During the relevant period, Dr. McKinstry was "physically at the [W]omen's [P]rison from 8:00 [a.m.] to 5:00 p.m. every day, Monday through Friday."  (Docket Entry 92-1 at 48.)  "100 percent" of that time "was devoted to patient care."  (Id. at 49.)  Asked to describe her "day-to-day" experience (id. at 53) during this period, Dr. McKinstry stated:

> Basically, we run the clinic.  If there was a clinic, you would come to my clinic if I had a clinic outside of prison.  That would be what we would do.  So we are the medical doctors, you know, seeing chronic care — people with diabetes, hypertension, high blood pressure.  We would see "acute sick calls," they call it.  They put in a sick call.  "I have — my shoulder hurts."  So we would

_____

23  However, outside her job at the Women's Prison, Dr. McKinstry works as a collaborative physician with "nurse practitioners in the state of North Carolina."  (Docket Entry 92-1 at 50 ("In the state of North Carolina, [nurse practitioners] are not allowed to practice independently.  They need a collaborative physician who can help them in their process of taking care of patients[], you know, medical decisions and whatnot.  So in that capacity, [Dr. McKinstry] work[s] with nurse practitioners in the state of North Carolina.").)  "[A]s part of the collaborative practice with a nurse practitioner, [Dr. McKinstry] tend[s] to teach them about disease processes" through "monthly education sessions."  (Id.)

see sick call inmates who have an acute problem on top of that. But different physicians have different functions. The person in [the] clinic doing chronic care is not necessarily [the] same physician seeing the acute sick call inmates.

We also have H&Ps — we call them "intake exams" — that we have to do. They are kind of — probably, at that time, it was designated a few days — two or three days of the week we would do that. The rest of the time is chronic care visits. So intake history and physicals are H&Ps, and that's a new inmate that comes in. We basically have to take a history on them — ask these questions about medical history, medications, surgeries. Have they been in the hospital recently? Which hospital? That sort of thing. So that encompasses a great majority of the prison day in the medical unit.

(Id. at 53-54.) Dr. McKinstry "would take care of . . . all of that. Some days you do the acute, some days you do the chronic, and some days you do the history and physicals." (Id. at 54-55.)

The prison also contained a mental health unit during the relevant period. (See Docket Entry 71-1 at 43 ("There was, and there still is [a mental health unit].").) Asked to "describe the makeup of the mental health department" (id.), Dr. McKinstry testified:

[W]e can tackle the housing first. Where is it located? It's actually located in the medical unit. The medical unit has three floors. The first floor is the clinics, the imaging procedures, physical therapy. The second floor would be the inpatient – what we call "inpatient" — so inmates that cannot be housed with the general population because they're too sick, they have cancer, they're on an IV drug. They get housed there. And then, I believe, the third floor — the same floor is where — the same floor with the inpatient side is . . . . where the mental health unit is. And the mental health unit is split up into two. It's inpatient mental health and outpatient mental health. And the inpatient mental health is where we house inmates who have suicidal

30

> ideations or have attempted suicide; whereas the outpatient mental health — they are in a program. In that program, they are taught, you know, coping mechanisms. They have therapy. They have sessions where they get to work on you know, coping is basically what that is. Some of them enter that area in preparation to be released.

(Id. at 43-44; see also id. at 44 (explaining that some inmates voluntarily "enter this program to reintegrate them into society" before their release from prison).)

During the relevant period, Dr. McKinstry "did treat inmates in the mental health unit," as "mental health inmates or patients not only have mental health issues, they have medical issues as well." (Docket Entry 92-1 at 56.) "So in that capacity" (id.) "[e]very Wednesday [the doctors[24]] dedicated time to take care of the mental health medical needs" (id. at 57). However, Dr. McKinstry "did not provide psychiatric care . . . to patients in the mental health unit." (Docket Entry 71-1 at 46.) Instead, "designated mental health providers within the mental health unit" provided such care. (Docket Entry 92-1 at 57.) More specifically, they "had a psychiatrist that came, and there were nurses in the mental health unit" (id.), i.e., "[d]esignated nurses for mental health purposes" (id.). (See also id. (explaining that "[t]here was one nurse in the inpatient side with one medical assistant").)

---

24 Only doctors (not nurses) provided medical care to the mental health patients. (See id. at 57; Docket Entry 71-1 at 45.)

31

The prison at times housed certain pretrial detainees.  (See id. at 51.)  As Dr. McKinstry explained:

> [W]e often get what we call "safekeepers."  The safekeepers are county detainees.  The majority of them are pregnant.  The majority of them have some type of drug abuse, and we get them for safekeeping because the county isn't able to take care of pregnant female inmates who were actively using drugs, basically.  We sometimes also get mental health county detainees that will sit in our [W]omen's [P]rison as safekeeping — for safekeeping.

(Id.)  Although Dr. McKinstry "do[es] have some knowledge of th[e safekeeping] process" (id.), she does not know the logistics of how the transfer process works (see id. at 58-59; see also id. at 59 (confirming that "[Dr. McKinstry] do[es] not know how, physically, inmates or safekeepers are transferred")).

Asked "[w]hat, if anything, did [she] do to familiarize [her]self with the local standard of care at the Davidson County Jail from November 16th, 2021, to November 16th, 2022," Dr. McKinstry responded:  "Practicing medicine for 12 years, taking care of acute patients."  (Docket Entry 71-1 at 47.)  Asked by Plaintiff's counsel if "[she's] familiar with the community standard of care in the corrections facility, whether it be prisons or jails," Dr. McKinstry replied "[y]es."  (Id. at 49.) Plaintiff's counsel further asked:

> Based on your testimony today and the review of the materials in this case that you've identified, the opinions that you've rendered, did you come to the conclusions that you came to that IMS and the

32

individually named defendants failed to use their best judgment and reasonable care regarding [Wilson]?

(Docket Entry 92-1 at 62.)  Dr. McKinstry responded "[y]es."  (Id.) Plaintiff's counsel then asked, "based on your report and your deposition testimony today, it is your opinion that the defendants in this case disregarded that substantial risk of harm by not sending Wilson out to a hospital or calling EMS to treat his conditions after the attempted suicide?"  (Docket Entry 71-1 at 50.)  Dr. McKinstry responded:  "That would be my opinion, yes." (Id.)

However, Dr. McKinstry conceded that the "opinions regarding the standard of care applicable to Nurse Madden, Dr. Entwistle, and IMS" (id.) as "stated by [Plaintiff's counsel in his questions] were not included in [Dr. McKinstry's] report that was sent to [defense counsel]" (id. at 50-51).  Defense counsel and Dr. McKinstry then engaged in the following exchange:

> [Defense Counsel:] And there's nothing about indifference — the word "indifference" does not appear in your report, correct?
>
> [Dr. McKinstry:]  No. But I think I said it.
>
> [Defense Counsel:]  But in your report is my question.
>
> [Dr. McKinstry:]  No. Not in my report, correct.
>
> [Defense Counsel:]  And you understood when you authored your report that your opinions needed and were required to be included in your report pursuant to the Federal Rules of Civil Procedure, correct?  And evidence?

33

[Dr. McKinstry:]  Yes.

(Id. at 51.)

As for her report, it states that "[Dr. McKinstry] was asked to opine on all or any breach of standard of care rendered to Mr. Wilson while in custody of the Davidson County Jail November 15, 2022."  (Id. at 52.)  "Within a reasonable degree of medical certainty, based on [Dr. McKinstry's] education and clinical experience, these are [Dr. McKinstry's] preliminary opinions" (id.):

(1) "Failing to render 24/7 emergency care - emergency care to include medical . . . mental health (IMS Clinical Policies and Procedures (rev 03/2023, IMS-000175)."  (Id. (bold font omitted) (ellipsis in original).)

(2) "Failing to properly quickly identify and refer any immediate health needs to include 'signs of self-harmful behavior . . . mentally unstable, severely intoxicated' and refer to a community hospital for care and medical clearance per IMS Clinical Policies and Procedures (rev 03/2023, IMS-000168)."  (Id. (bold font omitted) (ellipsis in original).)

(3) "Failure to adequately staff the jail with qualified, trained medical personnel who could identify mental health crises and/or emergencies to include risk for suicide, suicidal ideation, intent, behavior, substance intoxication and obtain or render proper and timely treatment."  (Id. at 53 (bold font omitted).)

34

(4) "Failing to properly monitor actively suicidal inmates on strict suicide watch . . . closely observed at least four times an hour. Per IMS Clinical Policies and Procedures entitled Suicide Prevention Program, 'All correctional and medical staff are responsible for monitoring the mental status of inmates' (IMS-000174)." (Id. at 55 (bold font omitted) (ellipsis in original).)

(5) "There was a breakdown and failure in communication at the Jail (a Systems error) and a lack of a sense of urgency, from the initial booking of Mr. Wilson between custody and medical, to communication between medical staff who were going off shift with those coming on, to the communication between medical staff and medical supervisors." (Id. at 56 (bold font omitted).)[25]

(6) "Failing to recognize that suicide attempts do not have to end in direct harm, hurt, or lethality; failing to recognize suicide intent as actual attempts." (Id. (bold font omitted).)

