**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| SUSAN WILSON,<br>as Administrator of the<br>Estate of MATTHEW BRIAN WILSON,<br><br>Plaintiff,<br><br>v.<br><br>DAVIDSON COUNTY<br>SHERIFF'S OFFICE, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:24cv219 |

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on the "Motion for Summary Judgment" (Docket Entry 72) (the "Motion") filed by Davidson County, Sheriff Richie T. Simmons, Officer Logan Peters, and Officer Jonathan Lambeth (collectively, the "Jail Defendants"). For the reasons that follow, the Court should grant the Motion.

**BACKGROUND**

Alleging various claims related to "the wrongful death of Matthew Wilson [('Wilson')] as a result of injuries sustained at the Davidson County Jail" (Docket Entry 9 at 1),[1] Susan Wilson (the "Plaintiff"), Wilson's mother and the administrator of his estate (see id.), sued (i) Jail Defendants; (ii) IMS Correctional Healthcare, LLC ("IMS"), Celia Entwistle, MD, and Michelle Madden,

1 Docket Entry page citations utilize the CM/ECF footer's pagination.

LPN; and (iii) Correctional Behavioral Health, PLLC ("CBH"). (See id. at 1-30.) The parties thereafter stipulated to CBH's dismissal without prejudice from this lawsuit (see Docket Entry 27 at 1), as well as to the dismissal of "Count VII of Plaintiff's Amended Complaint (Violation of Article I, Section 27 of the North Carolina Constitution against all Defendants)" (Docket Entry 61 at 1-2).

As such, the Amended Complaint purportedly asserts the following claims against Jail Defendants: (i) "42 U.S.C. § 1983 Claim against Defendants Davidson County and Richie T. Simmons, in his Official Capacity as Sheriff of Davidson County" (Count I) (Docket Entry 9 at 13 (bold font omitted)); (ii) "42 U.S.C. § 1983 Claim against all Defendants – Conditions of Confinement and Excessive Force" (Count III) (id. at 19 (bold font omitted));[2] (iii) "42 U.S.C. § 1983 Claim Against . . . [Officer] Lambeth[] and [Officer] Peters in their Individual Capacities" (Count IV) (id. at 20 (bold font omitted));[3] (iv) "Negligence against all Defendants" (Count V) (id. at 22 (bold font omitted)) for failure to "provide [Wilson] with necessary healthcare" (id. at 23);[4] (v) "Negligent

---

2 In particular, Plaintiff asserts that "[t]he acts of [Officer] Peters described in this lawsuit constitute excessive force under the Eighth and Fourteenth Amendments." (Id.)

3 More specifically, Plaintiff alleges that Officer Lambeth acted with deliberate indifference towards Wilson's serious medical needs (see id. at 21) and Officer Peters utilized excessive force against Wilson (see id. at 21-22).

4 Plaintiff relies on vicarious liability in asserting this (continued...)

Hiring, Negligent Supervision, and Negligent Retention against Defendants Davidson County and Sheriff Simmons" (Count VI) (id. at 25 (bold font omitted)); and (vi) "Punitive Damages against all Defendants" (Count VIII) (id. at 28 (bold font omitted)). After close of discovery (see, e.g., Text Order dated Apr. 23, 2025 (granting request to extend discovery deadline to September 16, 2025)), Jail Defendants moved for summary judgment on all claims against them (see Docket Entry 72 at 1-2). Plaintiff responded in partial opposition to the Motion. (See Docket Entry 96 (the "Opposition") at 1-23.) In this regard, per the Opposition, "Plaintiff does not oppose dismissal of: (1) the claims against Defendant Sheriff Simmons in his individual capacity, (2) the state law tort claims against [Sheriff] Simmons, and (3) the claims against Defendant Davidson County." (Id. at 4.)

Accordingly, as relevant to the Motion, the record reflects:

On November 15, 2022, officers arrested Wilson and, at 10:12 p.m., booked him into the Davidson County Jail. (See Docket Entry 73-5 (the "Screening Report") at 1.) Shortly thereafter, Officer DeCarlo conducted a jail suicide and medical health screening for Wilson. (See id. at 1-3.) Per the Screening Report, Wilson suffered from mental illness, for which he was hospitalized the week prior, and attempted suicide (by cutting) the previous

4(...continued)
claim against Davidson County and Sheriff Simmons. (See, e.g., id. at 22.)

year. (See id. at 2.) The Screening Report listed the following four items as "current medical problems that [Wilson] might need treatment for" (id. at 3): "Bipol[a]r[,] Depressed[,] ?? Sociopath[,] Su[ici]dal" (id. (all-cap font omitted) (question marks in original)). The Screening Report further indicated that Wilson "seem[ed] depressed" (id.), "seem[ed] anxious or afraid" (id.), and "seem[ed] to be talking in a strange manner" (id.). It also specified that Wilson "currently believe[d] that someone can control [his] mind by putting thoughts into [his] head or taking thoughts out of [his] head" (id. at 1), although he did not "currently feel that other people know [his] thoughts and can read [his] mind" (id.).

Based on Wilson's answers to its Suicide Screening component, the Screening Report noted that "[Wilson] should be referred for further mental health evaluation." (Id. (bold font omitted).) Officer DeCarlo accordingly called a nurse (see Docket Entry 73-6 at 5) and, either on her own initiative (see id.) or "collectively" with the nurse (Docket Entry 73-10 at 3), "deci[ded] to put [Wilson] in a suicide watch cell" (Docket Entry 73-6 at 5 (bold font omitted)). As part of his suicide watch designation, Wilson "automatically" received "[a] suicide gown," known as a "turtle suit." (Id. at 2-3.) Designed "to prevent someone from hanging themselves" (Docket Entry 73-8 at 4), a suicide gown "is like a thick blanket material that has some Velcro located on the

shoulders and the back to be able to be worn on a human" (id. at 3). Because of the gown's thickness and design, individuals cannot easily knot the gown to hang themselves. (See id. at 4; Docket Entry 73-9 at 2.)

Officers then escorted Wilson to P-33, a suicide watch cell (see Docket Entry 50-1 at 7; Docket Entry 73-6 at 6), which officers "can see . . . from the [control] tower" (Docket Entry 73-6 at 3). A surveillance camera also broadcast footage of P-33 to the control tower, where a monitor continuously displayed the footage. (See, e.g., Docket Entry 89-1 at 7.) Official policy also obliged officers to check on inmates on special watch, such as suicide watch, four times an hour, no more than 20 minutes apart. (See Docket Entry 73-8 at 6-7; Docket Entry 73-12 at 4; Docket Entry 110 at 14-15.) Located at the very end of a hallway of cells, adjacent to the top of the stairs down to a common area, P-33 contains a gate made of vertical metal bars with a horizontal crossbar at roughly waist height. (See, e.g., Docket Entry 68, Ex. H at 8:54:25; Docket Entry 68, Ex. K at 11:29:58; Docket Entry 100, Ex. A at 12:10:18-12:10:24.) Made of concrete walls, P-33 contains a combination metal toilet and water basin/faucet in its front right corner (as viewed from outside the cell),[5] just inside the gate, with a mirror affixed to the wall above it; the cell contains

5 Unless otherwise specified, this Opinion uses the video viewer's perspective for all video descriptions.

no other permanent fixtures. (See, e.g., Docket Entry 68, Ex. H at 8:54:25; Docket Entry 68, Ex. K at 11:30:14.)[6] The hallway appears to contain cells on one side and a wall of metal screening (similar to chain-link fencing) along the other side of the walkway, through which one can view the lower tier, which contains, inter alia, tables. (See Docket Entry 68, Ex. K at 11:29:45-11:30:46.) Positioned on the opposite side of that metal wall, the surveillance camera captures the top of the stairs, the interior of P-33, and parts of an adjoining cell, which contained at least one inmate during Wilson's time in P-33. (See Docket Entry 100, Ex. A at 12:10:10.)[7]

At 8:05 a.m. on November 16, 2022, Wilson received a carton of milk for his breakfast. (See Docket Entry 73-11 (the "Timeline") at 1.)[8] Approximately twenty minutes later, Wilson attempts to hang himself with his suicide gown. (See id.; see also Docket Entry 87 (the "Initial Video") at 8:24:07-8:24:45.) Approximately

6 Rather than a permanent bed, the cell contains a moveable mat. (See, e.g., Docket Entry 68, Ex. K at 11:29:45-11:29:51.)

7 The adjoining cell appears on the right of the screen when viewing the video footage. (See id.) Wilson's cell, P-33, occupies the last spot on the hallway, with a concrete wall on the left side of the video. (See id.)

8 Using jail surveillance footage, Captain Tracy Rabon prepared the Timeline for the North Carolina Department of Health and Human Services. (See, e.g., Docket Entry 110 at 36-38.) The parties all rely on the Timeline, the accuracy of which they do not dispute. (See, e.g., Docket Entry 50 at 3-4; Docket Entry 53 at 3-4; Docket Entry 54 at 8-9; Docket Entry 60 at 7-8; Docket Entry 89 at 2.)

thirty seconds after Wilson starts trying to tie the gown around the upper portion of the cell bars, Officer Smith runs up the hallway to the cell and Wilson quickly lifts the gown from around his neck as he backs away from the cell bars. (See Docket Entry 87 at 8:24:11-8:24:46.) When Wilson releases the gown, it falls to the crossbar and, using one hand, Officer Smith subsequently removes it from the cell entirely, tossing it up the hallway. (See id. at 8:24:44-8:25:16.) Another officer — identified in the Timeline as Officer Barker (see Docket Entry 73-11 at 1) — comes up the stairs, joining Officer Smith outside Wilson's cell. (See, e.g., Docket Entry 87 at 8:25:08-8:25:29.) The officers observe Wilson, who moves around his cell while apparently talking to them, for another minute before they depart back the way they came. (See id. at 8:25:29-8:26:51.) Throughout this incident, inmates walk up and down the hallway and stairs carrying, inter alia, food trays and a trash can. (See id. at 8:21:34-8:27:59.) Ordinarily, such trustee inmates would remove the breakfast items within an hour of serving breakfast. (See Docket Entry 73-12 at 3-4.) Per policy, inmates "[w]ere [not] allowed to keep trash, milk cartons, food, [or] other items inside their cell." (Docket Entry 73-21 at 4 (bold font omitted).)

