**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| SUSAN WILSON,<br>as Administrator of the<br>Estate of MATTHEW BRIAN WILSON,<br><br>Plaintiff,<br><br>v.<br><br>DAVIDSON COUNTY<br>SHERIFF'S OFFICE, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:24cv219 |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on "Plaintiff's Motion for Sanctions Against Defendants Davidson County and Richie T. Simmons for Spoliation of Evidence" (Docket Entry 49 (the "Motion") at 1 (bold and all-cap font omitted)). For the reasons that follow, the Court will deny Motion.

## BACKGROUND

Alleging various claims related to "the wrongful death of Matthew Wilson [('Wilson')] as a result of injuries sustained at the Davidson County Jail" (the "Jail") (Docket Entry 9 at 1),[1] Susan Wilson (the "Plaintiff"), Wilson's mother and the administrator of his estate (see id.), sued, among others, Davidson County and Sheriff Richie T. Simmons (collectively, the "Relevant Defendants"). (See id. at 1-30.) Plaintiff's Amended Complaint

1 Docket Entry page citations utilize the CM/ECF footer's pagination.

asserts various state and federal claims against Relevant Defendants, including a "42 U.S.C. § 1983 Claim against Defendants Davidson County and Richie T. Simmons, in his Official Capacity as Sheriff of Davidson County" (id. at 13 (bold font omitted)) for alleged deliberate indifference to Wilson's serious medical needs (see id. at 13-16) (the "Monell claim"). (See generally Docket Entry 9.) Shortly before close of discovery (see, e.g., Text Order dated Apr. 23, 2025 (granting request to extend discovery deadline to September 16, 2025)), Plaintiff filed the Motion (see Docket Entry 49 at 5).

Through the Motion, Plaintiff seeks sanctions under Federal Rule of Civil Procedure 37(e) (see, e.g., id. at 4) for Relevant Defendants' alleged "fail[ure] to preserve over ten hours of surveillance footage depicting Wilson" (Docket Entry 50 at 2). More specifically, for the loss of Jail surveillance footage during the period "[f]rom 9:41 PM [on ]November 15[, 2022,] until 8:05 AM [on ]November 16[, 2022]" (Docket Entry 49 at 2), Plaintiff seeks (i) "[a]n adverse inference instruction permitting the jury to presume that the missing video was unfavorable to [Relevant] Defendants;" (ii) "[a]n order precluding [Relevant] Defendants from offering testimony or argument that contradicts Plaintiff's account of events during the time frame of the lost footage;" (iii) "[a]n order permitting Plaintiff to present evidence to the jury about [Relevant] Defendants' failure to preserve and produce this

evidence;" and/or (iv) "[a]n award of attorney's fees and costs incurred in bringing th[e M]otion" (id. at 4). Relevant Defendants responded in opposition to the Motion. (See Docket Entry 54.)

Two weeks later, Relevant Defendants, Officer Logan Peters, and Officer Jonathan Lambeth (collectively, the "Local Defendants") moved for summary judgment on all claims against them. (See Docket Entry 72 (the "Local Defendants' Motion") at 1-2.) Plaintiff responded in partial opposition to Local Defendants' Motion. (See Docket Entry 96 (the "Opposition") at 1-23.) In particular, as relevant to the Motion, the Opposition (i) agrees to dismissal of all claims against Davidson County, all claims against "Sheriff Simmons in his individual capacity," and all "state law tort claims against [Sheriff] Simmons" (id. at 4) and (ii) only contests dismissal of Plaintiff's Monell claim against Sheriff Simmons (see id. at 1-23). Importantly, though, the Opposition abandons the Monell claim as pled in the Amended Complaint, which challenges a litany of alleged official policies of Sheriff Simmons regarding, inter alia, intake screening, electronic recording of special watch rounds, use of pepper spray, access to the narc box, proper administration of CPR, and clearing debris from suicide watch cells (see Docket Entry 9 at 13-16). Instead, the Opposition defines the relevant policy as "an attempted suicide, by itself, was not classified as a medical emergency and could never permit referral

to an emergency department." (Docket Entry 96 at 19.)[2] Wilson first attempted suicide around 8:24 a.m. on November 16, 2022. (See, e.g., Docket Entry 119 at 8-12.)[3]

## DISCUSSION

### I. Relevant Standards

As relevant to the Motion, Rule 37(e) provides that, "[i]f electronically stored information [('ESI')] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the [C]ourt," inter alia:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

---

2 The Opposition concedes that "Plaintiff has argued this policy is attributable to Defendant IMS." (Id. at 20.) The Opposition notes, however, that "IMS has argued this policy is attributable to [Sheriff] Simmons, in his official capacity." (Id.) The Opposition thus seeks to pursue such claim against Sheriff Simmons if "the Court were to decide the Sheriff was the final policymaker with respect to the policy at issue." (Id.)