As for the "facts or data used by [Dr. McKinstry]" (id.), the report indicates that "[she] reviewed any and all available medical records for Matthew Wilson. [Plaintiff's counsel's] office sent them to [her] on January 4, 2024. Below is the identification of those records." (Id. (bold font omitted); see also id. at 57 (identifying records)). Dr. McKinstry "reviewed additional data

---

25 The report did not include a rationale for this opinion. (See id.)

35

provided to [her] on April 3, 2025.  Below is the identification of those records" (id. at 57 (bold font omitted)):

IMS Clinical Policies and Procedures (rev 03/2023, 120 pages)

Executed IMS Correctional Healthcare Agreement (FY 21-22 Dr. Piland) - 4875-1978-6339

Amber Kinton - Full Deposition Transcript

MICHELLE MADDEN, LPN - Full Deposition Transcript

MICHELLE MADDEN, LPN EXHIBITS

Celia Entwistle's Responses to Plt's First Set of Int, RPDs, and RFAs

Michele Madden's Responses to Plt's First Set of Int, RPDs, and RFAs

Davidson County Jail Policy and Procedure Manual - 1.24 Suicide Prevention

Entwistle's Deposition 250319.ENW 15166_full_ex

IMS responses to Pltf's First set what [sic] of Int, RPDs, and RFAs

Exhibit 9 Texts

Exhibit 12 Timeline for P33 Bed

Exhibit 14 Incident Report-Phillips

Exhibit 15 Nursing Notes

Exhibit 17 Medical Screening

Exhibit 26 Davidson County SOP Manual

Exhibit 33 Nursing Policy Intake

Expert [sic] 34 Nursing Policy Suicide Prevention

Exhibit 43 Medical Protocols

36

Contract between IMS, Evergreen and Entwistle

(Id. at 57-58 (bold font omitted) (abbreviations and all-cap font in original).)

Board-certified in forensic psychology (id. at 59), Dr. Reardon primarily "conduct[s] evaluations at the requests of attorneys or at the request of the court to address matters before, mostly criminal courts, addressing criminal competency, sanity" (id. at 73). Neither a medical doctor nor nurse, Dr. Reardon did not attend medical or nursing school and cannot prescribe medication or "offer opinions regarding the pharmacology of medicine" (id. at 75). (See id. at 74-75.) According to Dr. Reardon, she "[is] not offering standard of care opinions regarding any care that Nurse Madden or Dr. Entwistle gave to Mr. Wilson" (id. at 76), as she "[is] not competent to offer standard of care opinions regarding Nurse Madden or Dr. Entwistle" (id.; see id. at 76-77). (See also id. at 77 (confirming that "[Dr. Reardon is] not qualified to offer [such] opinions because that is outside the scope of her profession and training").) Dr. Reardon further confirmed that she "ha[s] no opinions regarding [Wilson's] psychiatric diagnosis that [she's] offering in this case." (Id. at 78-79; see also id. at 78 (explaining that "[Dr. Reardon] did not personally evaluate Mr. Wilson[, a]nd so [she's] not in a position to offer a diagnosis which involves a much more comprehensive assessment").) Dr. Reardon also conceded that she "cannot offer

37

any opinions regarding specific types of medications or names of medications that [Wilson] should have been provided in the course of his care and treatment while in custody. It's outside the scope of [her] expertise." (Id. at 79.) According to Dr. Reardon, though:

> Communication of — of treatment and continuity of care is something that [she] ha[s] a great deal of experience, in the sense that [she] ha[s] worked for many, many years in multidisciplinary settings, that we need to provide sufficient information so that proper treatment decisions can be made for an individual.
>
> And in this case, . . . there was, in [her] opinion, not sufficient information provided for Dr. Entwistle to have. There was not sufficient information provided to, in accordance with the policy, that would've prompted [Wilson's] referral to an outside hospital. The attempted suicide — this was three hours after the fact.

(Id. at 80.) Rather than a standard of care opinion, Dr. Reardon classified the foregoing as a causation opinion (see id.), explaining that "[her] opinion is that those circumstances and the indifference to [Wilson's] care led to his death. It's more likely than not that that led to his death." (Id.)

As for her report, subsection C pertains to medical staff, whereas subsection B, which "has to do with the receiving and discharge paperwork that was completed — the initial screening, the initial medical screening," in connection with which "[t]he proper referrals were not made," — pertains to Jail personnel. (Id. at 82.) As for Dr. Reardon's opinions and the rationale for them, the report states, in full:

38

6. In this case, the subject matter upon which Dr. Reardon is prepared to testify is the defendants' care and treatment of Mr. Matthew Wilson, on and between 11/15/22 and 11/16/22, as it relates to his death by suicide.

7. The grounds for each opinion are (1) Dr. Reardon's skills, training, and experience in the care / treatment of persons with mental illness and at risk for suicide in correctional settings (3) [sic] Dr. Reardon's independent review and analysis of relevant discovery materials (see Attachment B)

8. The substance of the facts and opinions to which Dr. Reardon is expected to testify include:

  a. Information made available to DCSO prior to, during, and following Mr. Wilson's arrest provided a sufficient basis for involuntary commitment to a psychiatric hospital for evaluation and treatment to ensure his safety from self and / or others.

  b. Although Mr. Wilson was properly screened upon booking and placed on suicide watch at the Davidson County Jail (DCJ), there were no indications that any steps were taken to ensure timely follow-up by medical and/or mental health staff.

  c. The subsequent supervision, care, and treatment of Mr. Wilson while in custody were insufficient to address his acute mental health needs and ensure his safety. This included, but was not limited to: routine security checks not conducted per policy; failure to remove any and all potentially harmful contraband from the cell; remote camera visibility of cell restricted by mattress, left uncorrected; inadequate assessment and recommended intervention by medical staff following his initial attempt by hanging; unjustified delay in, and insufficient communication of, his mental condition and need for treatment by medical staff only after OC deployment; limited access to first line IM medication, which resulted in switch to alternative, possibly lower potency oral medication with less immediate effects; absence of plan by medical staff to monitor his response to medication, including side-effects; inattention, disregard, and/or failure to intervene in recurring

39

instances of self-injurious and other behaviors posing a risk to his health and safety, up until and including the moments he was rendered unconscious.

d. It is more likely than not that the supervision, care, and treatment of Mr. Wilson while in DCSO custody exacerbated his already fragile mental condition, resulting in further mental decompensation and increasing his risk of self-harm. This included, but was not limited to: placing another, clothed detainee in a cell while he himself was naked; threatened with and punitive use of chemical agents, inflicting psychological and physical pain; escort to medical naked, wet, and with poor visibility down metal stairs, resulting in his fall; escorted twice naked through an open population unit, without due concern for his safety or personal dignity; returned to same cell, despite indications of residual air contamination; and, apparent disregard for multiple requests for help and medical attention by Mr. Wilson following OC decontamination.

e. Mr. Wilson's mental condition had deteriorated to the point constituting serious medical need and/or medical emergency, as defined by DCSO policy, well before he was rendered unconscious.

f. It is more likely than not that Mr. Wilson's death followed as a result of insufficient attention to, and exacerbation of, his mental condition in a custodial environment that not only lacked adequate resources to monitor or treat it effectively but also failed to take reasonable steps necessary to ensure his safety and proper psychiatric care in a suitable environment.

(Id. at 85-86 (duplicate semicolon omitted).)

40

**DISCUSSION**

**I. Expert Motion**

**A. Relevant Standards**

**i. Medical Malpractice Requirements**[26]

"Although the Court follows federal law for the procedural aspects of the case, North Carolina law governs the substantive aspects of the state law claim[]. Compliance with the expert witness requirement is a substantive element of a medical malpractice claim under North Carolina law." Harrington v. Southern Health Partners, Inc., No. 1:21cv744, 2023 WL 3393569, at *4 (M.D.N.C. May 11, 2023) (citation and internal quotation marks omitted); accord Huntley v. Crisco, No. 1:18cv744, 2020 WL 4926636, at *3 (M.D.N.C. Aug. 21, 2020). "In a medical malpractice action under North Carolina law, the plaintiff must show: (1) the applicable standard of care under [North Carolina General Statute Section] 90-21.12; (2) a breach of the standard of care; (3) proximate causation; and (4) damages." Harrington, 2023 WL 3393569, at *4 (internal quotation marks omitted); see also Weatherford v. Glassman, 129 N.C. App. 618, 621, 500 S.E.2d 466, 468 (1998) ("In a medical malpractice action, a plaintiff must show

---

26  "Under North Carolina law, a 'negligence' claim arising from 'the furnishing or failure to furnish professional services in the performance of medical . . . or other health care by a health care provider' is redesignated a '[m]edical malpractice action' regardless of how the plaintiff labels his claim." Moreno v. Bosholm, 151 F.4th 543, 551 n.3 (4th Cir. 2025) (ellipsis and brackets in original).

41

(1) the applicable standard of care; (2) a breach of such standard of care by the defendant; (3) the injuries suffered by the plaintiff were proximately caused by such breach; and (4) the damages resulting to the plaintiff.").

As relevant here, Section 90-21.12 provides that, in any "action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider," N.C. Gen. Stat. § 90-21.11(2)(a),

> the defendant health care provider shall not be liable for the payment of damages unless the trier of fact finds by the greater weight of the evidence that the care of such health care provider was not in accordance with <u>the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities</u> under the same or similar circumstances at the time of the alleged act giving rise to the cause of action,

N.C. Gen. Stat. § 90-21.12(a) (emphasis added). "Because questions regarding the standard of care for health care professionals ordinarily require highly specialized knowledge, the plaintiff must establish the relevant standard of care through expert testimony." <u>Billings v. Rosenstein</u>, 174 N.C. App. 191, 194, 619 S.E.2d 922, 924 (2005) (internal quotation marks omitted).

In that regard:

> Although it is not necessary for the witness testifying as to the standard of care to have actually practiced in the same community as the defendant, the witness must demonstrate that he is familiar with the standard of care in the community where the injury occurred, or the standard of care of similar communities.