Thirty minutes later, Nurse Madden and then-Lieutenant Phillips (see Docket Entry 73-8 at 3; Docket Entry 73-11 at 1) approach P-33, where Wilson appears to be sleeping, curled up on

his side in a fetal position on his mat at the rear of the cell, facing the cell entrance. (See Docket Entry 68, Ex. H (the "Discussion Video") at 8:54:18-8:54:37.) When Nurse Madden begins speaking with Wilson, he lifts his head off his mat and begins talking with her, gesturing freely with his right arm before he sits and then stands up from his mat and approaches the front of the cell. (See id. at 8:54:30-8:55:17.) Wilson squats and then sits down in front of Nurse Madden at the gate, showing her various body parts as he cries and talks with Lieutenant Phillips and Nurse Madden, who crouches in front of Wilson at his eye level. (See id. at 8:55:17-8:57:00.) Wilson stands up, prompting Nurse Madden to stand, and continues to talk with Nurse Madden, occasionally including Lieutenant Phillips in his communications. (See id. at 8:57:00-8:59:15.) Wilson then turns around in the cell while Nurse Madden observes him, after which he moves towards the front right corner of the cell (approaching Lieutenant Phillips). (See id. at 8:59:15-8:59:36.) Wilson appears upset as he continues to speak with Nurse Madden, who approaches and stands in front of Wilson, largely obscuring him from view, as she continues communicating with him. (See id. at 8:59:36-8:59:58.) After they shift their positions slightly, with Nurse Madden moving slightly to the right and Wilson moving slightly to the left, they continue communicating, with Wilson again fully visible in the footage. (See id. at 8:59:58-9:00:06.)

As Nurse Madden gestures towards Wilson, he nods his head, after which Nurse Madden reaches out with her left hand to hold Wilson's wrist as though taking his pulse. (See id. at 8:59:58-9:00:16.) Nurse Madden turns to her right, facing up the hallway towards Lieutenant Phillips, again largely obstructing Wilson from view; although somewhat unclear from the video, it appears that she continues measuring his pulse. (See id. at 9:00:16-9:00:41.) Nurse Madden then shifts to the right as she and Wilson continue communicating, with Wilson appearing more animated as he continues speaking to Nurse Madden, as well as to Lieutenant Phillips, who responds, turns, and walks away up the hallway. (See id. at 9:00:41-9:01:02.) Nurse Madden and Wilson continue talking, with Wilson appearing upset as he drops into a crouch, seeming to plead with Nurse Madden as she begins moving away from his cell, ultimately walking up the hallway out of the video frame. (See id. at 9:01:02-9:01:30.) Wilson remains crouched at the front of the cell momentarily, before retreating back to his mat and lying back down in his original fetal position, facing his cell entrance, as inmates come up the stairs in front of his cell. (See id. at 9:01:30-9:01:40.)

Roughly two hours later, around 10:52 a.m., Wilson throws an initially unknown liquid, later identified as toilet water,[9] on

---

9 "[Officer Peters] believe[s that he] radioed" (Docket Entry 96-1 at 18) for assistance in determining "what sort of substance (continued...)

Officer Peters, who subsequently sprays Wilson with pepper spray. (See Docket Entry 60-12 at 2-3; Docket Entry 73-11 at 1; Docket Entry 73-15 at 2-5.) According to Officer Peters:

As Officer Peters attempted to scan P-33 (see, e.g., Docket Entry 96-1 at 18), Wilson "thr[e]w[] an unknown substance at [Officer Peters]" (id. at 17). Officer Peters responded to this "aggressive action" (Docket Entry 73-15 at 3) by "instruct[ing] Mr. Wilson to get back, get back multiple times, and to get on the ground" (Docket Entry 96-1 at 17). Officer Peters approached Wilson's cell "in order to complete [Officer Peters's] 15-minute scans to check [Wilson] off, according to North Carolina statute." (Id. at 18; see also Docket Entry 73-15 at 5 ("At the time, [Officer Peters] was needing to conduct [his] 15-minute scan. At the time, Mr. Wilson was preventing [Officer Peters] from doing so.").) Wilson again threw water on Officer Peters (see Docket Entry 73-15 at 4 (discussing video showing Wilson cupping his hands before throwing water)), prompting Officer Peters "to deploy [his] pepper spray) (id.). "[O]nce [Officer Peters] deployed [the pepper spray, Officer Peters] hit the button [to turn on his body worn camera (at times, a 'BWC' or 'body camera')]" (Docket Entry 96-1 at 17; see also id. at 16) and radioed the control tower for

9(...continued)
[Wilson] threw on [Officer Peters]" (id. (bold font omitted)) "once [Wilson] decided to throw it again, after [Officer Peters] had sprayed [Wilson]" (id.).

assistance (see id. at 18). "[Their] body cameras rewind 30 seconds from the time" the officer "hit[s] the button" (id. at 17 (bold font omitted)), so Officer Peters "believe[s]" (id.) that his verbal instructions to Wilson and subsequent deployment of the pepper spray (see id. at 16-17) will "be captured on [his] BWC" (id. at 17 (bold font omitted)). (See also id. at 16 (responding to question, "Do you have any explanation as to why your BWC was not on?" with, "My body camera was on at the time. I'm fairly sure of it." (bold font omitted)).)[10]

---

10 Pointing to an apparent post-it note reading "Childress 10 BWC" and "Peters/ No canera" [sic] (id. at 21), the Opposition maintains that "no footage [from Officer Peters's body worn camera] has been confirmed or produced [and] there is conflicting evidence as to whether the camera was on" (Docket Entry 96 at 15 (citing "**Ex. E**. L. Peters Dep. 27:21-28:18; **Ex. F** – Peters'[s] Incident Report" (bold font in original))). The Opposition does not, however, assert that the alleged absence of this footage precludes summary judgment or otherwise prejudices Plaintiff. (See id. at 1-23.) Similarly, "Plaintiff's Motion for Sanctions Against Defendants Davidson County and [Sheriff] Simmons for Spoliation of Evidence" (Docket Entry 49 at 1 (bold font omitted)), filed three weeks before close of discovery, neither implicates Officer Peters's BWC footage (see id. at 2-3 (seeking sanctions for "missing [video] footage" during period from "9:41 PM (November 15th) until 8:05 AM (November 16th)") nor asserts that the absence of such footage precludes entry of summary judgment on any of Plaintiff's claims, let alone Plaintiff's claims against Officers Lambeth and Peters (see id. at 1-5; see also id. at 4 (requesting as sanctions (i) "[a]n adverse inference instruction permitting the jury to presume that the missing video was unfavorable to Jail Defendants;" (ii) "[a]n order precluding the Jail Defendants from offering testimony or argument that contradicts Plaintiff's account of events during the time frame of the lost footage;" and/or "[a]n order permitting Plaintiff to present evidence to the jury about the Jail Defendants' failure to preserve and produce this evidence").) Moreover, some type of video footage of the incident between Officer Peters and Wilson existed at the time of Officer

(continued...)

Prior to the incident, Officer Peters had encountered Wilson during previous scans that day. (See id. at 18 (answering question, "this wasn't your first encounter with Mr. Wilson that day, right," with "I believe I conducted one or two scans prior to this incident, yes, sir" (bold font omitted)).)[11] However, Officer

---

10(...continued)
Peters's deposition (see Docket Entry 73-15 at 4-5 (displaying and discussing video)), but the parties did not submit it in connection with the Motion (see Docket Entries 73-1 to 73-29, 96-1, 105-1).

11 As relevant to Officer Peters, the Timeline provides: (i) "0809 Officer Peters scanned P2 outside P33 but does not scan P33 Bed 1 and talks to Wilson for nearly 30 seconds" (Docket Entry 73-11 at 1); (ii) "0817 Officer Peters goes by P33 does not scan the P33, nor does he scan P33 Bed 1 wall tag but does scan the P34 tag" (id.); (iii) "0841 Officer Peters scans P2 outside P33 but not P33 Bed 1" (id.); (iv) "0849 Officer Peters scans P34 and not P33 nor P33 Bed 1" (id.); (v) "0913 Officer Peters scans P2 outside of P33 but does not scan P33 Bed 1" (id.); (vi) "0921 Officer Peters scans P34 and does not scan P2 outside P33 not P33 Bed 1" (id.); (vii) "0931 Officer Peters walks by P33 and does not scan any tag" (id.); (viii) "0943 Officer Peters scan [sic] P2 outside of P33 but does not scan the P33 Bed 1" (id.); (ix) "1012 Officer Peters scans P2 outside of P33 not P33 Bed 1" (id.); (x) "1021 Officer Peters scans P34 and P2 outside P33 but does not scan P33 Bed 1[ and] Officer Peters talks to Wilson till 1024" (id.); (xi) "1043 Officer Peters scans P2 outside P33 not P33 Bed 1 and talks to Wilson for a brief moment" (id.); (xii) "1052 Wilson throws toilet water on Officer Peters and then Officer Peters sprays Wilson with OC" (id.); (xiii) "1053 Lieutenant Childress, Officer W Smith and [Officer] Lambeth arrive[] at P33 to assist Officer Peters with escorting Wilson to decontamination sink to decontaminate Wilson of OC" (id. at 2); (xiv) "1110 Wilson returns to P33 escorted by Lieutenant Childress, Officer Smith and Officer Watson" (id.) and "1111 Officer Peters scans P2 outside of P33 but not P33 Bed 1" (id.); (xv) "1121 Officer Peters scans P34 but nothing on P2 outside of P33 nor P33 Bed 1 and also talks to Wilson for a brief moment" (id.); (xvi) "1141 Officer Peters scans P2 outside P33 not P33 Bed 1 and talks to Wilson for a brief moment" (id.); (xvii) "12:33:46 Officer Peters arrives with AED and Nurse [Madden]" (id. at 3); and (xviii) "12:35:40 It appears that Nurse (continued...)

Peters "did not" (Docket Entry 105-1 at 2) "know anything about Mr. Wilson, other than he was in the P-33 cell" (id. (bold font omitted)). In particular, "[a]t the time [that he] pepper-sprayed Mr. Wilson" (id. (bold font omitted)), Officer Peters "did not" (id.) "know that [Wilson] had attempted suicide with his turtle suit before [Officer Peters] got there" (id. (bold font omitted)).

Officer Peters considered Wilson's "aggressive actions, throwing an unknown liquid at [Officer Peters]" (Docket Entry 73-15 at 5), "an imminent threat" (id. (bold font omitted)). Moreover, Wilson's actions "prevent[ed Officer Peters] from [conducting his required] 15-minute scan" (id.; see also Docket Entry 96-1 at 18) of Wilson (see Docket Entry 96-1 at 18), although Officer Peters does not recall which specific scanner Wilson "prevent[ed Officer Peters] from scanning" (id. at 19 (bold font omitted); see, e.g., id. at 19-20 (explaining that "[t]he Bed 1 is a block that is housed above the P-33 block" and "[t]here's also a Bed 2 and a 3 located in the same location," but that "[Officer Peters is] unsure of which block [he] was attempting to hit"); see also id. at 20 (confirming that, "if it was the P-33 Bed 1 block, [Officer Peters] hadn't [scanned it] all morning" (bold font omitted))).