3 The Court subsequently conducted two evidentiary hearings on Plaintiff's request for sanctions. (See Minute Entries dated Dec. 30, 2025, and Feb. 12, 2026; see also Docket Entry 110 (containing transcript of hearing on December 30, 2025).) At those hearings, the parties neither alerted the Court to the reconfiguration of Plaintiff's claims against Relevant Defendants nor addressed the implications of that reconfiguration on the Motion.

> (A) presume that the lost information was unfavorable to the party; [or]
>
> (B) instruct the jury that it may or must presume the information was unfavorable to the party[]
> . . . .

Fed. R. Civ. P. 37(e) (emphasis added).

As such, in resolving a Rule 37(e) motion,

> [the] Court must determine that four predicate elements are met under Rule 37(e) before turning to the sub-elements of (e)(1) and (e)(2): (a) the existence of ESI of a type that should have been preserved; (b) ESI is lost; (c) the loss results from a party's failure to take reasonable steps to preserve ESI; and (d) the lost ESI cannot be restored or replaced through additional discovery. Only if all four of those predicate elements are established can the Court consider sanctions under subsection (e)(1) or subsection (e)(2).

Packrite, LLC v. Graphic Packaging Int'l, LLC, No. 1:17cv1019, 2020 WL 7133806, at *3 (M.D.N.C. Dec. 4, 2020) (brackets, ellipsis, emphasis, and internal quotation marks omitted), recommendation adopted, No. 1:17cv1019, 2021 WL 9681472 (M.D.N.C. Jan. 6, 2021). "The movant has the burden of proving all four of the predicate elements of Rule 37(e)." Id. (brackets and internal quotation marks omitted) (collecting cases).

"The burden of proof is on the party seeking sanctions, and the standard of proof in the Fourth Circuit appears to be 'clear and convincing' evidence where, as here, relatively harsh sanctions are sought." Government Emps. Health Ass'n v. Actelion Pharms. Ltd., 343 F.R.D. 474, 482 (D. Md. 2023). Moreover, "[c]ourts have broad discretion when deciding to impose sanctions under Rule

37(e)," id. (internal quotation marks omitted), "even if the moving party demonstrates prejudice under Rule 37(e)(1) or intent to deprive under Rule 37(e)(2)," id. (internal quotation marks omitted). See, e.g., Lee v. Belvac Prod. Mach., Inc., No. 20-1805, 2022 WL 4996507, at *3 (4th Cir. Oct. 4, 2022) (explaining that "[the United States Court of Appeals for the Fourth Circuit] review[s] for abuse of discretion a district court's decision to deny a motion for an adverse-inference jury instruction, and the party disputing the district court's ruling bears the burden of establishing spoliation" (brackets and internal quotation marks omitted)); see also Fed. R. Civ. P. 37 advisory comm.'s notes, 2015 amend. subdiv. (e)(2) ("Finding an intent to deprive another party of the lost information's use in the litigation does not require a court to adopt any of the measures listed in subdivision (e)(2). The remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss."). Lastly, negligence — even gross negligence — cannot justify an adverse-inference instruction under Rule 37(e). See Fed. R. Civ. P. 37 advisory comm.'s notes, 2015 amend. subdiv. (e)(2); see also Government Emps., 343 F.R.D. at 482 ("Negligent or even grossly negligent behavior will not suffice [under Rule 37(e)(2)].").