42

When determining whether an expert is familiar with the standard of care in the community where the injury occurred, "a court should consider whether an expert is familiar with a community that is similar to a defendant's community in regard to physician skill and training, facilities, equipment, funding, and also the physical and financial environment of a particular medical community."

Id. at 194, 619 S.E.2d at 924-25 (citations omitted) (quoting Pitts v. Nash Day Hosp., Inc., 167 N.C. App. 194, 197, 605 S.E.2d 154, 156 (2004), aff'd per curiam, 359 N.C. 626, 614 S.E.2d 267 (2005)); see also Miller v. Carolina Coast Emergency Physicians, LLC, 277 N.C. App. 449, 475, 860 S.E.2d 238, 256 (2021) ("The 'critical inquiry' . . . is 'whether the doctor's testimony, taken as a whole' establishes that he is 'familiar with a community . . . in regard to physician skill and training, facilities, equipment, funding, and also the physical and financial environment of [that] community." (certain internal quotation marks omitted) (brackets and ellipses in original)), aff'd, 382 N.C. 91, 876 S.E.2d 436 (2022).  Moreover,

> [i]f a plaintiff's standard of care expert witness "fail[s] to demonstrate that he [is] sufficiently familiar with the standard of care 'among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action,'" then the "plaintiff [is] unable to establish an essential element of his claim, namely, the applicable standard of care," and the trial court properly enters judgment on behalf of the defendant.

Day v. Brant, 218 N.C. App. 1, 6, 721 S.E.2d 238, 243 (2012) (stray space omitted) (brackets in original).

43

Further, "[a]n expert proffered to testify on the applicable standard of care under [Section] 90-21.12 must qualify as an expert under North Carolina Rule of Evidence 702 [(at times, 'N.C. Rule 702')]." Harrington, 2023 WL 3393569, at *4; see also Moreno v. Bosholm, 151 F.4th 543, 561 (4th Cir. 2025) (holding that "[N.C. Rule] 702(b) govern[s] the witness's competency" for North Carolina "medical malpractice claim" (internal quotation marks omitted)). To qualify as an expert under N.C. Rule 702, an individual must "[be] a licensed health care provider" and, "[i]f the [relevant] party . . . is a specialist, the expert witness must" either "[s]pecialize in the same specialty" or "[s]pecialize in a similar specialty which includes within its specialty the performance of the procedure that is the subject of the complaint and have prior experience treating similar patients." N.C. R. Evid. 702(b)(1). And, "[d]uring the year immediately preceding the date of the occurrence that is the basis for the action, the expert witness must have devoted a majority of his or her professional time to either . . . [t]he active clinical practice of the same health profession [or speciality as the relevant party]" or "[t]he instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession [or speciality as the relevant party]." N.C. R. Evid. 702(b)(2).

44

Additionally:

a physician who qualifies as an expert under [N.C. Rule 702(a)] and who by reason of active clinical practice or instruction of students has knowledge of the applicable standard of care for nurses, nurse practitioners, certified registered nurse anesthetists, certified registered nurse midwives, physician assistants, or other medical support staff may give expert testimony in a medical malpractice action with respect to the standard of care of which he is knowledgeable of nurses, nurse practitioners, certified registered nurse anesthetists, certified registered nurse midwives, physician assistants licensed under Chapter 90 of the [North Carolina] General Statutes, or other medical support staff.

N.C. R. Evid. 702(d). Finally, if a movant can show "extraordinary circumstances," and the Court determines that it would "serve the ends of justice," the Court can authorize an otherwise qualified expert witness to opine on the appropriate standard of care notwithstanding the witness's inability to satisfy the requirements of N.C. Rule 702(b) & (c). <u>See</u> N.C. R. Evid. 702(e).[27]

---

27 More specifically, this subsection provides:

Upon motion by either party, a resident judge of the superior court in the county or judicial district in which the action is pending may allow expert testimony on the appropriate standard of health care by a witness who does not meet the requirements of subsection (b) or (c) of this Rule, but who is otherwise qualified as an expert witness, upon a showing by the movant of extraordinary circumstances and a determination by the court that the motion should be allowed to serve the ends of justice.

<u>Id.</u>

45

### ii. Federal Expert Witness Requirements

Pursuant to Federal Rule of Evidence 702 (at times, "Rule 702"), "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that," inter alia, "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[ and] (b) the testimony is based on sufficient facts or data." Fed. R. Evid. 702. Rule 702 also "requires that the expert testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case." United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007) (brackets and internal quotation marks omitted). The Court must ensure that any expert testimony qualifies as both relevant and reliable. See, e.g., id. at 278 (explaining that "court erred in failing to exclude [the witness's] testimony . . . when [the witness] did not adequately explain his methodology in reaching a questionable interpretation" (footnote omitted)); see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993) (explaining that "under the [Federal] Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable" and that "[t]he primary locus of this obligation is Rule 702, which clearly contemplates some

46

degree of regulation of the subjects and theories about which an expert may testify"). In ascertaining the reliability of "expert testimony that is primarily experiential in nature as opposed to scientific," the Court must "require an experiential witness to explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." Wilson, 484 F.3d at 274 (internal quotation marks omitted) (brackets in original).

In addition, under Federal Rule of Civil Procedure 26 ("Rule 26"), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702." Fed. R. Civ. P. 26(a)(2)(A). "Unless otherwise stipulated or ordered by the [C]ourt, this disclosure must be accompanied by a written report — prepared and signed by the witness — if the witness is one retained or specially employed to provide expert testimony in the case . . . ." Fed. R. Civ. P. 26(a)(2)(B). "The report must contain," as relevant here, "(i) a complete statement of all opinions the witness will express and the basis and reasons for them[ and] (ii) the facts or data considered by the witness in forming them." Id. "A party must make these

47

disclosures at the times and in the sequence that the [C]ourt orders." Fed. R. Civ. P. 26(a)(2)(D).[28]

Furthermore, "[t]he parties must supplement these disclosures when required under Rule 26(e)." Fed. R. Civ. P. 26(a)(2)(E). To that end, "[a] party who has made a disclosure under Rule 26(a) . . .[,] must supplement or correct its disclosure," inter alia, "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). "For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition." Fed. R. Civ. P. 26(e)(2).

Importantly, under Federal Rule of Civil Procedure 37 ("Rule 37"):

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). The United States Court of Appeals for the Fourth Circuit has explained that,

---

28  Plaintiff needed to serve expert disclosures by April 14, 2025 (see Docket Entry 43 at 1), and any rebuttal expert reports by September 2, 2025 (see Text Order dated Apr. 23, 2025).

48

in exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003). The first four "factors — surprise to the opposing party, ability to cure that surprise, disruption of the trial, and importance of the evidence — relate mainly to the harmlessness exception, while the remaining factor — explanation for the nondisclosure — relates primarily to the substantial justification exception." Id. "The burden of establishing these factors lies with the nondisclosing party — in this case, [Plaintiff]." Wilkins v. Montgomery, 751 F.3d 214, 222 (4th Cir. 2014). In deciding whether to exclude evidence under Rule 37(c), district courts "[are] not *required* to tick through each of the *Southern States* factors." Id. (emphasis in original).

As the United States Court of Appeals for the Seventh Circuit explained nearly thirty years ago:

> Rule 26(a) expert reports must be "detailed and complete." Fed. R. Civ. P. 26 Advisory Committee's note; *see also Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996), *cert. denied*, 519 U.S. 811 (1996). A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor. Fed. R. Civ. P. 26 Advisory Committee's note; *see also Smith v.*

49

*State Farm Fire & Cas. Co.*, 164 F.R.D. 49, 53 (S.D. W. Va. 1995); *cf. Walsh v. McCain Foods Ltd.*, 81 F.3d 722, 727 (7th Cir. 1996).  The report must be complete such that opposing counsel is not forced to depose an expert in order to avoid ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources.  *See Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir.), *cert. denied*, 516 U.S. 822 (1995).  Expert reports must not be sketchy, vague or preliminary in nature. Fed. R. Civ. P. 26 Advisory Committee's note; *see also Sierra Club*, 73 F.3d at 571. . . .  Expert reports must include "how" and "why" the expert reached a particular result, not merely the expert's conclusory opinions.  *See Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996).

Compliance with Rule 26, in particular with the requirement of total disclosure, is emphasized in the Advisory Committee comments.  The "incentive for total disclosure" is the threat that expert testimony not disclosed in accordance with the rule can be excluded pursuant to Rule 37(c)(1).  The availability of this sanction "put[s] teeth into the rule."  Richard M. Heimann & Rhonda L. Woo, Import of Amended Federal Rule of Civil Procedure 26(a), 506 PLI/Lit 279, 293 (July-Aug. 1994). . . .

*****

It is the responsibility of the attorney to ensure that the expert's report contains complete opinions that are properly and thoroughly set forth and supported; it should be the goal of the parties to eliminate surprise, avoid unnecessary depositions and reduce costs.  *See Reed*, 165 F.R.D. at 429 (citing *Sylla-Sawdo*n, 47 F.3d at 284).  We agree with the Tenth Circuit that Rule 26 enhances the district court's role as "gatekeeper," for it permits "an early and full evaluation" of evidentiary problems in a case and allows the [district] court to "make an early pretrial evaluation of issues of admissibility" carefully and meticulously.  *Robinson v. Missouri Pacific R.R. Co.*, 16 F.3d 1083, 1089 (10th Cir. 1994).  Without such completeness, counsel and the party he represents risk the imposition of sanctions under Rule 37.