---

11(...continued)
[Madden] starts chest compressions again, Officer Barker and Officer Peters were standing in the doorway of P33 and it was difficult to see in the cell" (id.).

According to the relevant Use of Force Report, officers took Wilson for decontamination and a medical check after the pepper spray incident. (See Docket Entry 73-14 at 2; see also Docket Entry 73-11 at 2.) Nurse Madden observed the officers with Wilson at the decontamination sink and went to assist, wiping Wilson's face and eyes and taking pictures of the marks on his body. (See Docket Entry 73-16 at 2-4; Docket Entry 68, Ex. J at 11:02:08-11:08:26.) Nurse Madden described Wilson as "under distress" and out of touch with reality during this encounter. (Docket Entry 73-16 at 3.) At 11:10, officers escorted Wilson back to P-33. (See Docket Entry 73-11 at 2.)

Shortly thereafter, Nurse Madden contacted Dr. Entwistle, "the [J]ail physician" (Docket Entry 67-1 at 4 (bold font omitted)), about Wilson, explaining that he (i) "[wa]s on [suicide watch]," (ii) "tried to hang himself w[ith] the turtle suit and is naked now," (iii) "got pepper sprayed," and (iv) "is [out of touch with reality] and under distress" (Docket Entry 60-13 at 1; Docket Entry 73-16 at 3). In response, Dr. Entwistle prescribed Seroquel and Vistaril. (See Docket Entry 60-13 at 1-2.)[12]

By 11:29:45, Nurse Madden returns to Wilson's cell, where she gives him the medication that Dr. Entwistle prescribed and advises Wilson to give the medicine about 20 minutes to take effect. (See

12 "Seroquel is a pretty first-line antipsychotic" (Docket Entry 67-1 at 16) and, although "[t]echnically not psychotropic," Vistaril "[c]auses sedation" and thus "has an effect" (id. at 49).

Docket Entry 68, Ex. K at 11:29:45-11:30:26; Docket Entry 68, Ex. L at 12:44:06-12:44:15; Docket Entry 73-16 at 4-5.) Visibly distressed, Wilson repeatedly expresses pain and asks for a shower or water, imploring Nurse Madden and an accompanying officer to turn back on the water in his cell. (See Docket Entry 68, Ex. K at 11:29:45-11:30:47.)[13] The officer says he lacks the key necessary to turn on Wilson's water and tells Wilson to go lie down, a directive with which Wilson appears to comply as the video ends. (See id. at 11:30:40-11:30:47.)

In both the Discussion Video and Initial Video, a white tray rests on the floor on the left side of the cell and a milk carton lies under the toilet on the right side of the cell. (See, e.g., Docket Entry 68, Ex. H at 8:54:18-8:54:24; Docket Entry 87 at 8:26:47-8:26:50.) By 12:10:00, the white tray no longer appears in the video footage of Wilson's cell, but a white (apparently styrofoam) cup rests against the rear wall, near the cell's right corner, and the milk carton remains under the toilet at the front of the cell, while Wilson sits on his mat near the cell entrance. (See Docket Entry 100, Ex. A at 12:10:00.) The mat lies on a slight diagonal slanted towards the right side of the cell, adjacent to the toilet and cell bars. (See id.) In visible distress, Wilson spends the next few minutes in constant motion,

---

13 Per the Timeline, Lieutenant Childress and Officer Smith accompanied Nurse Madden to Wilson's cell. (See Docket Entry 73-11 at 2.)

variously, inter alia, crying, screaming, splashing in the toilet bowl, repeatedly attempting to climb through the cell bars, flopping around on his mat, picking up his mat, sitting and/or curling up on the ground, and pacing. (See id. at 12:10:00-12:13:42.) By the end of this interval, Wilson's mat lies roughly perpendicular to the cell bars, on a slight rightward diagonal, with one end adjacent to the center of the rear wall and the other end angled towards the toilet. (See, e.g., id. at 12:13:42.)[14]

At 12:13:43, Wilson picks up the milk carton, which he begins breaking apart and stuffing in his mouth. (See id. at 12:13:42-12:13:55.) For roughly the next six minutes, Wilson intermittently puts pieces of the milk carton and/or his fingers in his mouth as he continues his frenetic movements around the cell, often while screaming or crying. (See id. at 12:13:42-12:19:38.)[15] Approximately seven minutes after he first picked up the milk carton, Wilson staggers from the right side of the cell to the left and then back to the right front corner of the cell gate, at which point he falls backwards, landing on his left side, atop his left arm, which extends, along with his right arm, to the right of his body, with his left leg fully extended towards the cell bars and

14 By the time Wilson collapses, his mat lies on a very slight angle, roughly centered in the middle of the cell, perpendicular to the rear wall, which one end of it abuts. (See, e.g., id. at 12:24:00.)

15 Wilson also drinks from the toilet bowl during this interval. (See id. at 12:17:24-12:17:32.)

his right leg slightly bent. (See id. at 12:20:48-12:20:58.) Lying on the floor between his mat and the left wall, Wilson turns more fully onto his stomach, raising his torso and moving his right leg and arm, before his head and body lower back to the floor, as his body turns more fully face-down, settling onto the floor with his left arm still lodged beneath his body, his legs fully extended, and his feet adjacent to the cell gate. (See id. at 12:20:58-12:22:35.) For three seconds at 12:22:49, Wilson's body twitches, and at 12:23:13 and again at 12:23:56, his shoulders rise and fall; otherwise, to the extent visible on the surveillance footage, Wilson lies motionless until officers enter his cell and rotate him to his back to begin administering CPR. (See id. at 12:21:40-12:29:33.)

In the interim, at 12:23:28, Officer Lambeth walks up the hallway into the video footage, briefly glancing into Wilson's cell as he strides towards the end of the hallway, where he holds his cellular telephone up to the wall before turning to face Wilson's cell. (See id. at 12:23:24-12:23:36.) Officer Lambeth faces Wilson's cell for a few seconds before focusing on the cellular telephone in his left hand, which he again holds up to the wall, apparently trying to scan it. (See id. at 12:23:36-12:23:52.) At 12:23:53, Officer Lambeth looks to his right, towards the inmate in the adjoining cell; a second later, Officer Lambeth looks towards Wilson's cell as he turns his head back to the left towards his

cellular telephone. (See id. at 12:23:53-12:23:56.) According to Officer Lambeth, the inmate "asked if Mr. Wilson was all right [sic] due to [the inmate] noticing that [Wilson] ceased to be yelling and screaming. And when [Officer Lambeth] looked for a second time, [Officer Lambeth] could see Wilson breathing, no obvious signs of distress, so [Officer Lambeth] just relayed to [the inmate], 'Yes, he's all right [sic].'" (Docket Entry 60-15 at 3.) Officer Lambeth then turns to his right and walks towards the wall between the cells, where he holds his cellular telephone up to three blue squares on the wall before walking to stand in front of the inmate in the adjoining cell. (See Docket Entry 100, Ex. A at 12:23:56-12:24:11.) They converse for a while before Officer Lambeth turns around and walks back past Wilson's cell and down the stairs, again largely focused on his cellular telephone aside from a brief glance towards Wilson's cell on his approach. (See id. at 12:24:11-12:24:39.)[16]

---

16 The Timeline offers this description of events:

> 1223 Officer Lambeth approaches P33 and looks at Wilson then scans P2 outside of P33 and stands in front of P33 looking towards Wilson, then scans P33 Bed 1, 2 & 3 tags. At that point Officer Lambeth heads toward P34 and scans P34 Bed 2 then Bed 1 while Inmate [W., R. L.] talks to Officer Lambeth for several seconds. Officer Lambeth then turns back around, looks into P33 towards Wilson, then proceeds down the stairs outside P33.

(Docket Entry 73-11 at 2.)

At 12:27:30, Officer Smith walks up the hallway to Wilson's cell and shines a flashlight on Wilson for about ten seconds before pulling out his radio and calling for assistance as he continues to shine his flashlight on Wilson. (See id. at 12:27:30-12:28:00; see also Docket Entry 73-11 at 2.) After additional officers arrive on the scene, they enter Wilson's cell and subsequently attempt CPR on him. (See Docket Entry 100, Ex. A at 12:28:00-12:31:57.) By the time EMS arrive, Nurse Madden has joined those attempting to revive Wilson. (See Docket Entry 68, Ex. L at 12:44:06-12:44:15; see also Docket Entry 73-11 at 3-4.)

Plaintiff also submitted surveillance footage of the control tower interior from 12:17:00 to 12:27:58 on November 16, 2022. (See Docket Entry 100, Ex. B.) Taken from the vantage of a camera affixed on or near the ceiling above an entrance area, the forefront of the video consists of a hexagonal room, bisected into two by a hallway that leads to another door. (See id. at 12:22:13-12:22:46, 12:26:24-12:26:29.) A built-in desk follows the contours of each half of the room. (See, e.g., id. at 12:17:00.) On the left, the wall above the desk contains at least three vertical windows; Officer Smith sits at a computer in front of the most visible windows, near the hallway, while Officer Lambeth sits at the portion of the desk closest to the video camera. (See id.)[17]

---

17 The letter "P" appears over the right-most of these windows. (See, e.g., id.)

Two raised, large monitors appear in the left corner of the footage, above and adjacent to where Officer Lambeth sits. (See id.) Apparently overexposed, the screens on the left side of the room, where Officers Lambeth and Smith sit, appear entirely white. (See id.) However, windows on the right side of the room reflect the middle and left portions of the left-side desk, revealing a monitor with multiple images as well as Officers Smith and Lambeth (to the extent they remain in the middle to left portion of that desk area). (See, e.g., id. at 12:17:00.)[18]

At various times during the first few minutes of the video footage, Officer Lambeth looks in the direction of the windows and monitor, but one cannot tell from the video itself what he sees. (See id. at 12:17:00-12:22:11.) At 12:22:11, Officer Lambeth stands up and walks down the hallway, exiting through the door at the end of the hallway. (See id. at 12:22:11-12:22:46.) Officer Smith remains working at the desk until Officer Lambeth returns approximately four minutes later, entering the room from the entrance under the camera. (See id. at 12:22:46-12:26:27.) As Officer Lambeth retakes his earlier seat, he turns his head towards Officer Smith, who then leans forward in his chair, stands up, and exits the control tower through the door at the end of the hallway, while Officer Lambeth remains at the desk, apparently looking at the images on the monitor. (See id. at 12:26:27-12:27:03.)