## II. Analysis

The Motion seeks sanctions for the loss of Jail surveillance footage[4] during the period "[f]rom 9:41 PM [on ]November 15[, 2022,] until 8:05 AM [on ]November 16[, 2022]" (Docket Entry 49 at 2), a period that predates Plaintiff's only remaining (reconfigured) claim against Relevant Defendants (see Docket Entry 96 at 4, 19; see also Docket Entry 119 at 8-12). Because the footage lacks relevance to Plaintiff's putative remaining claim against Sheriff Simmons, Plaintiff's abandonment of all other claims against Relevant Defendants moots the Motion. See, e.g., Johns v. Gwinn, 503 F. Supp. 3d 452, 467 (W.D. Va. 2020) (explaining that, "with regard to the duty to preserve, courts have held that lost or destroyed evidence is relevant if a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it" (internal quotation marks omitted)). Alternatively, the irrelevance of the missing footage to Plaintiff's new Monell claim against Sheriff Simmons prevents a finding that its loss prejudices Plaintiff. See Fed. R. Civ. P. 37 advisory comm.'s note, 2015 amend., subdiv. (e)(1) ("An evaluation of prejudice from the loss

---

4 As a digital recording (see, e.g., Docket Entry 110 at 8-11, 83-84), the surveillance footage qualifies as ESI, see, e.g., Johns v. Gwinn, 503 F. Supp. 3d 452, 461 (W.D. Va. 2020). Additionally, it appears undisputed that the identified footage no longer exists and cannot be recovered. (See, e.g., Docket Entry 54-32 at 2-3.)

of [ESI] necessarily includes an evaluation of the [lost ESI's] importance in the litigation."); see also, e.g., Johns, 503 F. Supp. 3d at 470 (explaining that, "[e]ven after finding that spoliation occurred under Rule 37(e), a court may not impose sanctions remedying the spoliation without first finding that the moving party was actually prejudiced by the spoliation," which requires "the moving party [to] demonstrate a likelihood that the lost evidence would have been favorable to the moving party's case").

Additionally, Plaintiff has not established that the missing footage existed "on December 13, 2022, when [Sheriff] Simmons was in receipt of the preservation letter from Plaintiff's Counsel," the date on which Plaintiff asserts "[Relevant] Defendants' duty to preserve the footage arose." (Docket Entry 50 at 9.)[5] The evidence in this case reflects that, in November 2022, the Jail possessed approximately 101 surveillance cameras, which fed into

5 In her brief in support of the Motion, Plaintiff asserted that "[Relevant] Defendants' duty to preserve the footage arose on December 13, 2022, when [Sheriff] Simmons was in receipt of the preservation letter from Plaintiff's Counsel." (Id.) At an evidentiary hearing on the Motion, however, Plaintiff's counsel argued that the duty arose earlier. (See Docket Entry 110 at 102-110.) That argument cannot salvage Plaintiff's Motion. For one, "[a] party waives an argument by failing to present it in [her] opening brief or by failing to develop [her] argument — even if [her] brief takes a passing shot at the issue." Grayson O Co. v. Agadir Int'l LLC, 856 F.3d 307, 316 (4th Cir. 2017) (internal quotation marks omitted). For another, regardless of when any preservation duty arose, the lack of prejudice from the loss of the footage to Plaintiff vis-à-vis her sole remaining (reconfigured) claim against Sheriff Simmons precludes Rule 37(e) sanctions.

seven DVRs. (See Docket Entry 110 at 10-11.) The surveillance cameras provided live footage at all times, but the DVRs recorded that footage "only on motion." (Id. at 11; see, e.g., id. ("[I]f there's no motion, then it's not recording."); see also id. at 85 (discussing motion-activated recording).) The DVRs typically retained footage for "about 30 days, give or take" (id. at 46), "[d]epending on how much activity was on each camera" (id.; see also, e.g., id. at 72 (testifying that, when searching for footage from individual camera: "I may be able to get 30 days, or I may not be able to get 30 days. I could get more than 30 days, just depending on which camera I select and how much footage has been recorded on that particular camera.")). Once a DVR reached capacity, it overwrote earlier footage (see, e.g., id. at 46, 72, 86), so the more activity in an area, the quicker the DVR overwrote the footage (see id. at 86-87). P-33, the suicide watch cell housing Plaintiff during his incarceration at the Jail, sits at the "end of a hallway of cells, adjacent to the top of the stairs down to a common area" (Docket Entry 119 at 10). Positioned opposite the hallway, a dedicated surveillance camera broadcast footage of P-33, as well as the hallway and the stairs, to the Jail's control tower. (See id. at 10-11.) From the submitted video footage, this location appears relatively high-traffic. (See, e.g., id. at 12.)