50

Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 741 n.6 (7th Cir. 1998) (parallel citations omitted) (brackets in original); see also, e.g., Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico, 248 F.3d 29, 35 (1st Cir. 2001) ("The purpose of a 'detailed and complete' expert report as contemplated by Rule 26(a), Fed. R. Civ. P. 26 [A]dvisory Committee's note, is, in part, to minimize the expense of deposing experts, and to shorten direct examination and prevent an ambush at trial. Failure to include information concerning the retained expert that is specifically required by Rule 26(a)(2)(B) . . . frustrates the purpose of candid and cost-efficient expert discovery." (citations omitted)); Wright v. Commonwealth Primary Care, Inc., No. 3:10cv34, 2010 WL 4623998, at *2 (E.D. Va. Nov. 2, 2010) ("The purpose of the report is to avoid the disclosure of 'sketchy and vague' expert information. An expert report satisfies Rule 26(a)(2)(B) if it is sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced." (citation and certain internal quotation marks omitted)), aff'd, 445 F. App'x 632 (4th Cir. 2011).

As the Fourth Circuit has emphasized, "Rule 26 disclosures are often the *centerpiece* of discovery in litigation that uses expert witnesses. A party that fails to provide these disclosures unfairly inhibits its opponent's ability to properly prepare,

51

unnecessarily prolongs litigation, and undermines the district court's management of the case." Carr v. Deeds, 453 F.3d 593, 604 (4th Cir. 2006) (internal quotation marks omitted) (emphasis in original). "The available penalty for failure to comply with Rule 26(a)(2)(B) is equally plain, and if a litigant refuses to comply with the requirements of the rule, he does so at his peril." Id. at 605.

### B. Analysis

### i. Medical Malpractice Claim

Medical Defendants move to exclude "Drs. Corvin, McKinstry, and Reardon based on their failure to qualify as expert witnesses on the applicable standard of care pursuant to [Section] 90-21.12 and [N.C. Rule] 702(b) and (d)." (Docket Entry 71 at 6; see, e.g., id. at 7 ("Drs. Corvin, McKinstry and Reardon fail to qualify as standard of care experts against either Dr. Entwistle or Nurse Madden.").) Plaintiff's Opposition does not dispute Medical Defendants' contentions as to Drs. Corvin and Reardon, arguing only that "Dr. McKinstry is qualified to provide standard of care testimony as to Dr. Entwistle and Nurse Madden pursuant to the requirements of [N.C.] Rule 702(b) and (d) and the community standard of care as required by [Section] 90-21.12" (Docket Entry 92 at 17; see id. at 7-17 (arguing that "Dr. McKinstry's Standard of Care Opinions Should Not be Excluded" (id. at 7 (bold font omitted)))). By failing to respond to Medical Defendants' standard

52

of care arguments as to Drs. Corvin and Reardon, Plaintiff concedes them. Kinetic Concepts, Inc. v. ConvaTec Inc., No. 1:08cv918, 2010 WL 1667285, at *6-9 (M.D.N.C. Apr. 23, 2010) (explaining that party concedes opponent's argument by failing to address it and collecting cases).

Nevertheless, Plaintiff contends that, "to the extent that Dr. Artigues[, Medical Defendants' proposed expert witness (see Docket Entry 92 at 21),] is permitted to testify as to the nature or quality of the care provided to [Wilson] in the Jail, Dr. Corvin should also be permitted to offer competing opinion testimony pursuant to N.C. [Rule] 702(e)" (id. at 22), on the theory that permitting Dr. Artigues to testify "would constitute extraordinary circumstances that would be highly prejudicial to . . . Plaintiff if Plaintiff were not permitted to have her own psychiatrist testify with respect to the care provided" (id.). Notably, Plaintiff provides no authority in support of this contention. (See id. at 21-22.) In any event, given that North Carolina courts have repeatedly found a lack of extraordinary circumstances even when exclusion of the proposed witness terminates a party's claim, Plaintiff has not shown that any such prejudice rises to the level of extraordinary circumstances. See, e.g., Estate of Dobson v. Sears, 296 N.C. App. 452, 465-66, 908 S.E.2d 882, 891 (2024) (rejecting argument that proposed expert qualified to render opinion on subject and that "[the p]laintiffs should be entitled at

53

a minimum to have their day in court," explaining that "[t]he record on appeal is devoid of any extraordinary circumstances to support the certification or admission of [the proposed expert] under [N.C.] Rule 702(e)" and that, "[w]ithout an expert witness to establish standard of care and negligence, [the d]efendants were entitled to summary judgment as a matter of law" (brackets and internal quotation marks omitted)); Knox v. University Health Sys. of E. Carolina, Inc., 187 N.C. App. 279, 284-85, 652 S.E.2d 722, 725-26 (2007) (rejecting argument "that the ends of justice would be met by allowing the witness to testify should the witness not meet the requirements of [N.C.] Rule 702 subsection (b) or (c)," explaining that "[t]he record on appeal does not show any extraordinary circumstances to support the certification of [the proposed witness] under [N.C.] Rule 702(e)," and affirming lawsuit's dismissal for failure to comply with expert witness requirement). The Court should therefore exclude Drs. Corvin and Reardon from testifying regarding Plaintiff's medical malpractice claim.

As for Dr. McKinstry, Medical Defendants seek to exclude her on the grounds, inter alia, that she lacks familiarity with the local standard of care. (See Docket Entry 71 at 9-12, 15-16.)[29]

_____

29 Medical Defendants further contend that Dr. McKinstry does not qualify to testify against Dr. Entwistle and Nurse Madden because she does not share the same specialty as Dr. Entwistle and does not supervise nurses. (See, e.g., id. at 4, 9, 15-16.)
(continued...)

54

The Opposition asserts that Dr. McKinstry "conducted sufficient research to become familiar with the standard of care at the Jail" (Docket Entry 92 at 15) because

> she reviewed Davidson County Sheriff's Office Incident File, Davidson County Jail Nurse's notes, Jail nurse and doctor texts, Event Reports, Medical Screening and Progress Notes, the IMS Contract for Services with Davidson County, IMS Clinical Policies and Procedures, Davidson County Jail Policy and Procedure Manual, and the deposition transcripts of Dr. Entwistle and Nurse Madden. [DOC 71-1, 56-58]. Dr. Entwistle provided a robust description of the medical office and medical clinic at the Jail including the physical space and equipment. [Entwistle Dep. 63:13 – 64:20]. Nurse Madden described the medical staffing, typical hours worked by medical staff, and the number of inmates at the Jail during the relevant period. [Madden Dep. 48:5-22]. Thus, there is substantial indication that Dr. McKinstry conducted sufficient research to become familiar with the standard of care at the Jail. *See Huntley*, 2020 WL 4926636, at *4; *Harrington*, 2023 WL 3393569 at *9.

(Docket Entry 92 at 15 (capitalization in original).)[30]

_____

29(...continued)
Plaintiff disputes these contentions. (See, e.g., Docket Entry 92 at 7 ("Dr. McKinstry's standard of care opinions against Dr. Entwistle are proper under substantive North Carolina law because both Dr. McKinstry and Dr. Entwistle specialize in correctional medicine."), 8 ("Dr. McKinstry is qualified to testify as to the applicable standard of care for Nurse Madden because she is knowledgeable of the standard by reason of active clinical practice.").) Given Dr. McKinstry's failure to familiarize herself with the relevant standard of care (as discussed herein), the Court need not resolve this dispute.

30 Plaintiff's reliance on the cited authority misses the mark. In Huntley, the proffered expert witness, Dr. Mathis, had worked for more than twenty years in correctional facilities in multiple states, had "prepared at least one correctional hospital for accreditation by the American Correctional Association ('ACA') while he served as medical director," and "[wa]s certified as a Correctional Healthcare Professional by the National Commission for
(continued...)

55

The Opposition further concedes that "[Medical] Defendants are correct that Dr. McKinstry testified that her own experience

---

30(...continued)
Correctional Health Care ('NCCHC')." Id., 2020 WL 4926636, at *2. In formulating his opinions, Dr. Mathis relied on, inter alia, the "standards of health care for medical providers in correctional situations promulgated by NCCHC and the ACA," id., as well as the detention center's and medical provider's policies, "the pleadings and discovery in this case, and other general resources on correctional facility policies and procedures," id., including "the North Carolina Jail Administrators' Guide for New Jail Administrators [and] the relevant provisions of the North Carolina Administrative Code governing medical policies in correctional facilities," id. at *4, many of which "materials referenced the NCCHC and ACA standards of care," id. Given Dr. Mathis's "extensive experience working in correctional medicine" and his "extensive familiarity with the NCCHC and ACA standards of care," the Huntley court concluded that such "experience coupled with his review of these materials make Dr. Mathis sufficiently familiar to testify as to the applicable standard of care." Id. Unlike Huntley, this case does not involve a witness certified in, and experienced with, explicitly incorporated national standards of care. For its part, Harrington involved "a full-time nursing educator at UNC Wilmington" who "purport[ed] to testify as to a 'uniform' standard of nursing care, specifically as it relates to taking and reporting vital signs." Id., 2023 WL 3393569, at *8. The defendants sought the witness's exclusion on the grounds that, because the witness lacked "experience providing care in a correctional setting, she cannot testify as to the standard of care for 'uniform' procedures in a correctional setting." Id. at *9 (internal quotation marks omitted). Rejecting that argument, the Harrington court concluded that, although the witness "herself never practiced in [the specific j]ail, . . . she has still demonstrated sufficient familiarity with the nursing standard of care at the facility based on her own research and review of relevant materials," and, in any event, that, "as to the uniform standard of nursing [the proposed witness] testifies to, the [c]ourt [wa]s not persuaded that [the witness's] lack of experience in a correctional setting renders her unable to testify as to certain 'uniform procedures' related to taking and monitoring vital signs." Id. N.C. Rule 702 explicitly permits witnesses to qualify as experts based on their role as educators, see N.C. R. Evid. 702(b)(2)(b), and this case does not involve a uniform standard for a basic medical skill.