---

18 The letter "O" appears over these windows. (See id.)

Officer Lambeth maintains the same position until the video footage ends. (See id. at 12:27:03-12:27:58.)

According to the Timeline, the control tower footage reveals:

> 1219 Officer W Smith and Officer Lambeth are sitting the Control Tower looking toward P33 for several seconds with discussions between each other
>
> 2020 Officer W Smith is looking JMS
>
> 12:21:00 Officer W Smith and Officer Lambeth are still sitting and looking towards P33 and having discussions till 12:21:21
>
> 1222 Officer Lambeth stands up and looks towards P33, then proceeds to start a scan
>
> 1224 Officer W Smith looks toward P33 several times thru out that minute between 1224 and 1225
>
> 12:24:24 [sic] Officer Lambeth returns to the Control Tower and sits down beside Officer W Smith as they look towards P33 and have a discussion
>
> 12:26:41 Officer W Smith stands up and heads towards P33 and Officer Lambeth continues to look towards P33 while the Officer W Smith is at the P33
>
> 1252 Lieutenant Phillips enters the Control Tower and it appears that Officer Lambeth and Lieutenant Phillips is [sic] having a discussion about the situation.

(Docket Entry 73-11 at 4.)

For his part, Officer Lambeth avers:

After "hav[ing no] contact with Matthew Wilson on November 15, 2022" (Docket Entry 73-18, ¶ 3), Officer Lambeth arrived at the "Davidson County Detention Center at approximately 10:00 a.m." on November 16, 2022 (id., ¶ 4). "When [Officer Lambeth] arrived at the Detention Center, Mr. Wilson was in a suicide cell. [Wilson]

was screaming and [Officer Lambeth] was made aware Mr. Wilson had attempted to kill himself, which is why [Wilson] was naked." (Id., ¶ 5.) "[Officer Lambeth] recall[s] hearing and seeing Mr. Wilson yelling and screaming for most of the morning on November 16, 2022." (Id., ¶ 6.) "Upon arrival, [Officer Lambeth] performed some housekeeping in the Detention Center and then went to the control tower." (Id., ¶ 7.) "The control tower had a direct view into the suicide cell Mr. Wilson was in. There was also a surveillance camera pointed at the suicide cell Mr. Wilson was in which relayed the feed to the control tower." (Id.)

"At 12:03 p.m.[] on November 16, 2022, [Officer Lambeth] conducted a scan of Mr. Wilson's cell where [Officer Lambeth] believe[s Wilson] made comments to [Officer Lambeth] about wanting to go to the hospital and that [Wilson] was going to harm himself." (Id., ¶ 8.) "After the scan at 12:03 p.m., [Officer Lambeth] returned to the control tower and told Officer Smith, who was the senior officer in charge in the control tower, about the statements Mr. Wilson made during [Officer Lambeth's] last scan." (Id., ¶ 9.) "[Officer Lambeth] was in the control tower with Officer Smith until [Officer Lambeth] got up for [his] next round of scans at 12:22 p.m. During that period, [Officer Lambeth] do[es] not recall if [Officer Lambeth] was actively watching Mr. Wilson or viewing [Wilson] on camera." (Id., ¶ 10.) "During that time, [Officer Lambeth] was not aware Mr. Wilson had put a milk carton in his

mouth or that he was making any effort to make himself throw up." (Id., ¶ 11.) "[Officer Lambeth] did not see Mr. Wilson ingest a milk carton nor did [Officer Lambeth] see him try to make himself throw up or struggle to breath [sic] in anyway [sic]." (Id.)

"At 12:23 p.m., [Officer Lambeth] approached Mr. Wilson's cell and saw him lying prone on the floor in his cell. [Officer Lambeth] checked if [Wilson] was breathing, saw [Wilson's] chest rise and fall, and saw no obvious signs of distress." (Id., ¶ 12.) "An inmate in the cell next to Mr. Wilson's asked if Mr. Wilson was okay and [Officer Lambeth] looked into Mr. Wilson's cell again, saw [Wilson's] chest rise and fall, and told the inmate Mr. Wilson appeared to be okay. [Officer Lambeth] then continued [his] rounds." (Id., ¶ 13; see also Docket Entry 60-15 at 3 ("On the second round of [Officer Lambeth's] scan, [the inmate in P-34] had asked if Mr. Wilson was all right [sic] due to [the inmate] noticing that [Wilson] ceased to be yelling and screaming. And when [Officer Lambeth] looked for a second time, [Officer Lambeth] could see Wilson breathing, no obvious signs of distress, so [Officer Lambeth] just relayed to [the inmate], 'Yes, he's all right [sic].'").) "It appeared to [Officer Lambeth that] Wilson was sleeping[,] and since [Wilson] had been yelling and cussing since at least 10:00 a.m., [Officer Lambeth] assumed [Wilson] had finally gotten tired and fell asleep." (Docket Entry 73-18, ¶ 14.)

"When [Officer Lambeth] returned to the control tower, [Officer Lambeth] informed Officer Smith that Mr. Wilson had stopped yelling, that [Officer Lambeth] confirmed [Wilson] was breathing, and that [Officer Lambeth] thought [Wilson] was sleeping. Officer Smith then went to check on Mr. Wilson himself." (Id., ¶ 15.) "Officer Smith found that Mr. Wilson was unresponsive when [Officer Smith] went to check on [Wilson] and medical staff as well as EMS were called." (Id., ¶ 16.) "At some point after EMS took Mr. Wilson from the facility, [Officer Lambeth] became aware that Mr. Wilson had ingested a milk carton that was in [Wilson's] cell, and [Wilson] asphyxiated on it." (Id., ¶ 17.) "That was the first time [Officer Lambeth] was made aware Mr. Wilson had a milk carton in his cell." (Id.)

During his deposition, Officer Lambeth further testified that he noticed Wilson naked and screaming in P-33 "[i]mmediately upon [Officer Lambeth's] arrival" on November 16, 2022. (Docket Entry 60-15 at 5; see id. at 4.) As Officer Lambeth explained:

To reach the control tower, when "you walk into booking, you come out the back door and kind of go down this little sidewalk, and there's . . . a drive for like the dumpster and delivery and stuff like that, and then you get to the new jail." (Id. at 5.) Then "[you] go up the steps, and that puts you on the top floor," and "immediately to your right is P-Pod, in the middle is the catwalk for the control tower, and then across the final door on

the right, [Officer Lambeth] believe[s], was O-Pod." (Id. at 5-6.) "[I]mmediately upon going up the steps to the second level when [Officer Lambeth] opened the door, [he] could hear screaming coming from P-Pod." (Id. at 6.) Although Officer Lambeth did not know the source of the screaming "until [he] got to the control tower" (id.), "it was indeed[] Mr. Wilson" screaming (id.). "[T]here w[ere] intermittent breaks" during the screaming, "but it was loud and distinct." (Id.) "[Officer Lambeth] could pick out a couple of words here and there, but" he "mainly just recall[s] the volume and intensity" of the screaming. (Id.)

"[A]fter [Officer Lambeth] got into the control tower and made it to the control desk where Officer Smith was sitting," Officer Lambeth "could see Mr. Wilson in the cell" (id.), as "[there wa]s [a] direct line of sight into [Wilson's] suicide cell" (id. at 5). At that time, "[Wilson] was standing by the bars completely unclothed and screaming." (Id. at 6.) "At some point [Officer Lambeth] asked why Wilson was not placed in the restraint chair and was told Lieutenant Childress did to [sic] not sign off on it." (Id. at 4 (bold font omitted).) Later that morning, Officer Lambeth again brought up the restraint chair, asking "'[w]hy are we putting him back in the cell?' 'Why isn't he in a restraint chair?'" (Docket Entry 89-1 at 10.) In response to Officer Lambeth's queries regarding the restraint chair, Officer Smith "said that [Officer Smith] would have to talk to Lieutenant

Childress; the supervisor had to sign off on it. Whether [Officer Smith] did or not, [Officer Lambeth] do[es]n't recall." (Id.) "[T]he restraint chair was located in the booking office," in imminent proximity to Jail staff. (Id. at 9.)

As for Officer Lambeth's personal observations of Wilson, "[d]uring [Officer Lambeth's] initial round [Wilson] was up and verbal. And then during [Officer Lambeth's] time in the tower, [Officer Lambeth] did observe [Wilson] still moving around." (Id. at 11.) "[Officer Lambeth] cannot testify that [he] was looking into the cell or looking at the camera when [Wilson] went to the ground, but when [Officer Lambeth] returned for the second scan and observed [Wilson] breathing, it was [Officer Lambeth's] assumption that [Wilson] was sleeping." (Id.) As for what Officer Smith said when Officer Lambeth returned to the control tower, "[Officer Lambeth] can't remember verbatim, but it was something to the nature of [Officer Smith] just thought it was weird, [Wilson's] been, you know, screaming and carrying on for the past however long he had been there. So [Officer Smith] wanted to go check on [Wilson]." (Id.) "[Officer Lambeth] do[es]n't know why, you would have to ask [Officer Smith]." (Id.)

## DISCUSSION

### I. Relevant Standards

### A. Summary Judgment

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, and all internal conflicts in it resolved favorably to him." Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets and internal quotation marks omitted). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute

exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, No. 4:08cv2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Baber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010). Further, factual allegations in a complaint or other court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

**B. Monell Liability**

"Section 1983 provides a remedy . . . for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002) (quoting 42 U.S.C. § 1983); see also Lindiment v. Jones, No. 1:17cv501, 2017 WL 4119644, at *4 (M.D.N.C. Sept. 15, 2017) ("The statutory basis for federal claims involving constitutional violations by state actors appears in 42 U.S.C. § 1983."),

recommendation adopted, No. 1:17cv501, 2017 WL 4417676 (M.D.N.C. Oct. 3, 2017). Section 1983 creates municipal liability for constitutional violations "for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986). The "tortious conduct" that forms the basis of such liability "must be pursuant to a municipality's official policy," a requirement that "distinguish[es] acts of the *municipality* from acts of *employees* of the municipality." Id. (internal quotation marks omitted) (emphasis in original). "[I]n other words, a municipality cannot be held liable under [Section] 1983 on a *respondeat superior* theory." Monell v. Department of Soc. Servs., 436 U.S. 658, 691 (1978). Nevertheless, "[if] there are no underlying constitutional violations by any individual, there can be no municipal liability." Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999).