"At 8:05 a.m. on November 16, 2022, Wilson received a carton of milk for his breakfast." (Id. at 11.) "Approximately twenty

minutes later, Wilson attempt[ed] to hang himself with his suicide gown." (Id. at 11-12.) Approximately four hours later, Wilson asphyxiated on the milk carton. (See, e.g., id. at 18-19.) Shortly thereafter, in connection with a state investigation concerning Wilson's death,[6] Captain Tracy Rabon reviewed "all of the videos surrounding P33 and Mr. Wilson from November 15th to the 16th" (Docket Entry 110 at 29)[7] to, inter alia, ascertain when officers conducted observation rounds of Wilson (see, e.g., id. at 17-38). Captain Rabon began collecting evidence for the State "the day of the incident" and observed "pauses or gaps" in the P-33 surveillance footage from November 16, 2022, "[w]hen there wasn't [any] activity." (Id. at 17.)[8] At his superior's direction, Captain Rabon preserved all the footage of P-33 from 8:05 a.m. on November 16, 2022, when Wilson "received his breakfast tray with

6 The State investigates every in-custody death. (See Docket Entry 110 at 18-19.)

7 Captain Rabon initially reviewed this footage on November 16, 2022. (See id. at 82.)

8 Given that (i) the system recorded only periods with observed motion (see, e.g., id. at 90-93), and (ii) Captain Rabon testified that he "sav[ed] each individual portion that was motion activated" (id. at 84) after 8:05 a.m. on November 16, 2022 (see id. at 85; see also id. (confirming "that was the only way that [he] w[as] able to save [the footage]")), Plaintiff's assertion that "the footage from 8:05 AM to 12:42 PM was produced as 32 separate videos that do not align, skipping certain portions" (Docket Entry 50 at 5; see also id. ("For example, one video ends at 8:13 AM and the next begins at 8:17 AM.")), provides no basis for sanctions.

the milk carton" (id. at 38), until Wilson's departure from the Jail around 12:45 or 12:50 that afternoon. (See id. at 17, 30.)[9]

"[On] or about December 13, 2022," the twenty-ninth day after Wilson's admission to the Jail, Sheriff Simmons received a letter from Plaintiff's counsel "dated December 12, 2022, requesting [that Sheriff Simmons] and his staff 'retain and preserve' various information" (Docket Entry 49 at 12), including all video recordings of Wilson while at the Jail (see id. at 9). Shortly after receiving the letter, then-Lieutenant Mark Barnes attempted to retrieve footage of Wilson from the Jail's system, but could not locate any footage of Wilson on the system. (See, e.g., Docket Entry 54-32 at 2.) The videos previously preserved for Wilson's case file "were the only videos available" when Lieutenant Barnes began retrieving materials in response to Plaintiff's preservation letter. (Id. at 3.)

Accordingly, Plaintiff has not satisfied her burden of proving that the disputed ESI existed when Relevant Defendants received the preservation letter, as required for Rule 37(e) sanctions. See, e.g., Packrite, 2020 WL 7133806, at *3. Further, Plaintiff seeks as sanctions an adverse jury instruction and other trial-related evidentiary rulings. (See Docket Entry 49 at 4.) However,

---

9 More specifically, Captain Rabon preserved "all footage that captured Mr. Wilson that was on the [Jail's] system from approximately 8:05 until [Wilson] left the facility" (id. at 77), including footage of Wilson traveling through the Jail for decontamination following a pepper-spraying incident (see id.).

"Plaintiff's claims against [Local] Defendants fail as a matter of law" (Docket Entry 125 at 61), warranting summary judgment in their favor and mooting Plaintiff's request for the foregoing sanctions, see Keister, on behalf of Est. of Orr v. Dolgencorp, L.L.C., 139 F.4th 449, 454 (5th Cir. 2025) ("[O]f the three sanctions available under Rule 37(e), [the plaintiff] only sought a jury instruction. When the district court granted [the defendant's] motion for summary judgment, [the plaintiff's] request for this jury instruction became moot.").

**CONCLUSION**

Plaintiff's abandonment of her original claims against Relevant Defendants moots the Motion. Alternatively, Plaintiff has not established the propriety of Rule 37(e) sanctions.

**IT IS THEREFORE ORDERED** that the Motion (Docket Entry 49) is **DENIED.**

This 15th day of September, 2026.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**