56

qualified her," but asserts that such "experience included reviewing the [listed] materials to familiarize herself with the applicable community standard of care." (Id.) Hence, the Opposition maintains, "Plaintiff sufficiently developed Dr. McKinstry's familiarity with the community standard of care through the items listed in her report." (Id. at 16.) Finally, the Opposition contends:

> [Medical] Defendants also appear to argue that[,] because the prison where Dr. McKinstry works has dedicated mental health services, she cannot opine as to Dr. Entwistle's treatment of [Wilson's] "mental health issues." [DOC 71, 15]. However, Dr. Entwistle testified that the Jail, similar to the prison where Dr. McKinstry works, has dedicated mental health services that take place in a specific part of the medical unit. [Entwistle Dep. 64:15-20]. Further, she testified that her practice was to stay away from the medical unit during mental health visits at the jail. *Id.* Therefore, [Medical] Defendants' argument, to the extent it is relevant, is without merit because the two facilities were similar with respect to providing dedicated mental health services in a specific location.

(Id. at 16-17.) These arguments lack merit.

To begin, Dr. McKinstry testified that, "to familiarize [her]self with the local standard of care at the Davidson County Jail from November 16th, 2021, to November 16th, 2022," she "[p]ractic[ed] medicine for 12 years, taking care of acute patients." (Docket Entry 71-1 at 47.) "Practicing medicine for 12 years" (id.) departs markedly from "reviewing [discovery] materials to familiarize herself with the applicable community standard of care" (Docket Entry 92 at 15). Moreover, Plaintiff has not shown

57

that the specified materials provide pertinent information regarding, inter alia, the demographics, funding, and equipment of the Davidson County Detention Center (see id.), important criteria for ascertaining Dr. McKinstry's familiarity with the relevant standard of care, see, e.g., Billings, 174 N.C. App. at 194-95, 619 S.E.2d at 924-25.[31]  Nor do the depositions of Dr. Entwistle and

---

31   Plaintiff faults Medical Defendants for failing to "explore[] the sufficiency of these items with respect to familiarity with the community standard of care" (Docket Entry 92 at 16 (citing "*Crocker v. Roethling*, 362 [sic] N.C. 140, 146, 675 S.E.2d 625, 631 (2009) ('Where . . . the basis of the opinion and the expert's familiarity with the same or a similar community is undeveloped, the proponent must be given an opportunity to establish the witness's competency.  However, the proponent does not have the duty to do so at the discovery deposition.'" (ellipsis in original)).  Crocker does not salvage Plaintiff's claim.  In that case, at a hearing on a motion for summary judgment and in the absence of any "motion to exclude, written or oral," the trial court excluded the plaintiff's proposed witness because, inter alia, the court found that the proposed witness "was testifying . . . to a national standard of care."  Crocker, 363 N.C. at 143, 675 S.E.2d at 629 (internal quotation marks omitted) (ellipsis in original).  However, according to the North Carolina Supreme Court, at his deposition the proposed expert witness

> was able to accurately describe a number of features of the community at issue here, including the location and population of Goldsboro [the relevant location], and the number of obstetricians privileged at Wayne Memorial Hospital [the relevant medical facility].  He did testify that he believed a physician in either Phoenix or Goldsboro would have the "same" knowledge, but also correctly described the applicable standard of care as "that of a reasonably trained physician practicing in the same or similar circumstances."

Id. at 144, 675 S.E.2d at 629.  Thereafter, in opposition to the defendants' summary judgment motion, the plaintiff submitted an affidavit from the proposed expert witness that "expanded and clarified [the witness's] familiarity with [the defendant's]
(continued...)

58

Nurse Madden supply the missing information. (<u>See, e.g.</u>, Docket Entry 92-1 at 9-10 (testifying that table-sized medical clinic contains "medical stuff" and "one of those rolly carts that has a bunch of supplies in it" and "some other stuff down at the end," although "[Dr. Entwistle] forget[s]," as well as, inter alia, "unknown equipment," a large television for CBH's telehealth services, "[a] big something here," and "some giant piece of equipment" over "there[]"), 45 (testifying that Nurse Madden thought the Jail contained "[m]aybe 300, 350" inmates, but "[she was] not exactly sure").)

---

31(...continued)
obstetrical practice and with Goldsboro and Wayne County." <u>Id.</u> at 146, 675 S.E.2d at 630-31; <u>see also</u> <u>id.</u> at 145, 675 S.E.2d at 630 (quoting affidavit, which stated, inter alia, that witness "reviewed information about the community of Goldsboro, North Carolina, Wayne County and Wayne Memorial Hospital for the [relevant year] and [is] familiar with the size of the population, the level of care available at the hospital, the facilities and the number of health care providers for obstetrics" (internal quotation marks omitted)). Explaining that "[t]he trial court may not automatically disqualify an expert witness simply because the witness indicates reliance on a national standard of care during a discovery deposition," <u>id.</u> at 146, 675 S.E.2d at 631, the North Carolina Supreme Court held that the trial court erred by granting summary judgment to the defendants without properly considering the proposed expert's affidavit, <u>see</u> <u>id.</u> at 149, 675 S.E.2d at 632. Here, unlike in <u>Crocker</u>, Dr. McKinstry affirmatively rested her familiarity with the relevant standard of care on her own practice of medicine, without mentioning any investigation regarding Davidson County and the Jail. More importantly, despite both a motion to exclude and a motion for summary judgment premised in large part on an inability to satisfy the standard of care requirement, Plaintiff failed to provide any affidavit from Dr. McKinstry to rectify the deficiencies in her knowledge. Plaintiff has thus failed to avail herself of the provided "opportunity to establish [Dr. McKinstry's] competency," <u>id.</u> at 146, 675 S.E.2d at 631, warranting Dr. McKinstry's exclusion.

Further, contrary to Plaintiff's contentions (see Docket Entry 92 at 16-17), the Women's Prison and Jail do not qualify as similar. Per Dr. McKinstry, the Women's Prison operates basically a miniature hospital — where Dr. McKinstry worked in person from 8 a.m. to 5 p.m. Monday to Friday — with multiple doctors with different specialities, multiple nurses and nurse practitioners, a separate director of nursing, and dedicated inpatient and outpatient mental health facilities with "designated mental health providers within the mental health unit" (Docket Entry 92-1 at 57), including a psychiatrist and "[d]esignated nurses for mental health purposes" (id.). (See Docket Entry 71-1 at 41-46; Docket Entry 92-1 at 48-49, 52-58.) In addition to this medical facility, the Women's Prison included "about six pods," i.e., "housing units," each of which "may have a nurse or a medical technician." (Docket Entry 71-1 at 41.) That arrangement in no way resembles the Jail's table-sized medical clinic with its one-day-a-week Zoom telehealth mental health services and, at most, "two or three" on-duty medical staff (Docket Entry 92-1 at 45).

Accordingly, Dr. McKinstry failed to demonstrate her familiarity with the applicable standard of care, as required to qualify as an expert witness on Plaintiff's medical malpractice claim. The Court should therefore grant Medical Defendants' request to exclude Drs. Corvin, Reardon, and McKinstry as expert witnesses for Plaintiff's medical malpractice claim.

60

### ii. Deliberate Indifference Claim

Medical Defendants also seek to exclude Drs. Corvin, McKinstry, and Reardon from offering opinions regarding Plaintiff's deliberate indifference claim. (See, e.g., Docket Entry 71 at 18-22.) In particular, Medical Defendants assert that "[n]one of [P]laintiff's experts provide any basis for a deliberate indifference opinion in their reports as required by Rule 26, so they should be excluded from expanding their testimony to retroactively include those opinions." (Id. at 20.) This position should prevail.

To begin, Plaintiff concedes that the expert reports of Drs. Corvin and McKinstry do not opine on deliberate indifference. (Docket Entry 92 at 19.) However, Plaintiff asserts that they should nonetheless "be permitted to testify" regarding deliberate indifference because (i) their "specialized knowledge, skill, experience, training, and education . . . would assist the jury in understanding the evidence and deciding whether the actions of [Medical] Defendants were 'inappropriate in light of the [substantial] risk' of harm faced by [Wilson]" (Docket Entry 92 at 19 (second set of brackets in original)) and (ii) they "would also clearly assist the jury in deciding whether the evidence demonstrates a substantial risk of serious harm satisfying the objective prong of the standard" (id. at 19-20). As an initial matter, Medical Defendants concede that Wilson suffered from an

61

objectively serious medical need (<u>see</u> Docket Entry 88 at 2), rendering unnecessary any expert testimony on that issue. More importantly, Plaintiff does not even attempt to establish that the omission of any deliberate indifference opinions from Dr. Corvin's and Dr. McKinstry's expert reports qualified as either "substantially justified or . . . harmless," Fed. R. Civ. P. 37(c)(1). <u>See</u> <u>Wilkins</u>, 751 F.3d at 222 ("The burden of establishing these factors lies with the nondisclosing party . . . ."). Under Rule 37, therefore, Plaintiff "is not allowed to use th[ose] . . . witness[es] to supply evidence" in support of her deliberate indifference claim. Fed. R. Civ. P. 37(c)(1).