**C. Deliberate Indifference**

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989). In other words, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for

his . . . medical care . . .[,] it transgresses the substantive limits on state action set by the Eighth Amendment [in the case of convicted prisoners] and the Due Process Clause [of the Fourteenth Amendment in the case of pretrial detainees]." Id. at 200. Accordingly, "[p]retrial detainees bring deliberate indifference claims under the Fourteenth Amendment, while convicted prisoners bring them under the Eighth Amendment." King v. Blackwood, 180 F.4th 562, 567 n.3 (4th Cir. 2026) (citation omitted). "Before 2023, [the United States Court of Appeals for the Fourth Circuit] assessed both types of claims under the same, subjective standard." Id. "Then, in *Short v. Hartman*, [87 F.4th 593, 611 (4th Cir. 2023)], th[e Fourth Circuit] eliminated the subjective element for Fourteenth Amendment deliberate-indifference claims brought by pretrial detainees, adopting an objective-reasonableness test instead." Id.

Presently, therefore, "pretrial detainees can state a claim under the Fourteenth Amendment, based on a purely objective standard, for prison officials' deliberate indifference to excessive risks of harm." Short, 87 F.4th at 604-05. As the Fourth Circuit has explained, "[t]he Fourteenth Amendment Due Process Clause protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'" Id. at 608-09 (quoting Kingsley v. Hendrickson, 576

U.S. 389, 398 (2015)). "That test is 'solely an objective one.'" Id. (quoting Kingsley, 576 U.S. at 397). Under this standard, "it is sufficient that the plaintiff show that the defendant's action or inaction was, in *Kingsley*'s words, 'objectively unreasonable,' 576 U.S. at 397: that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly." Short, 87 F.4th at 611 (parallel citation omitted). "Or as the Supreme Court put it . . ., it is enough that the plaintiff show that the defendant acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 836 (1994)).

Thus, to succeed on a claim of deliberate indifference to a medical need, a pretrial detainee must show:

> (1) [he] had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

Id. Importantly, though, "it is still not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee." Id. at 611-12.

**D. Excessive Force**

Both pretrial detainees and convicted prisoners possess constitutional protections against an officer's use of excessive force: a convicted prisoner under the Cruel and Unusual Punishment Clause of the Eighth Amendment and a pretrial detainee under the Due Process Clause of the Fourteenth Amendment. See Kingsley, 576 U.S. at 400; see also, e.g., Graham v. Connor, 490 U.S. 386, 395 n.10 (1989) (explaining that, "[a]fter conviction, the Eighth Amendment serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified," but "that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment" (internal quotation marks omitted) (ellipses in original)). "The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" Kingsley, 576 U.S. at 400. Accordingly, to succeed on an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Id. at 396-97.

The Supreme Court identified certain considerations that "may bear on the reasonableness or unreasonableness of the force used," id. at 397, namely:

> the relationship between the need for the use of force and the amount of force used; the extent of the [detainee's] injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the [detainee] was actively resisting.

Id. Courts must assess objective reasonableness "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. Courts must also account for the government's legitimate interests in managing the facility, "appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." Id. (internal quotation marks omitted) (brackets in original). Further, in assessing objective reasonableness, a court should view the use of force "in full context, with an eye toward the proportionality of the force in light of all the circumstances." Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015) (internal quotation marks omitted). Nevertheless, "[i]n considering the reasonableness of an officer's actions, [the Court] must consider the facts at the moment that the challenged force was employed." Id.

**E. Qualified Immunity**

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of

the challenged conduct." Rambert v. City of Greenville, 107 F.4th 388, 397 (4th Cir. 2024) (internal quotation marks omitted). "Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. at 397-98 (internal quotation marks omitted). "The protection applies regardless of whether the government official's error is a mistake of law, a mistake of fact or a mistake based on mixed questions of law and fact." Id. at 398. "It gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Id. (internal quotation marks omitted).

However, "an officer is not entitled to qualified immunity if he or she deprived an individual of a constitutional right and that right was clearly established at the time of the violation." Id. (internal quotation marks omitted). "A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear such that every reasonable official would have understood that what he is doing violates that right." Id. (internal quotation marks omitted). In analyzing qualified immunity, courts "conduct a two-pronged analysis," asking first "whether the plaintiff has

established that a constitutional violation occurred." Id. (internal quotation marks omitted). "The plaintiff bears the burden of proof on this question." Id. "Second, [courts] consider whether the right at issue was 'clearly established' at the time of the events in question. The officer bears the burden on this second prong." Id. (citation omitted). Courts possess "discretion to begin with either prong of the qualified immunity analysis." Id.

In conducting the qualified immunity analysis, "[t]he Supreme Court has stressed the need to identify a case or a body of relevant case law where an officer acting under similar circumstances was held to have violated the Constitution." Id. at 402 (brackets, ellipsis, and internal quotation marks omitted).[19] Moreover, because "[q]ualified immunity protects reasonable officers who try to comply with the law," courts "conduct the inquiry based on the clearly established law at the time of the violation — an officer cannot be expected to know how the law might develop." King, 180 F.4th at 568 (internal quotation marks omitted). "In 202[2], when the events of this case occurred, a reasonable officer could have concluded that the subjective standard applied to a deliberate-indifference claim regardless of

19 "To be sure, some misconduct is so flagrant that the plaintiff need not point to a case precisely on point to demonstrate that an officer was on notice that their conduct violated the law. But this case certainly does not present such a situation." Id. at 402 n.3 (citations omitted).

whether it was brought by a pretrial detainee, governed by the Fourteenth Amendment, or by a convicted prisoner, governed by the Eighth Amendment." Id.; see also id. at 567 n.3 (explaining that, in analyzing qualified immunity, trial court "correctly applied the pre-*Short* subjective standard, because the relevant events took place in 2020, before [the Fourth Circuit] decided *Short* [in 2023]"). "This standard requires proof of both an objective component — the deprivation must be 'objectively serious' — and a subjective one — the officer must have had 'a sufficiently culpable state of mind.'" Id. at 570. "An objectively serious medical need is one 'diagnosed by a physician as mandating treatment' or one 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. "The subjective prong requires that the officer actually knew of a substantial risk of serious harm and consciously disregarded that risk." Id.

**F. Public Official Immunity**[20]

"[A] derivative form of governmental immunity," public official immunity "precludes suits against public officials in their individual capacities . . . [a]s long as [the] public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his

---

20 "North Carolina courts refer to this form of immunity as 'public officer immunity' and 'public official immunity,' interchangeably, though the trend seems to indicate that 'public official immunity' is more common now." Hines v. Johnson, No. 1:19cv515, 2020 WL 1516397, at *16 n.8 (M.D.N.C. Mar. 30, 2020).

official authority, and acts without malice or corruption." Wilcox v. City of Asheville, 222 N.C. App. 285, 288, 730 S.E.2d 226, 230 (2012) (internal quotation marks omitted).[21] In other words, "[i]f a public officer is sued in his individual capacity, he is entitled to immunity for actions constituting mere negligence, but may be subject to personal liability for actions which are *corrupt, malicious or outside the scope of his official duties*." Green v. Kearney, 203 N.C. App. 260, 273, 690 S.E.2d 755, 765 (2010) (brackets omitted) (emphasis in original).[22] As relevant here, "[a] defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." In re Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984).[23] "Thus, elementally, a malicious act is an act (1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." Wilcox, 222 N.C. App. at 289, 730 S.E.2d at

---

21 "[A] state law defense to claims arising under state law," this immunity applies only to state, not federal, claims. Connell v. Adams, No. 1:22cv935, 2023 WL 2914856, at *7 (M.D.N.C. Apr. 12, 2023) (brackets, citation, and internal quotation marks omitted), recommendation adopted sub nom. Connell v. Karen Russell, PA-C, No. 1:22cv935, 2023 WL 3229968 (M.D.N.C. May 3, 2023).

22 Plaintiff relies on the malice exception in contesting the application of public official immunity. (See Docket Entry 96 at 21-22.)

23 "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Id. at 313, 321 S.E.2d at 890-91 (internal quotation marks omitted).

230. To survive summary judgment, a plaintiff must "sufficiently forecast[] evidence for each element of malice." Brown v. Town of Chapel Hill, 233 N.C. App. 257, 265, 756 S.E.2d 749, 755 (2014).

Additionally, under North Carolina law, "public officials are presumed to have executed their duties in good faith, absent substantial evidence to the contrary." McCullers v. Lewis, 265 N.C. App. 216, 227, 828 S.E.2d 524, 535 (2019). In this regard, the North Carolina Court of Appeals has explained:

> It is well settled that absent evidence to the contrary, it will always be presumed that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law. This presumption places a heavy burden on the party challenging the validity of public officials actions to overcome this presumption by competent and substantial evidence. Moreover, evidence offered to meet or rebut the presumption of good faith must be sufficient by virtue of its reasonableness, not by mere supposition. It must be factual, not hypothetical; supported by fact, not by surmise.

Id. at 227-28, 828 S.E.2d at 535 (brackets and internal quotation marks omitted); see also id. at 228, 828 S.E.2d at 535 (explaining that "a plaintiff may not satisfy its burden of pleading malice by alleging the defendant was recklessly indifferent"). Finally, although "evidence of constructive intent to injure may be allowed to support the malice exception to [public official] immunity," Wilcox, 222 N.C. App. at 291, 730 S.E.2d at 232 (rejecting argument that only direct evidence of actual intent to injure in the form of admission from relevant defendant sufficed, see id. at 289, 730 S.E.2d at 230), "the plaintiff must show at least that the

officer's actions were '*so reckless or so manifestly indifferent to the consequences* . . . as to justify a finding of [willfulness] and wantonness *equivalent in spirit to an actual intent*,'" id. at 292, 730 S.E.2d at 232 (brackets, ellipsis, and emphasis in original).

**II. Analysis**

**A. Davidson County and Sheriff Simmons**

The Motion seeks dismissal of all claims against Jail Defendants. (See Docket Entry 72 at 1-2.) The Opposition agrees to dismissal of all claims against Davidson County, all claims against "Sheriff Simmons in his individual capacity," and all "state law tort claims against [Sheriff] Simmons." (Docket Entry 96 at 4.) Further, to the extent any confusion exists regarding the scope of Plaintiff's claims against Sheriff Simmons, the Opposition only contests dismissal of Plaintiff's Monell claim against Sheriff Simmons. (See id. at 1-23.) Accordingly, Plaintiff concedes the propriety of dismissing all claims against Davidson County as well as all claims other than the Monell claim against Sheriff Simmons. See Kinetic Concepts, Inc. v. ConvaTec Inc., No. 1:08cv918, 2010 WL 1667285, at *6-9 (M.D.N.C. Apr. 23, 2010) (explaining that party concedes opponent's argument by failing to address it and collecting cases). The Court should thus dismiss such claims.