As for Dr. Reardon, Plaintiff tacitly acknowledges that "the phrase 'deliberate indifference' does not appear in her report," but asserts that "the opinions contained in Dr. Reardon's report, and as explained in her deposition, cut to the heart of the evidence and factual issues a jury would confront in deciding whether [Medical] Defendants were deliberately indifferent." (Docket Entry 92 at 20.) Thus, Plaintiff maintains, "it would not create unfair surprise for Dr. Reardon to opine as to the issues or evidence underlying . . . Plaintiff's deliberate indifference claims, nor would such testimony violate the Federal Rules of Civil Procedure because these opinions were disclosed in her report." (<u>Id.</u> at 21.) As Medical Defendants assert, however, "Dr. Reardon's report includes generic language that does not specify how Medical

62

Defendants were deliberately indifferent to a serious medical need or what Nurse Madden or Dr. Entwistle individually allegedly did" (Docket Entry 95 at 10). (See Docket Entry 71-1 at 85-86.) Medical Defendants further correctly note that "[n]either Dr. Entwistle nor Nurse Madden is mentioned by name, and [the Opposition] does not clarify or explain any substantially justified or harmless failure to properly disclose such opinions" (Docket Entry 95 at 10). (See also id. (asserting that "[the proposed experts'] failure to disclose all opinions in their reports is a clear violation of Rule 26(a)(2)(B)(i), so any opinions as to deliberate indifference from Drs. Corvin, McKinstry or Reardon should be excluded").) These failures alone warrant exclusion of Dr. Reardon's report. See, e.g., Carr, 453 F.3d at 605 ("Every litigant in federal court is plainly entitled under Rule 26(a)(2)(B) to be given the information spelled out therein, and none shoulder the burden to independently investigate and ferret out that information as best they can and at the expense of their client.").

Further, contrary to the mandates of Rule 26, Dr. Reardon's report offers only "conclusory opinions," devoid of the "'how' and 'why' [she] reached a particular result," Salgado, 150 F.3d at 741 n.6. (See Docket Entry 71-1 at 85-86.) Additionally, the Opposition relies heavily on Dr. Reardon's testimony — notably without citing to any particular portion of said testimony (see

63

Docket Entry 92 at 20-21) — in arguing against her exclusion. (See, e.g., id. at 21 ("Dr. Reardon's opinions and testimony address the very questions a fact finder must wrestle with in a deliberate indifference case. . . . Because Dr. Reardon's report and testimony thoroughly address the factual issues surrounding and comprising the question of deliberate indifference, [Medical] Defendants are incorrect that 'no interpretation of [her] report[] would include deliberate indifference.' [DOC 71, 20]. Contrarily, based on her report and testimony, Dr. Reardon should be permitted to testify as to the factual questions and evidence relevant to . . . Plaintiff's deliberate indifference claim and to offer an opinion on the ultimate issue of [Medical] Defendants' deliberate indifference." (certain brackets in original)).) Yet Rule 26 mandates a "complete" expert report in large part so "that opposing counsel is not forced to depose an expert in order to avoid ambush at trial," as well as "to shorten or decrease the need for expert depositions and thus to conserve resources." Salgado, 150 F.3d at 741 n.6; see also Ortiz-Lopez, 248 F.3d at 35; Wright, 2010 WL 4623998, at *2. Plaintiff therefore cannot look to Dr. Reardon's testimony to salvage the deficiencies in her report.

Moreover, although Dr. Reardon describes her opinions as "causation opinion[s], not . . . standard of care opinion[s]" (Docket Entry 71-1 at 80), her testimony focuses on what individuals "need to provide" (id.) and "should have" done (e.g.,

64

id. at 81 ("referral to mental health should have taken place"); accord id. at 82 ("should have prompted the referral and a call to the doctor"), 83 ("medication administration record should have been developed"); see also id. at 82 (discussing Dr. Reardon's "opinions regarding inadequate assessment and recommended intervention by medical staff following [Wilson's] initial attempt by hanging" and her "opinions related to unjustified delay in and insufficient communication of [Wilson's] mental condition and need for treatment by medical staff only after OC deployment")). Such opinions qualify as standard of care rather than causation opinions. See, e.g., Koon v. North Carolina, 50 F.4th 398, 409 (4th Cir. 2022) ("But all those 'shoulds' are the language of negligence, arguments about what a reasonably prudent person would have done."); see also id. at 410 ("But again, this is the language of negligence: should have and could have and if only."). Dr. Reardon herself concedes that she does not qualify to offer standard of care opinions against Dr. Entwistle and Nurse Madden. (See, e.g., Docket Entry 71-1 at 76-77.) Dr. Reardon's proffered testimony thus violates both Rule 26 and Rule 702.

Under the circumstances, the Court should grant the Expert Motion and exclude any testimony by Drs. Corvin, McKinstry, and Reardon against Medical Defendants.

65

## II. Judgment Motion

## A. Relevant Standards

## i. Summary Judgment

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, and all internal conflicts in it resolved favorably to him." Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets and internal quotation marks omitted). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies

66

Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996). Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, No. 4:08cv2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Baber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010). Further, factual allegations in a complaint or other court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

### ii. Medical Malpractice Claim

As previously noted, "[i]n a medical malpractice action under North Carolina law, the plaintiff must show: (1) the applicable standard of care under [North Carolina General Statute Section] 90-21.12; (2) a breach of the standard of care; (3) proximate causation; and (4) damages." Harrington, 2023 WL 3393569, at *4 (internal quotation marks omitted). And, as relevant here, "the plaintiff must establish the relevant standard of care through

expert testimony." <u>Billings</u>, 174 N.C. App. at 194, 619 S.E.2d at 924 (internal quotation marks omitted).[32]

> If a plaintiff's standard of care expert witness "fail[s] to demonstrate that he [is] sufficiently familiar with the standard of care 'among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action,'" then the "plaintiff [is] unable to establish an essential element of his claim, namely, the applicable standard of care," and the trial court properly enters judgment on behalf of the defendant.

<u>Day</u>, 218 N.C. App. at 6, 721 S.E.2d at 243 (stray space omitted) (brackets in original).

---

32  North Carolina law does not require expert testimony "to establish the standard of care, failure to comply with the standard of care, or proximate cause, in situations where a jury, based on its common knowledge and experience, is able to decide those issues." <u>Bailey v. Jones</u>, 112 N.C. App. 380, 387, 435 S.E.2d 787, 792 (1993).  However,

> application of this "common knowledge" exception to the requirement of expert testimony in medical malpractice cases has been reserved for those situations in which a physician's conduct is so grossly negligent or the treatment is of such a nature that the common knowledge of laypersons is sufficient to find the standard of care required, a departure therefrom, or proximate causation. *See Buckner v. Wheeldon*, 225 N.C. 62, 64, 33 S.E.2d 480, 482 (1945) (plaintiff had compound fracture of leg with bone protruding through open wound, doctor failed to cleanse or sterilize open wound before setting leg in cast, causing infection); *Groce v. Myers*, 224 N.C. 165, 170, 29 S.E.2d 553, 557 (1944) (doctor, in the course of treating plaintiff's insanity, jerked plaintiff's arm, breaking it); *Mitchell v. Saunders*, 219 N.C. 178, 184, 13 S.E.2d 242, 246 (1941) (doctor left sponge in patient's body during surgery).

<u>Bailey</u>, 112 N.C. App. at 387, 435 S.E.2d at 792.

### iii. Deliberate Indifference Standard

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989). In other words, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his . . . medical care . . .[,] it transgresses the substantive limits on state action set by the Eighth Amendment [in the case of convicted prisoners] and the Due Process Clause [of the Fourteenth Amendment in the case of pretrial detainees]." Id. at 200; see also Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988) ("Because [the plaintiff] was a pretrial detainee and not a convicted prisoner at the time of the alleged denial, [his] claim [for denial of medical care] is governed by the due process clause of the fourteenth amendment rather than the eighth amendment's prohibition against cruel and unusual punishment.").

"[P]retrial detainees can state a claim under the Fourteenth Amendment, based on a purely objective standard, for prison officials' deliberate indifference to excessive risks of harm." Short v. Hartman, 87 F.4th 593, 604-05 (4th Cir. 2023). As the Fourth Circuit has explained, "[t]he Fourteenth Amendment Due

69

Process Clause protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'" Id. at 608-09 (quoting Kingsley v. Hendrickson, 576 U.S. 389, 398 (2015)). "That test is 'solely an objective one.'" Id. (quoting Kingsley, 576 U.S. at 397). Under this standard, "it is sufficient that the plaintiff show that the defendant's action or inaction was, in *Kingsley*'s words, 'objectively unreasonable,' 576 U.S. at 397: that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly." Short, 87 F.4th at 611 (parallel citation omitted). "Or as the Supreme Court put it . . ., it is enough that the plaintiff show that the defendant acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 836 (1994)).

Thus, to succeed on a claim of deliberate indifference to a medical need, a pretrial detainee must show:

> (1) [he] had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

70

Id. Importantly, though, "it is still not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee." Id. at 611-12.

Moreover, a "'mere difference of opinion' with the medical staff's 'sound professional judgment' cannot 'give rise to a[constitutional] violation.'" Johnson v. Adams, No. 24-7009, 2026 WL 624616, at *2 (4th Cir. Mar. 4, 2026) (brackets in original). Nevertheless, "the mere fact that prison officials provide some treatment does not mean they have provided '*constitutionally adequate* treatment.'" Heyer v. United States Bureau of Prisons, 849 F.3d 202, 211 (4th Cir. 2017) (emphasis in original). In other words, although "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." Id. (internal quotation marks omitted); see also id. at 211-12 (concluding that evidence that prison knew interpreter it provided during medical interactions did not speak the plaintiff's language supported finding "that [the prison] was deliberately indifferent, as it knew that its failure to provide ASL interpreters during [the plaintiff's] medical interactions created a substantial risk of serious harm to his health").