As for the Monell claim, the Amended Complaint challenges a litany of alleged official policies of Sheriff Simmons regarding,

inter alia, the Screening Report, electronic recording of special watch rounds, use of pepper spray, access to the narc box, proper administration of CPR, and clearing debris from suicide watch cells. (See Docket Entry 9 at 13-16.) Rather than addressing Jail Defendants' arguments regarding those alleged policies (see Docket Entry 73 at 17-20),[24] the Opposition instead attempts to recast Plaintiff's Monell claim against IMS as against Sheriff Simmons (see Docket Entry 96 at 19-21). Specifically, the Opposition defines the relevant policy as "an attempted suicide, by itself, was not classified as a medical emergency and could never permit referral to an emergency department" (id. at 19) and concedes that "Plaintiff has argued this policy is attributable to Defendant IMS" (id. at 20). However, the Opposition notes, "IMS has argued this policy is attributable to [Sheriff] Simmons, in his official capacity." (Id.) In the Opposition's view, "[t]o the extent the Court were to decide the Sheriff was the final policymaker with respect to the policy at issue, the official capacity claim against Sheriff Simmons should not be dismissed." (Id.) This argument lacks merit.

To begin, "[i]t is well-established that parties cannot amend their complaints through briefing." Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d

24 By failing to address these arguments, Plaintiff concedes them. See Kinetic Concepts, 2010 WL 1667285, at *6-9.

175, 184 (4th Cir. 2013). As the Opposition tacitly concedes, Plaintiff has consistently maintained that such policy belonged to IMS, not Sheriff Simmons (see Docket Entry 96 at 20), and the "[Amended] Complaint cannot be construed as giving [Sheriff Simmons] notice that [Plaintiff's Monell] claim was based on [the newly described policy]," Robinson v. Bowser, No. 1:12cv301, 2013 WL 5655434, at *4 (M.D.N.C. Oct. 16, 2013). (Compare Docket Entry 9 at 13-16, with id. at 16-19 (faulting IMS and CBH for alleged hospital-referral-related policy).) As such, Plaintiff's reconfigured Monell claim against Sheriff Simmons "is not properly before the Court." Robinson, 2013 WL 5655434, at *4 (explaining that, "[b]ecause [the p]laintiff maintains in her [c]omplaint and throughout her briefing that she could only be fired for just cause, [the p]laintiff's at-will argument, presented for the first time in her response brief at the summary judgment stage, is not properly before the Court"). Moreover, although "the disputed policy belonged to the Sheriff, not IMS" (Docket Entry 121 at 83), "the alleged policy did not proximately cause Plaintiff's injury" (id. (citing Docket Entry 119 at 46-48); see also Docket Entry 124 at 2 (adopting Docket Entry 119)). For all these reasons, Plaintiff's Monell claim against Sheriff Simmons fails as a matter of law.

The Court should therefore grant Jail Defendants' request to dismiss Plaintiff's claims against Davidson County and Sheriff Simmons.

**B. Section 1983 Claim Against Officer Lambeth**

Jail Defendants contend, inter alia, that qualified immunity shields Officer Lambeth from Plaintiff's deliberate indifference claim. (See, e.g., Docket Entry 73 at 12-13.) In turn, Plaintiff contends that material factual disputes exist regarding "*Farmer's* subjective prong, precluding summary judgment." (Docket Entry 96 at 7.)[25] According to Plaintiff:

> A reasonable jury could also find [Officer] Lambeth had subjective awareness of the risk as the Jail's own policy provides that, while sharp objects should certainly be removed from his cell, "[s]taff are reminded that removal of such items from the immediate area of an inmate does not provide guarantees that the inmate cannot or will not attempt suicide by other means." [D.E. 94-1, Ex. D]. Jail policies may "demonstrate that a defendant 'knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care.'" *Stevens v. Holler*, 68 F.4th 921, 932 (4th Cir. 2023). *See also Short*, 87 F.4th at 613 (concluding a policy creating "a baseline of when a risk of suicide is sufficiently severe such that additional steps must be taken" is instructive in determining an officer's subjective knowledge of the risk posed by their inaction). Further, [Wilson] did not require any item in his cell at all to commit suicide, and [Officer] Lambeth

25 Officer Lambeth does not contest the objective component of this test. (See Docket Entry 73 at 10 ("[Jail] Defendants do not dispute whether the objective prong is satisfied, but there is no genuine issue of material fact on the subjective prong."); see also Docket Entry 89 at 8 (explaining that Officer Lambeth "does not dispute that Wilson posed a substantial risk of suicide at the time [Officer] Lambeth arrived at the Detention Center").)

was aware of that. [**Ex. B** – 49:2-10 (noting an inmate could ram their head into the wall); **Ex. D** - *Attempted Suicides in the Jail* (documenting prior suicide attempts at the Jail via "Intentional fall" and "Intentionally banging head")]. Therefore, whether [Officer] Lambeth knew about the milk carton when he found [Wilson] lying in his cell is irrelevant to the analysis of the subjective prong or, at best, an issue for a jury to consider while weighing all the evidence.

[Jail] Defendants also contend the subjective prong is not met because [Officer] Lambeth saw [Wilson] breathing before leaving him prone on the ground. [D.E. 73, 11]. This is not an undisputed fact and should not be relied on at the summary judgment stage – it is based solely on [Officer] Lambeth's testimony and remains an issue of credibility for the jury. Even if it was undisputed that [Officer Lambeth] saw [Wilson] breathing, a jury could still conclude [Officer] Lambeth appreciated the severity of the situation and failed to act. *Gordon [v. Kidd]*, 971 F.2d [1087,] 1093 [(4th Cir. 1992)] (summary judgment is not appropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom." [sic]). Whether [Officer] Lambeth saw [Wilson] breathing does not preclude a jury from determining [Officer] Lambeth need not wait for an inmate to stop breathing to act.

This is particularly true in light of evidence that, in contrast to [Officer] Lambeth, another officer saw from the control room that "Wilson was laying on the floor looking to be unconscious," and despite [Officer] Lambeth relaying to him that Wilson was breathing as if that was the threshold for responding, the officer immediately responded to the issue, went to P-33, entered the cell, and began trying to wake Wilson whose "lips and hands were blue." [D.E. 94-1, Ex. A].[26]

---

26 The referenced exhibit, an apparent incident report from Officer Smith, states:

> On November 16, 2022 I, Officer Smith was working at the Davidson County Detention Center located at 110 West Center Street Lexington NC, 27292. At approximately 1203 inmate Wilson . . . in cell P-33 was screaming loudly and hitting the box every 2 minutes yelling he needed

(continued...)

(Docket Entry 96 at 9-10 (bold font, italicized font, second set of brackets, and citation-related brackets in original).) These arguments miss the mark.

Because the events at issue predated Short, the Court "evaluate[s] whether Officer[ Lambeth] violated [Wilson's] constitutional right[s], for qualified immunity purposes, by applying the subjective deliberate-indifference standard." King, 180 F.4th at 570. Under that standard, Plaintiff must "demonstrate that [Officer Lambeth] acted with 'deliberate indifference' (subjective) to [Wilson's] 'serious medical needs' (objective)," Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Notably, "[d]eliberate indifference is a very high standard — a showing of mere negligence will not meet it." Grayson, 195 F.3d at 695. "In

---

26(...continued)

> medical. Then approximately at 1223 inmate Wilson was laying on the floor looking to be unconscious and the floor officer that was scanning stopped and looked at inmate Wilson. I asked Ofc. Lambeth was inmate Wilson breathing I was told by Ofc. Lambeth he was breathing. I looked at the cell from the tower and told Ofc. Lambeth to run control and I went into the Pod at 1229. I called for assists. Once Lt. Childress and Ofc. Barker came in the Pod I went into the cell and checked inmate Wilson, noticed his lips and hands were blue and immediately began CPR/Called for EMS. I advised control CPR had been started and had officer get AED and bag mask, Lt. Childress, Ofc. Barker and Nurse [Madden] assisted with CPR and AED. Fire Department and EMS arrived and took over. As I went outside to get EMS. This is the end of my report.

(Docket Entry 94-1 at 1 (abbreviations, capitalization, and punctuation in original).)

order to be liable under this standard, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 302 (4th Cir. 2004) (internal quotation marks omitted). "Stated somewhat differently, [d]eliberate indifference requires a showing that the defendant[] . . . *actually knew of* and *ignored* a detainee's serious need for medical care." Id. (internal quotation marks omitted) (emphasis and initial set of brackets in original).

"Liability under this standard thus requires [these] two showings," id. at 303:

> First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officer[] *should have* recognized it; [he] actually must have perceived the risk. Second, the evidence must show that the official in question subjectively recognized that his actions were inappropriate in light of that risk. As with the subjective awareness element, it is not enough that the official *should have* recognized that his actions were inappropriate; the official actually *must have* recognized that his actions were insufficient.

Id. (citations and internal quotation marks omitted) (emphasis in original). "The subjective component therefore sets a particularly high bar to recovery." Iko, 535 F.3d at 241.

"Although the deliberate indifference standard requires a showing of actual knowledge as to both elements, it 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.'" Parrish, 372 F.3d at

303. "Thus, a factfinder may conclude that an officer knew of a substantial risk from the very fact that the risk was obvious." Id. (brackets and internal quotation marks omitted). "But, it is not enough that a reasonable officer *would have* found the risk to be obvious. Rather, the risk of injury must be so obvious that the fact-finder could conclude that the officer *did* know of it because he could not have failed to know of it." Id. (brackets, citation, and internal quotation marks omitted) (emphasis in original). In that regard,

> a plaintiff can make a prima facie case under this standard by showing that a substantial risk of serious harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it.

Id. (brackets, ellipsis, and internal quotation marks omitted). "Similarly, a factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances." Id.