71

### iv. Monell Liability

For its part, "Section 1983 provides a remedy . . . for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States."  <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 283 (2002) (quoting 42 U.S.C. § 1983); <u>see also</u> <u>Lindiment v. Jones</u>, No. 1:17cv501, 2017 WL 4119644, at \*4 (M.D.N.C. Sept. 15, 2017) ("The statutory basis for federal claims involving constitutional violations by state actors appears in 42 U.S.C. § 1983."), <u>recommendation adopted</u>, No. 1:17cv501, 2017 WL 4417676 (M.D.N.C. Oct. 3, 2017).  Section 1983 creates municipal liability for constitutional violations "for which the municipality is actually responsible."  <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 479 (1986).  The "tortious conduct" that forms the basis of such liability "must be pursuant to a municipality's official policy," a requirement that "distinguish[es] acts of the *municipality* from acts of *employees* of the municipality."  <u>Id.</u> (internal quotation marks omitted) (emphasis in original).  "[I]n other words, a municipality cannot be held liable under [Section] 1983 on a *respondeat superior* theory."  <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658, 691 (1978).  In that regard:

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and

72

widespread as to constitute a custom or usage with the force of law.

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (brackets and internal quotation marks omitted).

Further, "a plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a *particular* constitutional or statutory right will follow the decision." Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999) (internal quotation marks omitted) (emphasis in original). "Thus, municipal liability will attach only for those policies or customs having a *specific* deficiency or deficiencies . . . such as to make the *specific* violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run." Id. (internal quotation marks omitted) (emphasis and ellipsis in original). Of course, "[if] there are no underlying constitutional violations by any individual, there can be no municipal liability." Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999).

"[T]hese principles are equally applicable to a private corporation acting under color of state law when an employee exercises final policymaking authority concerning an action that allegedly causes a deprivation of federal rights." Austin v. Paramount Parks, Inc., 195 F.3d 715, 729 (4th Cir. 1999). For example, an entity that provides medical care to a state prisoner acts under color of state law, see, e.g., Conner v. Donnelly, 42

73

F.3d 220, 224-25 (4th Cir. 1994) (explaining that Supreme Court has held "that a private physician under contract with the State of North Carolina to provide medical services to prison inmates, but not employed directly by the state, nonetheless acts under the color of state law when treating an inmate" and "that the Supreme Court's analysis applies also to private physicians who treat state prisoners without the benefit of a contract"), and thus that entity can incur liability for deliberate indifference, see id. at 225 ("If a physician treating a prisoner — whether by contract or by referral — misuses his power by demonstrating deliberate indifference to the prisoner's serious medical needs, the prisoner suffers a deprivation under color of state law.  The source of the deprivation does not change because the physician has no contractual relationship with the state:  the physician acts under color of state law because the state has incarcerated the prisoner and denied him the possibility of obtaining adequate medical care on his own.").

### B. Analysis

### i. Initial Matters

As discussed in connection with the Expert Motion, Plaintiff lacks an expert witness qualified to opine on the standard of care applicable to Medical Defendants.  Accordingly, "[P]laintiff is unable to establish an essential element of [her medical malpractice] claim, namely, the applicable standard of care, and

74

the [Court should] enter[] judgment on behalf of [Medical D]efendants" on that claim. <u>Day</u>, 218 N.C. App. at 6, 721 S.E.2d at 243 (brackets and internal quotation marks omitted).[33]

Additionally, Plaintiff did not respond (<u>see</u> Docket Entry 97 at 1-23) to Medical Defendants' arguments regarding the failure of Plaintiff's excessive force claim (i.e., Count III) against them (<u>see</u> Docket Entry 67 at 17-19). Plaintiff thus concedes that failure. <u>See</u> <u>Kinetic Concepts</u>, 2010 WL 1667285, at *6-9. The Court should therefore grant Medical Defendants' request for summary judgment on this claim as well.

### ii. Deliberate Indifference Claim

Medical Defendants do not dispute that Wilson suffered from a serious medical need. (<u>See, e.g.,</u> Docket Entry 67 at 7-13 (challenging deliberate indifference claim on grounds that Dr. Entwistle and Nurse Madden provided appropriate care rather than

---

33 To the extent Plaintiff attempts to salvage her medical malpractice claim by contending that Dr. McKinstry and Dr. Corvin "are both qualified to testify as to whether Dr. Entwistle or Nurse Madden" breached various "common law duties" (Docket Entry 97 at 20), Plaintiff waived such argument by failing to develop it (<u>see</u> <u>id.</u>) (or include it in her Opposition (<u>see generally</u> Docket Entry 92)). <u>See</u> <u>Grayson O Co. v. Agadir Int'l LLC</u>, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument — even if its brief takes a passing shot at the issue." (brackets and internal quotation marks omitted)). In any event, "[a plaintiff's] failure to comply with the requirements of [N.C.] Rule 702 — and thus [North Carolina] Rule [of Civil Procedure] 9(j) — in his medical malpractice claim is a complete barrier to recovery in North Carolina." <u>Hines v. Correct Care Sols., LLC</u>, 604 F. App'x 256, 258 (4th Cir. 2015).

75

that Wilson did not suffer from serious medical need); <u>see also,</u> <u>e.g.,</u> Docket Entry 88 at 18 ("[Medical] Defendants do not dispute that Mr. Wilson had a serious psychiatric illness but it was one for which he received reasonable and appropriate treatment.").) Instead, they contend that Dr. Entwistle and Nurse Madden acted reasonably and without deliberate indifference in treating Wilson's serious medical need. (<u>See, e.g.,</u> Docket Entry 67 at 7-13.) This position should prevail.

According to Plaintiff, Dr. Entwistle and Nurse Madden displayed deliberate indifference by failing to transfer Wilson to a hospital following his initial suicide attempt. (<u>See</u> Docket Entry 97 at 7-8.) In this regard, Plaintiff contends:

> Here, a reasonable jury could conclude that when [Wilson] first set foot in the Jail, he was in a facility unequipped to treat attempted suicide. A reasonable jury could conclude that this fact remained true when [Wilson] first attempted suicide in the Jail, when he was stripped naked, when he was speaking rapidly about demons and killing himself, when he was screaming for help, when he was told to just lie down and breathe, when he was pepper sprayed, when he was not oriented to situation or reality, when he continued screaming, when a milk carton was inexplicably left in his cell, and when [O]fficer Lambeth walked away from [Wilson] as he lay collapsed and dying.
>
> To be sure, neither [Nurse] Madden nor Dr. Entwistle placed the milk carton in the cell or ignored him dying on the floor. Instead, they left [Wilson] in a facility that was clearly not equipped or prepared to treat his condition and exposed him to a substantial, immediate, and ongoing risk of serious harm. Based on the evidentiary forecast, a reasonable jury could conclude that deep breathing techniques and handing him a pill fell short of constitutionally adequate treatment under

76

the circumstances and were insufficient measures to mitigate the true risk of harm — death by suicide.

A reasonable jury, upon determining witness credibility and weighing the evidence, could conclude not just that the facility was inadequate to treat inmates who attempted suicide, but also that [Nurse] Madden and Dr. Entwistle were authorized to get [Wilson] to a facility that could treat him.

Whether, under these circumstances, Dr. Entwistle or Nurse Madden failed to take reasonable measures to abate the danger by telling [Wilson] to breathe deeply and by eventually giving him a pill, is a question of fact answerable only by a jury. *See[,] e.g.*, *Farmer,* 511 U.S. at 844; *Cox v. Quinn*, 828 F.3d 227, 237 (4th Cir. 2016) (affirming denial of summary judgment in deliberate indifference claim because reasonableness of officers' action is jury question); *Raynor v. Pugh*, 817 F.3d 123, 129-30 (4th Cir. 2016) (overturning summary judgment in deliberate indifference claim because whether officer responded reasonably was a dispute of fact); *Pfaller[ v. Amonette]*, 55 F.4th [436,] 451 [(4th Cir. 2022)] (finding genuine dispute of material fact as to whether prison doctor responded appropriately). Thus, the individual [Medical] Defendants are not entitled to summary judgment on Plaintiff's deliberate indifference claim.

(Docket Entry 97 at 7-9 (footnotes omitted).)[34]

------

34 The cited cases do not advance Plaintiff's position. <u>Cox</u> and <u>Raynor</u> involved prison guards who allegedly failed to protect an inmate from a known risk of assault by fellow inmates. <u>See, e.g.</u>, <u>Cox</u>, 828 F.3d at 231 ("In 2011, [the plaintiff] was severely beaten by a fellow inmate while incarcerated at the Western Virginia Regional Jail. [The plaintiff] had repeatedly complained to jail officials — including the [defendants], correctional officers . . . — that he was being threatened, harassed, and robbed by the group of inmates who ultimately orchestrated the beating."); <u>Raynor</u>, 817 F.3d at 126 (describing verified allegations, including that inmate, Mullins, threatened the plaintiff in front of prison-housing-manager defendant, who responded by "stat[ing] that he did not care what Mullins did and ordered both men back into their [shared] cell," shortly after which Mullins assaulted and seriously injured the plaintiff while the defendant "watched the entire assault and did not call for assistance or take any action until
(continued...)