Here, Officer Lambeth does not recall if he "was actively watching Mr. Wilson or viewing [Wilson] on camera [during the period when Wilson ingested the milk carton and collapsed]." (Docket Entry 73-18, ¶ 10.) Nor does the control tower video establish that Officer Lambeth's line of sight encompassed either P-33 or the surveillance footage of P-33 during the relevant

period. (See generally Docket Entry 100, Ex. B.)[27] Officer Lambeth, however, avers that he "was not aware" and "did not see" Wilson ingest a milk carton, attempt to "make himself throw up[,] or struggle to breath [sic] in anyway [sic]." (Docket Entry 73-18, ¶ 11.) Officer Lambeth further avers that, when he observed Wilson "lying prone on the floor in his cell" during Officer Lambeth's second scan, "[Officer Lambeth] checked if [Wilson] was breathing, saw [Wilson's] chest rise and fall, and saw no obvious signs of distress." (Id., ¶ 12.) The video reflects that, in the few seconds that Officer Lambeth looked into Wilson's cell, Wilson's shoulders rose and fell in Officer Lambeth's line of sight. (See Docket Entry 100, Ex. A at 12:23:24-12:24:39.) Officer Lambeth further avers that he thought that Wilson "was sleeping" (Docket Entry 73-18, ¶ 14), "ha[ving] finally gotten tired" after yelling for multiple hours (id.), a perception that Officer Lambeth relayed to Officer Smith upon returning to the control tower (see id., ¶ 15).

Moreover, even construed in Plaintiff's favor, Wilson's posture in the video footage during Officer Lambeth's scan of his cell does not unambiguously reveal that Wilson had collapsed rather than fallen asleep. (See Docket Entry 100, Ex. A at

27 Plaintiff offers no evidence regarding what lay in Officer Lambeth's line of sight during his time in the control tower. (See Docket Entry 60 at 9, 20-22 (discussing only cell surveillance footage); see also Docket Entry 96 (discussing neither video).)

12:23:24-12:24:39.) Similarly, although Officer Smith later described Wilson as "looking to be unconscious" from the control tower (Docket Entry 94-1 at 1), the video does not support a finding that Wilson "so obvious[ly appeared unconscious (rather than sleeping) during the few seconds that Officer Lambeth observed Wilson (see Docket Entry 100, Ex. A at 12:23:24-12:24:39)] that the fact-finder could conclude that [O]fficer [Lambeth] did know of [such unconsciousness] because he could not have failed to know of it," Parrish, 372 F.3d at 303 (brackets, emphasis, and internal quotation marks omitted).[28] Accordingly, contrary to Plaintiff's contentions, the record does not support the conclusion that "[Officer] Lambeth appreciated the severity of the situation and failed to act" (Docket Entry 96 at 10). See, e.g., Parrish, 372 F.3d at 303 ("[T]he evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officer[] *should have* recognized it; [he] actually must have perceived the risk." (emphasis in original).); see also Koon v. North Carolina, 50 F.4th 398, 409 (4th Cir. 2022) ("[The court] may only draw inferences that 'fall within the range

---

28 The fact that (i), approximately six minutes after Officer Lambeth observed Wilson from outside his cell, Officer Smith "noticed [Wilson's] lips and hands were blue" after entering "the cell and check[ing Wilson]" (Docket Entry 94-1 at 1), as well as that (ii) Jail policies and statistics indicate that inmates can commit suicide by, for instance, falling or banging their heads on walls (see, e.g., Docket Entry 96-1 at 8, 13), does not change this conclusion.

of reasonable probability' based on evidence in the record. A permissible inference must be reasonably probable given the facts, not just conceivable or possible. So [the court] must reject tenuous inferences that rest upon speculation and conjecture." (citation omitted)). Because the record does not establish that "[Officer Lambeth] *actually knew of* and *ignored* [Wilson's] serious need for medical care," Parrish, 372 F.3d at 302 (internal quotation marks omitted) (emphasis in original), qualified immunity shields Officer Lambeth from Plaintiff's Section 1983 claim. The Court should therefore grant Officer Lambeth summary judgment on this claim.

**C. Section 1983 Claim Against Officer Peters**

Unlike the deliberate indifference claim against Officer Lambeth, the Amended Complaint asserts an excessive force claim against Officer Peters. (Compare Docket Entry 9 at 21, with id. at 21-22.) However, the Opposition attempts to add a deliberate indifference claim against Officer Peters. (See, e.g., Docket Entry 96 at 11-12 (arguing that because Officer Peters passed Wilson's "cell throughout the morning," a time when "[Wilson] was screaming for help," without "attempt[ing] to provide medical assistance to [Wilson]," a jury could find that he acted with deliberate indifference).) Plaintiff cannot expand her Section 1983 claim against Officer Peters through the Opposition. See Southern Walk, 713 F.3d at 184 ("It is well-established that

parties cannot amend their complaints through briefing or oral advocacy.”).

Moreover, even if permitted, the deliberate indifference claim fails as a matter of law. Plaintiff identifies no record evidence establishing that, during Officer Peters's personal observations, Wilson's behavior alerted Officer Peters to an unmet medical need. (See Docket Entry 96 at 11-12.) Instead, the record reflects that Officer Peters "did not" (Docket Entry 105-1 at 2) "know anything about Mr. Wilson, other than he was in the P-33 cell" (id. (bold font omitted)), and specifically "did not" (id.) "know that [Wilson] had attempted suicide with his turtle suit" (id.). The record further reflects that, at various points throughout the morning, Wilson appeared calm. (See, e.g., Docket Entry 68, Ex. H at 8:54:18-8:54:37.) Accordingly, Plaintiff's contention that, "in the hours leading up to [Wilson] asphyxiating on the milk carton, [Officer] Peters was subjectively aware of the risk of harm to [Wilson]" (Docket Entry 96 at 12) rests entirely on impermissible speculation. See Koon, 50 F.4th at 409.

As for her excessive force claim, Plaintiff asserts that certain Kingsley "factors raise multiple questions of fact." (Docket Entry 96 at 15.) In this regard, the Opposition first asserts that a fact question exists "as to whether [Officer] Peters's actions were excessive," on the theory that "[a] jury could find that pepper spraying a confined, mentally ill detainee

who cannot reach or threaten an officer is 'excessive,' even if [Jail] Defendants prove there was a legitimate purpose." (Id.) However, the record conclusively establishes (i) that P-33 contained open bars, through which Wilson could reach and throw materials (see, e.g., Docket Entry 68, Ex. K at 11:29:45-11:30:47), (ii) that, due to P-33's position, inmates and officers had to pass P-33 to access the stairs to the common area (see, e.g., id. at 11:29:58; Docket Entry 87 at 8:21:34-8:25:23), and (iii) that Wilson threw toilet water on Officer Peters (see Docket Entry 73-15 at 2-4), a situation raising health and security concerns. Thus, even construed in Plaintiff's favor, the record forecloses her contention that Wilson could not "reach or threaten" (Docket Entry 96 at 15) Officer Peters (or other individuals).

The Opposition next maintains that a factual question exists "regarding efforts made to temper the force." (Id.) According to the Opposition:

> [Officer] Peters testified he issued verbal commands with his body camera on, but no footage has been confirmed or produced, there is conflicting evidence as to whether the camera was on, and there were no witnesses to these alleged commands. [**Ex. E.** L. Peters Dep. 27:21-28:18; **Ex. F** – Peters' Incident Report]. [Officer] Peters also denies in written discovery that he did not call for backup until after spraying [Wilson] but then states the opposite in his deposition. [**Ex. G** – Peters's Response to RFA #14; **Ex. E** – 80:14-16]. This raises questions of credibility for a jury to assess, and a reasonable jury could find that there were no real attempts to temper the force.

(Id. (bold font, inconsistent possessives, and citation-related brackets in original).) These arguments lack merit.

First, the record indicates the presence of another inmate in P-33 during the relevant interaction (see, e.g., Docket Entry 73-11 at 1; Docket Entry 96-1 at 21), yet the Opposition offers no testimony from that inmate (see Docket Entry 96 at 15). Second, the Opposition does not identify admissible evidence regarding the absence of body worn camera footage (see id. (citing only "Peters / No canera" [sic] (Docket Entry 96-1 at 21) post-it note for support)), and "[s]tatements in a brief are not evidence," Bayer CropScience Inc. v. Syngenta Crop Prot., LLC, No. 1:13cv316, 2013 WL 12137000, at *1 (M.D.N.C. Dec. 12, 2013) (collecting cases). Moreover, even if Plaintiff could prove that such footage does not — and never did — exist, it would not support a reasonable inference that Officer Peters lied about commanding Wilson to stop throwing water. (See, e.g., Docket Entry 96-1 at 16-17 (testifying that Officer Peters "[is] fairly sure" that his "body camera was on at the time," as he "hit the button [for it]" after deploying pepper spray).)

Third, the Opposition's argument that Officer Peters "denies in written discovery that he did not call for backup until after spraying [Wilson]" (Docket Entry 96 at 15 (citing Docket Entry 96-1 at 28)) at best qualifies as misleading. The cited request for admission states: "Admit that you did not call for backup

personnel and/or advise the lieutenant on the duty of the situation in an attempt to intimidate the inmate through a show of force." (Docket Entry 96-1 at 28 (emphasis added).) For one, the request includes no temporal limitation (see id.) and thus does not contradict Officer Peters's testimony that he called for assistance after deploying the pepper spray. More importantly, denying that one acted "in an attempt to intimidate the inmate through a show of force" (id.) does not create a credibility issue regarding whether and when one called for assistance.

Finally, the Opposition contends that a factual question exists "as to the threat perceived by [Officer] Peters." (Docket Entry 96 at 15.) Per the Opposition:

> [Wilson] did not possess a weapon, attempt escape, or threaten physical harm. [Wilson] was not resisting restraint, attacking officers, or attacking the inmate who shared his cell. [Officer] Peters claims that his legitimate reason for the use of force was because [Wilson] was obstructing his ability to conduct rounds. Allegedly, [Officer Peters] felt so compelled to complete his rounds that he pepper-sprayed a vulnerable inmate, but there is evidence suggesting [Officer] Peters consistently skipped rounds and failed to "scan P-33" all morning, before and after the incident, which, again, raises issues of credibility. [D.E. 50-1, Ex. G; **Ex. E** – 85:16-86:6].

(Docket Entry 96 at 15-16 (bold font and citation-related brackets in original).) These contentions likewise miss the mark.

To begin, the record establishes that, as Officer Peters attempted to conduct his required rounds, Wilson threw a then-unknown substance on Officer Peters and refused orders to cease

that conduct. Thus, Wilson both attacked an officer and resisted official commands. Additionally, the record does not support Plaintiff's contention that Officer Peters "failed to 'scan P-33' all morning, before and after the incident" (Docket Entry 96 at 16). (See Docket Entry 73-11 at 1-2 (reflecting that "Officer Peters scans P2 outside P33" throughout morning).) Moreover, any failure by Officer Peters to correctly scan all relevant tags during his rounds does not create a jury question regarding Officer Peters's testimony that he pepper-sprayed Wilson because Wilson's actions interfered with Officer Peters's attempts to conduct his scans (see, e.g., Docket Entry 96-1 at 18-20).