According to Plaintiff, Medical Defendants possessed authority to transfer Wilson to a hospital following his initial suicide attempt because "[t]he Medical Plan and Contract demonstrate that broad authority was delegated to IMS for determining whether a condition constituted a medical emergency for which a referral to the emergency room would be appropriate" (id. at 14) and "several members of the detention staff, including a named Defendant, testified that they relied on the medical providers — not an overriding and unwritten Sheriff policy — to know when to help facilitate an emergent referral, including for an attempted suicide" (id.).[35]  Notably, though, the cited deposition testimony

34(...continued)
after the attack had ended").  Farmer similarly involved allegations that prison officials knowingly exposed an inmate to a serious risk of assault from fellow inmates.  See, e.g., id., 511 U.S. at 830-31.  Finally, Pfaller involved a prison doctor's repeated  failure to refer an inmate, with known hepatitis C, id., 55 F.4th at 443, for further testing despite bloodwork that "qualified him for additional testing three times" over a three-year period, id. at 449, which delay ultimately contributed to the inmate's death from liver cancer, see id. at 443, 449.

35  In this regard, Plaintiff asserts:

Officer DeCarlo testified that[,] when an inmate attempted self-harm in the Jail, the protocol was to alert medical and "then medical goes from there", meaning "you leave it to medical."  [Ex. C, DeCarlo Dep. 47:8-15].  [Officer] DeCarlo further testified that she was trained as a detention officer to call for an ambulance "when the nurse says" and that she relied on the nurse for that decision.  [Id. 84:22 – 85:3].  When asked whether he was taught that an inmate who attempted suicide would be processed out of the facility, Officer Phillips testified that "the nurse would evaluate them
(continued...)

speaks in generalities regarding medical situations, emergencies, and suicide attempts (see id. at 13-14); none of the cited testimony involved a purely mental health crisis where the deponent (or anyone) called 911 or transferred a physically uninjured inmate — let alone an inmate who had not yet been arraigned — to the hospital. (See id.; see also Docket Entry 97-1 at 2, 6-8, 10-11, 13-14.)

The cited provisions of the Contract and Medical Plan — and Dr. Entwistle's contract with IMS (see Docket Entry 97 at 17)[36] —

35(...continued)
and deem if it's needed or not, as far as being processed out." [Ex. D, Phillips Dep. 135:1-8]. When asked whether "yelling, screaming, and cussing" constituted a medical emergency requiring transport to a hospital", [Officer] Lambeth testified "I wouldn't be the one to make that call" due to not being a "medically trained professional . . . [.]" [Ex. E, Lambeth Dep. 144:20 – 145:2]. Similarly, IMS's own VP of Operations even agreed that IMS had the authority to decide whether a situation constituted a medical emergency sufficient for an emergent referral. [Ruppe Dep. 59:19-22]. To any extent Ms. Ruppe contradicted herself by further testifying that the Sheriff clawed back some of that authority, this is an issue of witness credibility.

(Docket Entry 97 at 13-14 (ellipsis, underscoring, italics, and certain brackets in original).)

36 Plaintiff maintains that Dr. Entwistle constituted the "final policymaker for IMS" (id. at 18) regarding the "policy that no inmate could ever be emergently referred solely for mental health reasons, including attempted suicide" (id. at 16), "[b]ecause the only entity 'solely responsible' for overseeing and supervising Dr. Entwistle and any IMS employee in the Jail was Evergreen, which was an entity solely controlled and managed by Dr. Entwistle, [and thus] her policy decisions were not subject to review by other [IMS] policymakers" (id. at 18). However, Dr.
(continued...)

79

likewise speak in generalities, without directly addressing mental health crises (see id. at 13 (referencing, inter alia, "medical discretion" and "medical duties" (internal quotation marks omitted))). Yet even Plaintiff's proposed expert witness distinguished between "mental health" needs and "medical" needs. (See, e.g., Docket Entry 92-1 at 56 (explaining that "mental health inmates or patients not only have mental health issues, they have medical issues as well"); see also id. at 57 (explaining that medical doctors at Women's Prison "dedicated time [one day each week] to take care of the mental health medical needs").) Further, contrary to the generalities upon which Plaintiff relies, the record contains specific evidence not only that the Sheriff did not delegate to IMS the authority to transfer an inmate to the hospital for purely mental health reasons (see, e.g. Docket Entry 57-1 at 39-40; Docket Entry 86-1 at 55), but also that the policy of not transferring inmates, including actively suicidal ones, to the hospital for purely mental ailments prior to the inmates' initial appearances long predated IMS's involvement at the Jail (see, e.g., Docket Entry 88-1 at 10-22) and "[w]as not an IMS rule" (Docket Entry 60-8 at 6).

---

36(...continued)
Entwistle's contract with IMS specifically states that "[Dr. Entwistle] will report to Dr. John Henry Piland, M.D. ('Dr. Piland') and will be subject to Dr. Piland's direction and control in Dr. Piland's capacity as Chief Medical Director of [IMS]." (Docket Entry 97-1 at 16.)

80

On this record, "a reasonable jury [could neither] infer that IMS, rather than the Sheriff, maintained the [disputed] policy" (Docket Entry 97 at 14) nor "conclude" that Dr. Entwistle and Nurse Madden "were authorized" to transfer Wilson to the hospital (id. at 8). See, e.g., Koon, 50 F.4th at 409 ("[The court] may only draw inferences that 'fall within the range of reasonable probability' based on evidence in the record. A permissible inference must be reasonably probable given the facts, not just conceivable or possible. So [the court] must reject tenuous inferences that rest upon speculation and conjecture." (citation omitted)). Moreover, even if Dr. Entwistle and Nurse Madden possessed such authority, Plaintiff's deliberate indifference claim would fail because a "'mere difference of opinion' with the medical staff's 'sound professional judgment' cannot 'give rise to a[ constitutional] violation,'" Johnson, 2026 WL 624616, at *2 (brackets in original). The record reflects that, within a three-hour period, Nurse Madden evaluated Wilson following his initial suicide attempt; tried to calm Wilson down, in accordance with her training, when he became distressed during her evaluation of him; helped clean the pepper spray from Wilson's eyes and face; contacted Dr. Entwistle in an attempt to abate Wilson's distress; and promptly administered the prescribed medication, including a sedative and an antipsychotic, to Wilson, ensuring that he consumed the medication. (See Docket Entry 60-13 at 1-2; Docket Entry 67-1 at 16, 49, 59, 64-65; Docket

81

Entry 68, Ex. H at 8:54:18-9:01:40; Docket Entry 68, Ex. K at 11:29:45-11:30:47; Docket Entry 68, Ex. J at 11:02:08-11:08:26; Docket Entry 68, Ex. L at 12:44:06-12:44:15; Docket Entry 73-16 at 2-5.)  The record further reflects that, upon first learning of Wilson's presence at the jail through the text message from Nurse Madden, Dr. Entwistle promptly prescribed both a sedative and a antipsychotic medication to help ameliorate Wilson's distress. (See Docket Entry 60-13 at 1-2; Docket Entry 67-1 at 16, 49, 53-54.)  "Such conduct hardly constitutes, at minimum, the sort of 'reckless' conduct required for a deliberate indifference claim." Johnson, 2026 WL 624616, at *2.  See Koon, 50 F.4th at 409 ("Saying that she should have done a better examination is to make a kind of medical malpractice claim, and we know that cannot be the basis of deliberate indifference."); see also id. at 410 ("But again, this is the language of negligence:  should have and could have and if only.  It just doesn't rise to deliberate indifference.").

The Court should accordingly grant summary judgment to Dr. Entwistle and Nurse Madden on Plaintiff's deliberate indifference claim.

### iii. Monell Claim

According to Plaintiff, her "*Monell* claim in this case is straightforward:  IMS had actual knowledge that the Jail was not equipped to treat suicide attempts; however, IMS maintained an unwritten policy of ignoring the serious risk and treating certain

82

suicide attempts in the Jail anyway." (Docket Entry 97 at 9.) According to Medical Defendants, this claim fails because, inter alia, "the policies Plaintiff takes issue with are actually the Sheriff's policies, not IMS's policies" (Docket Entry 67 at 14) and "if a policy of the Sheriff conflicted with a policy of IMS the Sheriff's policy controlled" (id. at 16). As discussed above, the disputed policy belonged to the Sheriff, not IMS. Thus, Plaintiff's Monell claim fails as a matter of law. See, e.g., Pembaur, 475 U.S. at 479 (explaining that Section 1983 creates liability only for constitutional violations "for which the [entity] is actually responsible").

Additionally, because neither Dr. Entwistle nor Nurse Madden displayed deliberate indifference towards Wilson, Plaintiff's Monell claim would fail even if the Court attributed the policy at issue to IMS. See Grayson, 195 F.3d at 697 ("[If] there are no underlying constitutional violations by any individual, there can be no municipal liability."). Finally, the alleged policy did not proximately cause Plaintiff's injury. (See Docket Entry 119 at 46-48.) The Court should therefore grant the Judgment Motion as to Plaintiff's Section 1983 Monell claim against IMS.[37]

---

[37] Given the failure of Plaintiff's substantive claims against Medical Defendants, her claim for punitive damages likewise fails. See, e.g., Owen v. Goodwin, No. 1:21cv217, 2023 WL 6446204, at *9 (W.D.N.C. Sept. 29, 2023) ("Because all the [p]laintiff's substantive claims cannot withstand summary judgment, his claim for punitive damages must fail as well. Therefore, the [d]efendants
(continued...)

83

<u>**CONCLUSION**</u>

Drs. McKinstry, Corvin, and Reardon, Plaintiff's proffered witnesses, do not qualify to testify under N.C. Rule 702 and Rule 702. They also failed to comply with the Rule 26 disclosure requirements, and Plaintiff has not established that this failure qualifies as substantially justified or harmless. Finally, Plaintiff's claims against Medical Defendants fail as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Motions (Docket Entries 66, 70) be granted.

This 27th day of July, 2026.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

---

37(...continued)
are entitled to summary judgment on the [p]laintiff's claim for punitive damages.").