Turning to the Kingsley analysis, the record reflects that, after Wilson disregarded Officer Peters's orders, Officer Peters sprayed Wilson the second time that Wilson threw liquid on Officer Peters. (See, e.g., Docket Entry 73-15 at 5; Docket Entry 96-1 at 17-18.) The first and third Kingsley factors — the relationship between the need for the use of force and the amount of force used and any effort made by the officer to temper or limit the amount of force used — thus weigh in Officer Peters's favor. See, e.g., Williams v. Benjamin, 77 F.3d 756, 762-63 (4th Cir. 1996) (concluding that "guards' decision to use some force to quell the disturbance was justifiable" where "inmates threw water at [guard] and refused to obey the command to desist" and observing that "limited use of mace constitutes a relatively 'mild' response

compared to other forms of force" (emphasis added));[29] Robison v. Testa, No. 1:20cv263, 2021 WL 5770211, at *5 (W.D. Pa. Dec. 6, 2021) (finding that third Kingsley factor favored officer where "[officer] initially used verbal commands and directions to 'temper or to limit the amount of force'" and "escalated his use of force to deploying OC spray only after his verbal and physical commands were ineffective"). The second Kingsley factor, the extent of the detainee's injury, also weighs in Officer Peters's favor. See, e.g., Williams, 77 F.3d at 763 ("[P]rompt washing of the maced area of the body will usually provide immediate relief from pain." (emphasis added)); see also Moskos v. Hardee, 24 F.4th 289, 298 (4th Cir. 2022) (finding that plaintiff failed to establish objective prong of deliberate indifference claim for delay in decontamination where he "experienced the usual transitory effects of pepper spray for a period of, at most, 90 to 120 minutes" and "did not testify to any serious medical reaction or to any pain beyond the normal discomfort of pepper spray" (emphasis added)).

---

29 A "potentially lethal" substance "used by [the] military," Jackson v. Morgan, 19 F. App'x 97, 102 (4th Cir. 2001), "mace[, ]a trade name for tear gas," Williams, 77 F.3d at 763, "was used primarily as a weapon with greater consequences and required more thorough decontamination," Jackson, 19 F. App'x at 102, than "pepper spray[, which] is designed to disable a subject without causing permanent physical injury," Wilson v. Laureano, No. 3:22cv692, 2024 WL 1683616, at *10 (E.D. Va. Apr. 18, 2024) (internal quotation marks omitted). See, e.g., Jackson, 19 F. App'x at 102 (describing mace as "more potent" and explaining that "[p]epper spray is a milder irritant and is employed to avoid physical confrontation among inmates and guards," with effects that generally "d[o] not last more than an hour").

The remaining factors, "the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the [detainee] was actively resisting," Kingsley, 576 U.S. at 397, also favor Officer Peters. As noted, from an open cell at the top of the stairs, Wilson repeatedly threw an unknown substance on Officer Peters, ignoring Officer Peters's multiple commands to "get back" and "get on the ground" (Docket Entry 96-1 at 17), thereby impeding Officer Peters's required rounds and creating a security risk. "[Wilson's] undisputed refusal to comply with those orders justified some need for force to restore order." Grady v. Smith, No. 1:20cv54, 2023 WL 130802, at *19 (M.D.N.C. Jan. 9, 2023) (brackets and internal quotation marks omitted), recommendation adopted, No. 1:20cv54, 2023 WL 3743095 (M.D.N.C. Feb. 17, 2023); see also, e.g., Geddings v. Roberts, No. 1:15cv264, 2018 WL 1626116, at *10 (M.D.N.C. Mar. 30, 2018) ("Case law . . . support[s] that a prisoner's failure to comply with an officer's order permits the officer to use some measure of force to gain the prisoner's compliance or to respond to a threat that arises because of the prisoner's failure to comply" (brackets and internal quotation marks omitted)). Under the circumstances, Officer Peters's deployment of pepper spray qualifies as objectively reasonable, warranting entry of summary judgment in his favor.[30]

---

30 Further, because precedent authorizes limited use of pepper spray when an inmate disregards official orders, see, e.g.,
(continued...)

**D. Negligence Claim**

The Amended Complaint asserts that "Defendants" negligently failed to "provide [Wilson] with necessary healthcare" (Docket Entry 9 at 23; see id. at 22-25).[31] According to the Amended Complaint, "Defendants negligently breached th[eir] duty [to provide such care]" by (i) "[f]ailing to refer Wilson for a further mental health evaluation after his intake screening;" (ii) "[f]ailing to provide emergency care;" (iii) "[f]ailing to contact the physician in charge and relay Wilson's symptoms in a timely manner;" (iv) "[f]ailing to render aid to Wilson when he was found unconscious in his cell;" (v) "[f]ailing to provide an appropriate medical response to symptoms of asphyxia;" (vi) "[f]ailing to clear [Wilson's] airway before inserting an Ambu bag;" and (vii) "[i]n such other ways as may be revealed during the course of discovery." (Id. at 23.) Notably, the Negligence Claim mentions by name every defendant but Officer Peters and Officer Lambeth (see id. at 22-25), and none of the identified failings even arguably implicate Officer Peters (see id.). Thus, the

---

30(...continued)
Williams, 77 F.3d at 762-63, qualified immunity also shields Officer Peters from Plaintiff's excessive force claim, see, e.g., Rambert, 107 F.4th at 398, 402.

31 Notably, the Amended Complaint asserts only a negligence, rather than a gross negligence, claim against "Defendants." (See id. at 22-25.)

Amended Complaint does not fairly assert a negligence claim against Officer Peters.

Regardless, any such claim fails as speculative for the same reasons as the purported deliberate indifference claim against Officer Peters. Additionally, Plaintiff's conclusory assertions that Officer Peters "consciously disregarded an obvious medical emergency with willfulness and wantonness" (Docket Entry 96 at 22) does not suffice to establish that he acted with malice, see, e.g., McCullers, 265 N.C. App. at 227-28, 828 S.E.2d at 535. Likewise, the record neither supports Plaintiff's assertion that Officer Peters "[u]s[ed] unnecessary force against a mentally ill detainee, while simultaneously ignoring his suicidal crisis" (Docket Entry 96 at 22), nor permits a finding that Officer Peters's actions "were 'so reckless or so manifestly indifferent to the consequences . . . as to justify a finding of willfulness and wantonness equivalent in spirit to an actual intent,'" Wilcox, 222 N.C. App. at 292, 730 S.E.2d at 232 (brackets and emphasis omitted) (ellipsis in original), as necessary for a finding of "constructive intent" to injure (Docket Entry 96 at 22). As such, public official immunity shields Officer Peters from any negligence claim.

As for Officer Lambeth, Plaintiff asserts:

> A reasonable jury could find [Officer] Lambeth acted with malice and conscious disregard for [Wilson's] known medical emergency and was outside the scope of duty when [Officer Lambeth] walked away from [Wilson] while he was lying on the floor of his cell. The evidence, viewed in Plaintiff's favor, shows that [Officer] Lambeth knew

> Wilson was a severe suicide risk: he was yelling for help for hours, made statements about wanting to go to the hospital and harming himself, and had attempted to strangle himself with his suicide gown. Despite this knowledge, when [Officer] Lambeth found Wilson lying silent and motionless on his cell floor, [Officer Lambeth] left [Wilson] there without checking responsiveness or calling for medical care. Ignoring obvious signs of medical crisis and refusing to take reasonable, required action permits a finding of malice as "the safety of life or limb" was apparent.

(Id.)

As an initial matter, even construed in Plaintiff's favor, the record does not establish that, during the few moments when Officer Lambeth observed Wilson, Wilson displayed "obvious signs of [a] medical crisis" (id.). Further, Plaintiff has not established that Officer Lambeth acted "outside the scope of duty" (id.), as required for a finding of malice, see Wilcox, 222 N.C. App. at 293, 730 S.E.2d at 233. Cf. id. at 293-97, 730 S.E.2d at 233-35 (concluding that evidence would support finding that officers acted contrary to their duties when they disobeyed orders to cease participation in and/or not join vehicle pursuit). Further, for the same reason that the record does not support a finding that Officer Lambeth subjectively knew of and disregarded Wilson's medical needs, the record cannot support a finding that Officer Lambeth intended to injure Wilson. See id. at 289, 730 S.E.2d at 231 ("[C]onstructive intent to injure exists where the actor's conduct is so reckless or so manifestly indifferent to the consequences, where the safety of life or limb is involved, as to

justify a finding of willfulness and wantonness equivalent in spirit to an actual intent." (emphasis added) (brackets and internal quotation marks omitted)). Thus, Plaintiff has not met her "heavy burden . . . to overcome th[e good-faith] presumption by competent and substantial evidence," McCullers, 265 N.C. App. at 227-28, 828 S.E.2d at 535 (internal quotation marks omitted), as required to establish that Officer Lambeth acted with malice towards Wilson. Cf. Wilcox, 222 N.C. App. at 293-97, 730 S.E.2d at 233-35 (concluding that evidence would support finding that officers acted with malice when, after disregarding orders, they fired multiple times into slow-moving vehicle, which contained a known passenger and "did not pose an obvious imminent public threat," id. at 294, 730 S.E.2d at 233, injuring passenger). Thus, public official immunity shields Officer Lambeth from Plaintiff's negligence claim.

In sum, the Court should grant the Motion as to Plaintiff's negligence claim.

**E. Remaining Claims**

Plaintiff premises her conditions of confinement claim on her excessive force and deliberate indifference claims. (See Docket Entry 96 at 5.) Because, for the reasons discussed above, such claims fail as a matter of law, so too does her conditions of

confinement claim.[32] Similarly, given the failure of Plaintiff's substantive claims against Jail Defendants, her claim for punitive damages likewise fails. See, e.g., Owen v. Goodwin, No. 1:21cv217, 2023 WL 6446204, at *9 (W.D.N.C. Sept. 29, 2023) ("Because all the [p]laintiff's substantive claims cannot withstand summary judgment, his claim for punitive damages must fail as well. Therefore, the [d]efendants are entitled to summary judgment on the [p]laintiff's claim for punitive damages."). The Court should thus dismiss these claims.

## CONCLUSION

Plaintiff's claims against Jail Defendants fail as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 72) be granted.

This 21st day of August, 2026.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

32 Plaintiff further failed to respond to Jail Defendants' arguments regarding her conditions of confinement claim (see generally Docket Entry 96), further warranting its dismissal. See Kinetic Concepts, 2010 WL 1667285, at *6-9.